**RIVERBEND INVESTMENTS 11235 LLC**

**CONFIDENTIAL**

**SUMMARY OF OFFERING TERMS**

All of the information shown herein has been prepared solely by Riverbend Management 11235 LLC, a Delaware limited liability company (the "**Manager**"), for the offering (the "**Offering**") of Class B units of limited liability company interest (the "**Class B Units**") in Riverbend Investments 11235 LLC, a Delaware limited liability company (the "**Company**" or the "**Fund**"). If you are interested in investing in the Fund, you must request the Fund's Confidential Private Placement Memorandum (the "**Memorandum**") from the Manager. **This material and all of the information shown herein is considered "Confidential Information" and subject to the terms of your Nondisclosure and Confidentiality Agreement with the Manager.**

This material does not constitute an offer to sell or a solicitation of an offer to purchase any Class B Units or any other securities and may not be relied upon by you in evaluating the merits of investing in the Fund. The descriptions of the Fund and the other entities contained herein are a summary of certain terms and are not intended to be complete. This material is intended only for informational purposes and all information shown herein is qualified in its entirety by the information in the Memorandum. **An offer to invest in the Fund will only be made only by means of the Memorandum to be furnished to you by the Manager upon request, which contains a description of the material terms (including, without limitation, the investment strategy, risk factors, conflicts of interests, fees and expenses) relating to the Fund.** The investment program of the Fund is speculative and involves a high degree of risk and is solely dependent on the success of the Fund's investment (as summarized below). There can be no assurance that the Fund's investment objective will be achieved. You could lose all or a substantial amount of your investment in the Fund. This information is not intended to provide, and should not be relied upon for, accounting, legal or tax advice, or investment recommendations. You should consult your own advisers to fully understand the consequences of an investment in the Fund. You should carefully read the Memorandum, including the risk factors, before deciding whether to invest in the Fund. In addition, you should rely only on the Memorandum in deciding whether to invest in the Fund.

All capitalized terms not defined herein have the applicable meanings set forth in the Operating Agreements (as defined below). In the event of any discrepancy between the terms as summarized herein and the provisions of the Operating Agreements, the provisions of the Operating Agreements shall control and prevail.

***********

Exhibit D

## The Fund

| | |
|---|---|
| Fund: | Riverbend Investments 11235 LLC (the "**Company**" or the "**Fund**") is a Delaware limited liability company formed on June 1, 2020. |
| Purpose: | The Fund was formed for the sole purpose of investing in the Riverbend Apartments, a multifamily residential property complex located at 8850 Riverbend Parkway, Indianapolis, Indiana 46250 (the "**Property**"), through a series of intermediary entities as summarized below. |
| LLC Agreement: | The Limited Liability Company Agreement of the Fund (the "**LLC Agreement**") governs the rights of the Manager and the Members. |
| Members: | The Fund will be owned by members (the "**Members**") with units of limited liability company interest (the "**Units**") in the Fund designated as either Class A Units (the "**Class A Units**") or Class B Units (the "**Class B Units**").<br><br>The holders of Class A Units (the "**Class A Members**") will be the Manager and its affiliates as summarized below.<br><br>The holders of Class B Units (the "**Class B Members**") will be the qualified investors whose subscriptions to purchase Class B Units are accepted by the Manager.<br><br>The "**Ownership Interest**" of a Member is the Member's relative ownership interest in the Fund equal to a number, expressed as a percentage, determined by dividing the Units held by such Member by the aggregate Units held by all Members as of the date of calculation (or of all Members of that class, as the context may require). |
| Manager: | The Manager of the Fund is Riverbend Management 11235 LLC, a Delaware limited liability company (the "**Manager**"). The Manager is owned 80% by TF Management Group LLC, a Delaware limited liability company ("**TFMG**"), and 20% by Cresting Management LLC, a Florida limited liability company ("**Cresting Management**"). The principals of the Manager are Mikhail Zlotnik (on behalf of TFMG) and Ramon Gonzalez (on behalf of Cresting Management).<br><br>The LLC Agreement gives the Manager broad authority to manage the Fund and make all decisions with respect to the Fund. Under the terms of the LLC Agreement, the Manager also determines the |

amount of distributable cash available for distribution by the Fund to the Members.

As provided in the LLC Agreement, the Manager may only be removed as the manager of the Fund for cause and upon written notice of removal for cause from the Member or Members holding an aggregate Ownership Interest of no less than 75%. In the event the Manager resigns or is removed as the manager of the Fund, the Member or Members holding an aggregate Ownership Interest of no less than 75% may appoint a replacement manager.

| | |
|---|---|
| No Control; Relationship; Disclaimer: | The Fund is, and shall at all times be, merely an investor in the LP (as defined below). The Fund shall have no control over the LP, its investment, or any operations of the LP or any of the intermediary entities. Neither the Fund nor the LP will have any control over the improvement, leasing, management, or disposition of the Property. |

The Offering (as defined below) does not constitute a direct or indirect offering of interests in the LP or any of the intermediary entities. Each Member will only be an investor in the Fund and will not (i) be a member in the LP, (ii) own a direct interest in the LP, or (iii) have any voting rights in the LP.

Each investor, by purchasing Class B Units, will agree and acknowledge that it will not have any direct right to assert any claims against the LP or any of the intermediary entities, or any of their respective officers, partners, managers, directors, employees, or agents ("**LP Affiliates**"), for or in respect of any matters relating to the Fund, the LP, any of the intermediary entities, or any of the LP Affiliates, including without limitation, the purchase of Class B Units, any investment by the Fund in the LP, or the performance, activities, or actions of the LP or any of the intermediary entities as they relate to, impact, or affect, directly or indirectly, the Fund's acquisition, ownership, and disposition of the LP Interest (as defined below) and the Fund's status as a member in the LP or any related matter. In addition, none of the LP Affiliates has reviewed this summary and therefore makes no warranties or representations as to the accuracy or completeness of this summary or compliance of the Offering with applicable rules and regulations.

**<u>Intermediary Entities</u>**

| | |
|---|---|
| LP: | The Fund's sole asset is a membership interest (the "**LP Interest**") in Pepper Riverbend Investors, LLC, an Ohio limited liability company (the "**LP**"). The other members of the LP are affiliates of Pepper Pike Capital Partners. The LP is managed by |

| | |
|---|---|
| | Pepper Pike Acquisition Associates, LLC, an Ohio limited liability company and affiliate of Pepper Pike Capital Partners (the "**LP Manager**"). The Operating Agreement of the LP (the "**LP Operating Agreement**") governs the rights of the Fund and the other members of the LP and the LP Manager. |
| Intermediary Entities: | The LP holds an interest in the Property indirectly through a series of intermediary entities. The chart attached hereto as Exhibit A shows the organization of the Fund, the LP, and the intermediary entities between the LP and the Property. The chart also shows the approximate ownership percentages of the LP and the intermediary entities, as well as the Fund assuming that the Offering is fully subscribed and projecting the investments made or to be made in the Fund by the Manager and its affiliates. |
| Operating Agreements: | Each of the intermediary entities is governed by its respective Operating Agreement (together with the LLC Agreement and the LP Operating Agreement, the "**Operating Agreements**").<br><br>Although certain terms of the Operating Agreements may be summarized herein, the provisions of the Operating Agreements shall prevail and control. A copy of the LLC Agreement will be included with the Fund's Confidential Private Placement Memorandum (the "**Memorandum**") and copies of the other Operating Agreements are available upon request to the Manager. |

## The Fund Offering Terms

| | |
|---|---|
| Class B Units: | The Fund is accepting subscriptions for Class B Units. |
| Size of Offering: | The Fund is offering up to $2,500,000 million of Class B Units (the "**Offering**") at a price of $1.00 per Class B Unit, provided that the Manager may decrease the size of the Offering for any reason at any time. |
| Use of Proceeds: | The proceeds of the Offering will be used as follows:<br><br>• 10% of the proceeds will be used to compensate the Manager in putting the deal together and to pay or reimburse the Fund, the Manager, or their affiliates for Fund Expenses, including, without limitation, approximately $50,000 in fees, costs, and expenses incurred in connection with forming the Fund and the Manager, acquiring the LP Interest, preparing the Offering documents and conducting the Offering, and related matters. |

- The remaining proceeds will be paid by the Fund to Tempo Growth Fund LLC, a Delaware limited liability company and affiliate of TFMG ("**TGF**"), which will then be used by TGF as follows:

  - Up to $500,000 will be used by TGF to repay Peak Returns LLC, a Florida limited liability company and affiliate of Cresting Management ("**Peak Returns**"), the $500,000 in capital loaned by Peak Returns to TGF prior to the Offering to finance the Fund's acquisition of the LP Interest, plus interest thereon at a rate of 12% per annum plus 1 point from the date the Fund acquired the LP Interest to the date of repayment of the loan (the principal amount of such repayment, not to exceed $500,000, to be determined by Peak Returns in its sole discretion).

  - The remaining proceeds will be used to return to TGF a portion of the $3,000,000 in capital contributed by TGF to the Fund prior to the Offering to finance the Fund's acquisition of the LP Interest, plus interest thereon at a rate of 12% per annum plus 1 point from the date the Fund acquired the LP Interest to the date of such return.

Following this use of proceeds, the remaining principal amount of the capital loaned by Peak Returns to TGF will be converted into a capital contribution by Peak Returns to the Fund and each of Peak Returns and TGF will be issued Class A Units at a purchase price of $1.00 per Class A Unit in consideration of their respective capital contributions that were not repaid or returned from the proceeds of the Offering as described above.

Closings: The initial closing of the Offering of Class B Units (the "**Initial Closing**") may be held on any business day as determined by the Manager in its sole discretion.

The Manager may hold subsequent closings of the Offering at any time prior to the one-year anniversary of the Initial Closing, as determined by the Manager in its sole discretion.

Closing Conditions: To subscribe for Class B Units, an investor must (i) execute and deliver to the Manager a fully-completed, dated, and signed Subscription Agreement, (ii) execute and deliver to the Manager the signature page to the LLC Agreement, and (iii) make the investor's capital contribution in full by wire transfer in accordance with the instructions in the Subscription Agreement.

| | |
|---|---|
| Investor Qualification: | The Offering will be conducted under Rule 506(c) of Regulation D as an offering exempt from registration under federal and state law. The Class B Units are only available for sale to investors who are an "accredited investor" as defined in Regulation D under the Securities Act. Investors should review the Subscription Agreement to determine whether they qualify as an eligible investor in the Fund.<br><br>To the extent applicable, the Fund will rely on the exemption from registration under the Investment Company Act of 1940, as amended (the "**Company Act**") by reason of Section 3(c)(1) of the Company Act (for issuers whose securities are not beneficially owned by more than 100 persons) and/or Section 3(c)(5)(C) of the Company Act (for issuers whose assets are invested primarily in real estate interests). |
| Manager's Investment Commitment: | In connection with the Initial Closing, the Manager or certain of its affiliates will also invest in the Fund by making capital contributions to the Fund of at least $100,000 in the aggregate in exchange for Class A Units at a purchase price of $1.00 per Class A Unit. The Manager may waive all or any portion of the compensation to be paid to it from the proceeds of the Offering as a deemed capital contribution to the Fund by the Manager or such affiliates.<br><br>Each of TGF and Peak Returns (affiliates of the Manager) will be issued Class A Units in exchange for the remaining amounts of their respective capital contributions to the Fund after repayment or return of a portion thereof from the proceeds of the Offering less accrued interest and conversion of the remaining principal amount Peak Returns' loan to TGF into a capital contribution to the Fund as described above.<br><br>Additionally, any affiliates of the Manager may also participate in the Offering on the same terms as the other investors. |

**Capital Contributions**

| | |
|---|---|
| Minimum Investment: | The minimum investment in Class B Units is $100,000, although the Manager reserves the right to accept investments of lesser amounts in its sole discretion. Subscriptions for Class B Units may be accepted or rejected in whole or in part in the Manager's sole discretion. |
| Initial Capital Contributions: | Each Member shall be required to make its initial capital contribution to the Fund in full as a condition precedent to the Member's admission to the Fund. Upon acceptance of an |

investor's subscription for Class B Units, the investor shall pay the total amount of subscription accepted by the Manager as a capital contribution to the Fund by wire transfer in accordance with the instructions in the Subscription Agreement.

Additional Capital Contributions: No Member will be required to make any additional capital contributions to the Fund.

Member Loans: If the Fund requires additional capital in excess of the initial capital contributions of the Members (for example, to pay Fund Expenses), in lieu of requiring the Members to make additional capital contributions to the Fund, the Manager may cause the Fund to borrow such capital either (i) from a commercial bank, lending institution, or other person or (ii) from the Manager, any Member, or any of their affiliates provided that the loan is on commercially reasonable terms and bears interest at a rate not to exceed 12% per annum. Any third-party loans must be without recourse to the Members unless otherwise agreed in writing by the Members.

No Withdrawal: Except as specifically provided otherwise in the LLC Agreement, no Member may demand a return of the Member's capital contribution to the Fund or withdraw from the Fund.

The Manager, by written notice to any Member, may suspend payment of any distribution or withdrawal proceeds to such Member if the Manager reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Fund, the Manager, the Members, or any of the Fund's service providers.

The Manager may require a Member to withdraw all or any part of the Member's capital contribution to the Fund if the Manager considers such withdrawal necessary to correct violations of law or applicable regulation, or to avoid a material adverse impact on the Fund, the Manager, or the other Member. In such event, the Manager shall give not less than five business days' written notice to the Member specifying the date of withdrawal. As soon as practicable thereafter, the withdrawing Member shall receive the balance of the value in such Member's Capital Account, subject to all appropriate adjustments pursuant to the provisions of the LLC Agreement.

Capital Accounts: The Fund will establish and maintain a capital account ("**Capital Account**") for each Member for the purposes of allocating the Fund's profits and losses. The Capital Account of a Member shall

be (A) increased by (i) the amount of all capital contributions by such Member to the Fund and (ii) any profits (or items of gross income) allocated to such Member, and (B) decreased by (i) the amount of any losses (or items of loss) allocated to such Member and (ii) the amount of any cash distributed to such Member. The Capital Account of the Member also shall be adjusted appropriately to reflect any other adjustment required pursuant to Treasury Regulations Section 1.704-1 or 1.704-2.

Allocations: The Fund's items of income, gain, loss, or credit actually recognized by the Fund for income tax purposes for each fiscal year will generally be allocated for income tax purposes among the Members in a manner intended to be consistent with the distribution of cash to the Members to the extent reasonably possible. It is possible that a Member will be allocated taxable income for a particular year even though the Member does not receive any distribution to pay the resulting income tax liability.

The Manager expects the allocation provisions in the LLC Agreement will have a "substantial economic effect" within the meaning of the Regulations under Section 704 of the Code. Accordingly, the Manager expects the allocation provisions in the LLC Agreement will be respected by the United States Internal Revenue Service.

**PROSPECTIVE INVESTORS ARE URGED TO CONSULT, AND MUST DEPEND UPON, THEIR OWN TAX ADVISORS TO EVALUATE THE TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.**

**<u>Distributions</u>**

Distribution Policy: The Fund will distribute to the Members any cash received by the Fund as distributions from the LP, less any amounts needed to pay or establish reserves for Fund Expenses or other expenses or liabilities of the Fund as determined by the Manager in its sole discretion, on a quarterly basis as soon as practicable following the end of each calendar quarter.

Interim Distributions: All distributions other than liquidating distributions will be made to the Members as follows:

Ordinary Operations: With respect to distributions of cash received by the Fund from the ordinary operations of the Property (e.g., rent income), such distributions shall be made to the Members on a pro rata basis according to their respective Ownership Interests, except that with respect to the Class B

| | |
|---|---|
| | Members, 80% of their portion shall be distributed to them and the remaining 20% shall be paid to the Manager.<br><br>Capital Events: With respect to distributions of cash received by the Fund from capital events affecting the Property (e.g., sale or refinance of the Property), such distributions shall first be made to the Members on a pro rata basis according to their respective unreturned capital contributions until all of their capital contributions are returned to them, and then such distributions shall be made to the Members on a pro rata basis according to their respective Ownership Interests, except that with respect to the Class B Members, 80% of their portion shall be distributed to them and the remaining 20% shall be paid to the Manager. |
| Liquidating Distributions: | Distributions upon liquidation of the Fund will be made in accordance with the distribution provisions for Capital Events. |
| Return of Distributions: | Distributions made by the LP to its Members (including the Fund) may be subject to recall by the LP to discharge certain liabilities of the LP, and, in such event, the Fund will need to recall from the Members the amounts of the distributions being recalled by the LP that the Fund distributed to the Members.<br><br>Additionally, the LLC Agreement provides that the Manager may recall distributions made by the Fund to the Members if the Manager determines that the Fund does not have sufficient cash to cover any other liabilities or obligations of the Fund. The Manager shall allocate the Members' obligations to return distributions to the Fund among the Members on a pro rata basis according to their respective Ownership Interests during the applicable period or as otherwise determined by the Manager to be fair and equitable. The Manager may also withhold any future distributions to a Member until the Member has returned all amounts as required by the Manager. |
| Tax Distributions: | To the extent there is available cash for distribution to the Members as determined by the Manager in its sole discretion, the Manager shall cause the Fund to distribute to the Members within 100 days after the end of each Fiscal Year sufficient cash to pay their respective tax obligations with respect to the taxable net income of the Fund allocated to them for such Fiscal Year. These tax distributions will be applied against the amounts that would otherwise be distributable to the Members. |

**Fees and Expenses**

| | |
|---|---|
| Management Fee: | Commencing on the Initial Closing and continuing until the Fund has been wound-up and all proceeds have been paid out or distributed as provided in the LLC Agreement, the Fund will pay the Manager a management fee (the "**Management Fee**") equal to 1.5% per annum of all unreturned capital contributions. The Management Fee will be calculated, prorated, and paid at the end of each calendar month. |
| Fund Expenses: | The following fees, costs, and expenses, whether paid by the Fund or paid by the Manager or an affiliate and reimbursed by the Fund will be included in the expenses that are borne and payable by the Fund prior to the determination of any cash available for distribution to the Members (the "**Fund Expenses**"): |

- The Management Fee;
- All fees, costs, and expenses incurred by or on behalf of the Fund in connection with forming the Fund and the Manager, acquiring the LP Interest, preparing the Offering documents and conducting the Offering, and related matters (estimated to be about $50,000);
- All fees, costs, and expenses incurred by or on behalf of the Fund in marketing the Offering;
- All fees, costs, and expenses chargeable or passed through to the Fund by the LP that are not paid out of the Fund's capital contributions to the LP, if any, as may be provided for in the LP Operating Agreement;
- The fees and reasonable expenses incurred by the Partnership Representative;
- Any taxes, corporate maintenance, or qualification or filing or licensing fees, or federal or state "blue sky" securities filing fees incurred by or on behalf of the Fund, and any fees, costs, and expenses incurred by or on behalf of the Fund in connection with the preparation, reporting, and filing of foreign, federal, state, or local tax returns by the Fund;
- All costs, litigation and alternative dispute resolution expenses, and attorneys' fees incurred by or on behalf of the Fund in any claim or action in connection with the recovery, protection or preservation of property received or held by the Fund;

- All fees, costs and expenses incurred by or on behalf of the Fund in the dissolution and winding-up of the Fund;
- All fees, costs, and expenses of the Administrator; and
- All fees, costs, and expenses incurred by or on behalf of the Fund in connection with the obligations of the Fund to indemnify any Indemnitee under the terms of the LLC Agreement.

| | |
|---|---|
| Pepper Pike Portion of Fund Expenses: | Pepper Pike Capital Partners has agreed to reimburse the Manager for $25,000 of the fees, costs, and expenses incurred by the Manager in connection with the Fund's acquisition of the LP Interest, which reimbursement will be used by the Manager to reduce the Fund Expenses. |

**<u>Other Terms</u>**

| | |
|---|---|
| Fund Term: | The Fund shall have a perpetual existence unless and until the occurrence of certain events, including, without limitation, the disposition of the Property and the dissolution of the LP and the distribution to the Members of all or substantially all of the assets to be received by the Fund from the LP, or the written election of the Manager and the Members holding an aggregate Ownership Interest of no less than 75%. |
| Transfers: | No Member will be able to sell, assign or transfer its Units in the Fund, in whole or in part, without the prior written consent of the Manager, which consent may be withheld in the Manager's sole discretion. |
| Capital Raising Activities: | The Manager may engage duly licensed placement agents, broker/dealers, third-party advertising services and marketers, and similar entities, including affiliates, to advertise the Offering, solicit for subscriptions for Class B Units, or raise capital for the Fund. The costs for such capital raising services will be a Fund Expense. |
| Conflicts of Interest: | The Manager may engage affiliates of the Manager to perform services for the Fund whenever the Manager reasonably concludes that those affiliates are at least as qualified as other qualified vendors providing similar services, and the Fund may pay those affiliates market-based fees, in amounts commensurate |

with fees that would be payable to unaffiliated entities for the same services.

The affiliates of the Manager are engaged in a broad spectrum of real estate investment activities. In the ordinary course of their respective businesses, they may engage in activities in which their interests may conflict with the interests of the Fund and the Members. By acquiring Units, each Member will be deemed to have acknowledged the existence of such actual and potential conflicts of interest and, to the fullest extent permitted by applicable law, to have waived any claims with respect to the existence of such conflicts of interest.

Neither the Manager, the Members, any of their respective affiliates, nor any of their respective principals, partners, members, officers, employees, or agents will be prohibited from forming any real estate investment fund, engaging in any other business venture substantially similar to the Fund, or offering or participating in any parallel or side investment opportunities with the LP, any of the intermediary entities, or any of the LP Affiliates or relating to the Property that competes or may be deemed competitive with the Fund. In particular, the Manager and/or certain of its affiliates have entered into certain arrangements related to the Property, as described in the Memorandum.

Risk Factors: **PROSPECTIVE INVESTORS IN THE FUND SHOULD CAREFULLY REVIEW THE RISK FACTORS SET FORTH IN THE MEMORANDUM PRIOR TO INVESTING. ANY EVALUATION OF THE INVESTMENT IN THE FUND AND THE DECISION TO INVEST IN THE FUND SHOULD BE MADE UPON A COMPLETE AND THOROUGH REVIEW OF THE FUND OFFERING DOCUMENTS, INCLUDING THE MEMORANDUM.**

Reports and Financial Statements: The Manager will furnish to the Members (i) unaudited annual financial statements of the Fund within 180 days following the end of the Fund's fiscal year and (ii) unaudited quarterly financial reports of the Fund within 75 days following the end of each of the first three fiscal quarters of the Fund's fiscal year subject to timely receipt of such annual and quarterly financial reports from the LP. In addition, the Manager will distribute to the Members the LP's unaudited annual financial reports and quarterly financial reports within 15 calendar days following the Fund's receipt of such reports from the LP.

Administrator: The Fund intends to retain the services of Redwood Real Estate Administration, LLC (or other qualified fund administrator) as

the Fund's administrator (the "**Fund Administrator**") to provide professional third-party fund administration services to the Fund, the cost of which shall be a Fund Expense.

Side Letters: The Manager, on its own behalf or on behalf of the Fund, may from time to time enter into letter agreements or other similar agreements ("**Side Letters**") with one or more Members. These Side Letters may entitle a Member to make an investment in the Fund on terms other than those summarized herein or described in the Memorandum or LLC Agreement or provide a Member with additional or different rights and benefits.

Tax Considerations: **THE SUMMARY BELOW IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT INTENDED AS A SUBSTITUTE FOR AN INDIVIDUAL ANALYSIS OF THE TAX CONSEQUENCES OF OWNERSHIP OF CLASS B UNITS. PROSPECTIVE INVESTORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISERS REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF OWNERSHIP OF CLASS B UNITS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES. THE MANAGER ASSUMES NO RESPONSIBILITY FOR THE TAX CONSEQUENCES OF PURCHASE OR OWNERSHIP OF ANY CLASS B UNITS TO ANY MEMBERS.**

Federal Income Tax Treatment of the Fund as a Partnership: A limited liability company with more than one member is generally classified as a partnership for federal income tax purposes unless it elects to be classified as an association taxable as a corporation or is considered to be a publicly traded partnership. The Fund has no intention of electing to be classified as an association taxable as a corporation for federal income tax purposes. Moreover, the Fund does not intend to participate in or allow any of the activities that would cause the Fund to be treated as a publicly traded partnership within the meaning of the Code and the Regulations (as such terms are defined in the LLC Agreement). Accordingly, the Manager believes that the Fund will be classified as a partnership for federal income tax purposes and that each Member in the Fund will be treated as a partner for federal income tax purposes.

Because it will be treated as a partnership for federal income tax purposes, the Fund will file annual income tax information returns but generally will not be subject as an entity to federal income tax liability. Instead, each Member will receive an IRS Form 1065, Schedule K-1, showing the Member's allocable share of the Fund's income, gain, loss, deduction and credit for each tax year. Each Member generally will be required to report, on the

Member's separate income tax return, such Member's share of Fund income, gain, loss, deduction and credit, whether or not any cash or other property is distributed to such Member by the Fund. In the absence of cash distributions from the Fund, a Member may need to use funds from other sources to pay taxes with respect to Fund income or gain that is allocated to that Member. Similarly, each Member generally will be able to report its share of tax losses of the Fund, if any, for tax purposes, subject to certain limitations, even if the Member receives a cash distribution.

| | |
|---|---|
| Members' Tax Basis in Class B Units: | Generally, the initial tax basis of a Member's Class B Units will equal the amount of money contributed to the Fund in exchange for those Class B Units, plus the Member's adjusted tax basis in any property contributed to the Fund, less liabilities of the Member that are assumed by the Fund, plus the Member's allocable share of the Fund's liabilities determined in accordance with the Regulations under Section 752 of the Code. A Member's tax basis in its Class B Units will be increased by the Member's allocable share of Fund taxable income and the amount of any additional capital contributions by the Member. A Member's tax basis in its Class B Units will be decreased (but not below zero) by the Member's allocable share of Fund tax losses and the amount of any distributions to the Member by the Fund. Subject to certain potentially applicable limitations, a Member may be able to deduct its allocable share of Fund tax losses, but only to the extent that such losses do not exceed the Member's adjusted tax basis in its Class B Units. Losses in excess of basis may be carried forward until the Member's adjusted tax basis in its Class B Units is increased above zero. |
| Fiscal Year End: | The fiscal year of the Fund is the period from January 1 to December 31 of each calendar year, except that the first fiscal year of the Fund shall be from inception of the Fund to December 31, 2020, and provided that the Manager may change the fiscal year end as it deems appropriate. |
| Exculpation and Indemnification: | Neither the Manager, the Partnership Representative, any of their respective affiliates, nor any of their respective principals, partners, members, officers, employees, or agents (each, an "**Indemnitee**") will be liable for, and each shall be indemnified and held harmless by the Fund to the fullest extent legally permissible from and against, any loss or cost arising out of, or in connection with, any act or activity undertaken (or omitted to be undertaken) in fulfillment of any obligation or responsibility under the LLC Agreement, including any such loss sustained by reason of any investment in Fund or the LP, except that no |

Indemnitee will be exculpated from, nor indemnified and held harmless from and against, any liability arising from losses caused by such Indemnitee's gross negligence, willful misconduct, or violation of applicable law.

| | |
|---|---|
| Member Liability: | A Member will not be liable for the debts or obligations of the Fund except to the extent of its capital contributions in the Fund. |
| ERISA; Expulsion of ERISA Members: | The Manager intends to operate the Fund in such a manner that the assets of the Fund are not deemed to be "plan assets" for purposes of ERISA. The Manager intends to monitor the investments in the Fund and take actions to ensure that less than 25% of the Units are held by investors that are subject to Part 4 of Title I of ERISA. As a result, the Manager may need to restrict subscriptions, purchases and transfers of Class B Units that would result in such 25% limit being exceeded. The Manager may also expel a Member that is subject to Part 4 of Title I of ERISA by forcing such Member to either redeem its Class B Units or sell its Class B Units to another Member or Person, if it is determined by, the Manager, the United States Department of Labor or Internal Revenue Service, or a court of competent jurisdiction that (i) such Member's continued status as a Member of the Fund or the conduct of the Fund will result, or there is a material likelihood that such continuation or conduct will result, in a material violation of ERISA or Section 4975 of the Code, or (ii) all or a portion of the Fund's assets constitute "plan assets" of such Member. |

***********

**EXHIBIT A**
**ORGANIZATIONAL CHART**




*Percentages may be rounded and, in the case of ownership of the Fund, are only estimates that are subject to change based on the actual amount of capital contributed to the Fund by the Members.