Paul Kiebler

Michelle Brady vs. APM Management, LLC, et al.

November 10, 2020

CADY
REPORTING SERVICES, INC.

Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

~~~~~~~~~~~~~~~~~~~~

MICHELLE BRADY,
Plaintiff,
vs. Case No. 1:19-cv-01303
APM MANAGEMENT, LLC, et al.,
Defendants.

~~~~~~~~~~~~~~~~~~~~

Deposition of
PAUL E. KIEBLER IV
Via Zoom
November 10, 2020
9:32 a.m.
Ashanti Edwards, RPR





APPEARANCES:

On behalf of the Plaintiff:
Via Zoom
Bolek Besser Glesius, LLC, by
MATTHEW D. BESSER, ESQ.
5885 Landerbrook Drive
Cleveland, Ohio 44124
(216) 464-3004
Mbesser@bolekbesser.com

On behalf of the Defendants:
Via Zoom
Meyers, Roman, Friedberg & Lewis,
by
JONATHAN T. HYMAN, ESQ.
28601 Chagrin Boulevard, Suite 600
Cleveland, Ohio 44122
(216) 831-0042
Jhyman@meyersroman.com

~ ~ ~ ~ ~

ALSO PRESENT: Alex Cook, Via Zoom

~ ~ ~ ~ ~





TRANSCRIPT INDEX


APPEARANCES 2

EXAMINATION OF PAUL E. KIEBLER IV
BY MR. BESSER 4

REPORTER'S CERTIFICATE 147

EXHIBIT CUSTODY
NO EXHIBITS MARKED

AFTERNOON SESSION 110






PAUL E. KIEBLER IV, of lawful age, called for examination, as provided by the Federal Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF PAUL E. KIEBLER IV

BY MR. BESSER:

Q. Mr. Kiebler, I'm Matt Besser. I'm Michelle Brady's attorney. Before we get started I'm going to read some stipulations for your counsel because we're doing this via video.

MR. BESSER: So Jon, just let me know if there are any problems with any of these. One, the video remote deposition -- this is a video-recorded remote deposition that may be used to the same extent as an in-person deposition at a trial or hearing and the parties agree not to object to the use of video deposition on the basis that it was taken remotely and recorded by a court reporter who is not physically present with the witness. Two, the parties agree not to challenge the validity of the oath administered by the reporter. Three, no person, including counsel,

5

will communicate with the witness off the record by any means while a question is pending, except for the purpose of determining whether privilege should be asserted. Four, the court reporter will record stenographically and the transcript shall constitute the official record. Five, the reporter may simultaneously videotape and preserve the recording. The reporter may review the video to improve accuracy of the transcript. Six, counsel may introduce exhibits electronically by using screen sharing technology and by sending the exhibits by e-mail. All good, Jon?

MR. HYMAN: All good.

Q. Mr. Kiebler, are you wearing a smartwatch or any device that sends or receives messages?

A. No. No watch. Nothing.

Q. Where are you physically located right now?

A. In my office.

Q. And is anyone present with you in the room?

A. No.

Q. Are there any other devices in the



6

room that can send or receive messages?

A. I mean, I have my computer, I have an iPad that's not on, I've got a TV. I've got just normal office stuff.

Q. Okay. Do you agree with me that you won't communicate with anyone during this deposition except on the record or during breaks or with your counsel to assert privilege?

A. Yeah. We want to assert privilege.

Q. Well, no. I'm not asking whether you assert privilege. I'm just asking, since I can't see where you are, you know, who's with you, do you agree that you won't communicate with anyone about how to answer questions?

A. Yes.

Q. You understand that you are under oath, correct?

A. I do.

Q. Okay. And you understand it's the same or similar oath that you would take if you were testifying in front of a jury?

A. I do.

Q. Are you -- well, will you agree with me that if at any time you can't



7

understand or hear my questions you will let me know so that I have a fair opportunity to rephrase it?

A. I will.

Q. Thank you. Are you under any medication that would impair your ability to understand my questions or answer truthfully today?

A. Just Aleve.

Q. Okay. Can you state your full name for the record?

A. Paul Kiebler.

Q. Do you have a middle initial?

A. E.

Q. What does that stand for?

A. Edward.

Q. And what's your address?

A. 200 Park Avenue, Beachwood, Ohio.

Q. That's your business address, correct?

A. Correct.

Q. What's your home address?

A. We typically don't give it out.

Q. Okay. We'll mark that confidential, so that won't be part of the



8

public record. What's your home address?

A. XXXXX.

Q. Did you recently move?

A. No.

Q. Did you own a house at 15450 Suffolk Lane in Chagrin?

A. I did.

Q. Did you live there?

A. I did.

Q. When did you move from there?

A. A couple years ago.

Q. Did you just recently sell it?

A. Yes.

Q. Were you renting it in the meantime, in the interim? Was anyone living there?

A. No.

Q. Have you ever -- you understand you're in a deposition today, correct?

A. I do.

Q. Have you ever been deposed before?

A. I have.

Q. How many times?

A. I'd just be guessing. I don't know.

9

Q. More than five?
A. Yes.
Q. More than ten?
A. I don't know.
Q. What kinds of cases were you deposed in?
A. Legal.
Q. Clearly? Can you be more specific about what types of legal cases they were?
A. I don't remember all the cases. They were depositions on different legal matters.
Q. Involving your business matters or personal matters?
A. Both.
Q. When was the most recent one?
A. I don't remember.
Q. Was it this year?
A. I don't remember. I don't think so though.
Q. Was it within the past two or three years?
A. Probably.
Q. What state was that in?
A. Ohio.



10

Q. Was that a Cuyahoga County case or a different case?
A. I don't remember.
Q. What type of case was it, your most recent deposition?
A. Again, I don't remember when my most recent deposition was, I don't remember what the case was.
Q. Okay. Was it a defamation case? Was it a contract case? Was it employment discrimination?
A. It was most likely a contract case.
Q. Is that your memory? You say most likely. I don't understand.
A. I told you I don't remember the case. We can go through this for the next ten minutes, but I don't remember the case, so I can't answer the question.
Q. All right. Were you personally a party or was the business a party?
A. I don't remember.
Q. Who was your lawyer?
A. I don't remember.
Q. Was the Meyers Roman firm your lawyer?



11

A. Might be. I told you, I don't remember. If I don't remember, I can't tell you if Meyers Roman was the lawyer or not.
Q. Have you ever been deposed in a case that was filed outside of Ohio?
A. I don't remember.
Q. Have you ever been deposed in a case involving the rights of employees?
A. Deposed?
Q. Yes.
A. I don't remember. I don't think so, but I don't remember for sure.
Q. Have you ever been deposed in a case involving the Family Medical Leave Act or on a disability discrimination claim?
A. I don't remember.
Q. Have you ever been deposed in a case involving unpaid wages, overtime or minimum wage?
A. I don't remember.
Q. Can you tell me anything about any deposition you've been in in terms of the type of case it was or who your counsel was?
A. About ten years ago I got deposed in a bankruptcy proceeding and I believe a



12

downtown Cleveland law firm was my attorney. Gosh. I can't remember their name. But yeah, that was -- I got deposed there.
Q. In the past five years, how many times do you think you've been deposed?
A. You've already asked me that. I don't remember.
Q. In the past five years, you don't remember?
A. I don't remember.
Q. In any of those cases was Pepper Pike Capital Partners a party?
A. I don't remember.
MR. HYMAN: Objection. He's already told you he doesn't remember anything about the cases. So you can ask him -- I mean, we can spend all day talking about things, he's going to tell you he doesn't recall. But he said he doesn't recall.
Q. In any of those cases was APM Management a party?
MR. HYMAN: Same objection.
A. I don't remember.
Q. Do you have a good memory?
A. How the hell would I know if I have

a good memory or not?
Q. I'll take that as a --
A. Do you have a good memory?
Q. Yes, I do.
A. Okay.
Q. But I'm -- I'm not the one being deposed, so -- you can't tell me whether you have a good memory or not?
MR. HYMAN: Objection.
A. If you ask my wife my wife would say I have a very poor memory.
Q. All right. Fair enough. Have you ever testified in court before? So different than a deposition. You know, actually showing up and giving testimony in a court room.
A. I have.
Q. And were any of those -- how many times, do you know?
A. I don't remember.
Q. Were those business -- were those matters relating to your business or something else?
A. Probably both.
Q. When was the last time you testified in court?



A. I don't remember.
Q. Was it within the past, say, five years?
A. Yes.
Q. Was it in Ohio?
A. Yes.
Q. The case you're thinking of, was that a business case or a personal case?
A. Business.
Q. What was that case about?
A. That was a contract case.
Q. Was your employer -- was Pepper Pike Capital Partners or APM Management a party to that case?
A. I don't remember.
Q. Were you involved as a party or as a third-party witness?
A. I don't remember. I believe a third-party witness, but I don't remember for sure.
Q. Do you know if that was in Cuyahoga County?
A. I believe it was.
Q. Can you recall any other times in the past five years you've testified in court?



A. Five years? I don't remember.
Q. Did you review any documents or any e-mails for the purpose of refreshing your memory for testimony today?
A. I did not.
Q. What do you do for a living?
A. I work with real estate.
Q. Are you employed?
A. Yes.
Q. Who is your employer?
A. Pepper Pike Staffing.
Q. Who owns Pepper Pike Staffing?
A. I believe Pepper Pike Capital Partners.
Q. Who owns Pepper Pike Capital Partners?
A. I'm not 100 percent sure.
Q. Are you an owner, whole or a part, of Pepper Pike Capital Partners?
A. Personally, no.
Q. What about through -- indirectly through a trust?
A. I don't understand that question.
Q. Okay. Let me back up and say, when I ask if you're an owner I also mean are you a



member or a partner, do you have any equity interest. Can we agree on that terminology or no?
A. No. Because I don't understand what it means. I mean, ask -- reask the question and I'll answer it for you.
Q. Do you have -- all right. Do you own any equity or ownership stake in Pepper Pike Capital Partners?
A. I don't know, but I don't believe so.
Q. Are you either the beneficiary or trustee of any trust that has an ownership stake in Pepper Pike Capital Partners?
A. I don't know, but I believe -- probably.
Q. When you say probably, are you referring to your status as a beneficiary or a trustee?
A. Those are legal terms. I mean, I'm not an attorney.
Q. Okay. All right. You don't know what it means to be a trustee of a trust?
A. I know what it means to be a trustee of a trust. Basically, you control the

trust.
Q. Okay.
A. But, you know, you're asking legal questions of me and I'm not an attorney, so I can't answer them clearly.
Q. What trusts do you control?
A. By control -- again, you're asking legal questions. I mean, what --
Q. Well, I'm using your terminology. I'm using your understanding of what it means to be a trustee. You said, it means you control the trust. So what trusts do you control?
A. I don't think I, personally, control any of them. I mean, I don't know that. I guess the true answer is I don't know.
Q. Do you know what it means to be a beneficiary of a trust? To benefit from a trust?
A. You get money out of it.
Q. Are you the beneficiary of any trusts?
A. Individually, I don't know.
Q. Are you the beneficiary of the Paul Kiebler Revokable Trust?



A. I don't know. I probably am, but I don't know.
Q. So do you believe that there is a trust that you either benefit from or control that has some measure of ownership stake in Pepper Pike Capital Partners?
A. Again, I already answered that. I don't know, personally. I believe so, but I don't know, personally.
Q. Who would know?
A. I guess the attorneys.
Q. What attorneys? The attorneys who helped you incorporate Pepper Pike Capital?
A. Yeah. My attorneys.
Q. Is that the Meyers Roman law firm?
A. It's my attorneys. I have several law firms that work for me.
Q. Okay. What are they?
A. Jones Day, Kirkland Ellis, Taft, Meyers Roman, Walter Haverfield. We use a lot of different attorneys.
Q. So as you sit here, you can't tell me whether you own, directly or indirectly, any percent of equity in Pepper Pike Capital Partners?



MR. HYMAN: Objection. Asked and answered.
Q. You can answer.
A. I think you said that one of the trusts owns it, is --
Q. I'm asking you.
A. -- your testimony. I already answered I don't know and you said that my trust does, so I'm answering your question.
Q. No. I'm asking.
A. Why don't we just move on and you can ask a question.
Q. I want to be clear because this is my opportunity to ask you questions and to find out what you would testify to at trial.
A. It's not your opportunity to ask me the same question 10 times. You've asked the question, I've answered the question. I can continue to sit here all day long and answer the same question, but it's up to you.
Q. I don't understand your answer, so I'm asking for clarification.
A. My answer is I don't know. You're going to ask me the same question again, I'm going to answer again I don't know and then



you're going to ask me the same question again, I'm going to answer again I don't know. Then, you're going to ask me a fifth time and I'm going to say I don't know, you're going to ask me a sixth time and I'm going to say I don't know. Now we're on the seventh time and I'm going to answer the exact same way I have previously. I don't know. Now --
Q. You don't know -- you don't know who owns Pepper Pike Capital Partners? That's your testimony?
A. This is the eighth time you've asked me the exact same question.
Q. What is your job at Pepper Pike Staffing?
A. I'm -- my job at Pepper Pike Staffing? I am -- I think I am the founder or chairman, something like that.
Q. Do you have any job title with Pepper Pike Capital Partners?
A. I believe the same thing. Either founder or chairman. We don't use titles here.
Q. I'm sorry? You don't use titles?
A. Not very often.
Q. Are you an officer or employee of

any other corporate entity?
A. Yes.
Q. How many?
A. I don't know.
Q. Let's start with employee. Are you -- how many other entities are you an employee of?
A. None.
Q. You don't know -- so your answer -- let's start again.
A. This is very confusing. I mean, you're bouncing around asking questions and then you ask the same questions, then you ask a different question that you said you asked earlier, but you didn't ask. So I'm just utterly and totally confused by this, but --
Q. Okay. Well, as I said at the start -- you told me that if you didn't understand my question you would let me know.
A. I am. I -- at the start I said I would explain. I'm explaining to you I don't understand what you're asking me. You're asking the same question 27 times and then you're asking me -- you just said, are you an officer or employee of blah, blah, blah, and I



said, I'm not an employee, and then you said, well, you just -- so -- all right. Ask your question.
Q. Do I understand you correctly that you are not sure how many corporate entities you are an officer of?
A. That is correct.
Q. Is it a lot?
MR. HYMAN: Objection. I think we would all have different interpretations of what the term a lot means.
Q. Is it more than 10? More than 10?
A. More than 10 what?
Q. More than 10 corporate entities that you are an officer of.
A. Is a member an officer?
Q. Well, let's separate the two out. Let's just say officer for now.
A. I don't know.
Q. Are you a member of more than 10 corporate entities?
A. I don't know.
Q. Are you a sole or a part owner of any corporations, any companies?
A. Personally? I don't know.



Q. Personally or through a trust?
A. Through a trust? I don't know. I mean, I truly don't.
Q. Do you receive compensation, any kind of payment from Pepper Pike Staffing?
A. Yes.
Q. Do you receive compensation or any kind of payment from any other corporate entity excluding via the stock market?
A. I've already answered them. My only -- I'm only an employee of Pepper Pike Staffing, so that's my only employer.
Q. Right. My question is a little bit -- a little different. Do you receive any kind of payment from any other corporate entity?
A. Like a paycheck? No.
Q. Any financial compensation, any money that a corporation or a company pays you, besides Pepper Pike Staffing or besides what's traded on the open market?
A. Other than selling stuff, no.
Q. Other than selling stock?
A. Well, I mean, I sold a four-wheeler last night for $1,800 bucks. The guy handed me cash. I sold -- I sold our house on Suffolk,



that you brought up earlier, and, you know, we made -- we got money from -- we lost money on the sale, but we got money from that. Is that what you're talking about?
Q. No. What I'm getting at is, do you receive a --
A. Like a pension or anything? No. I --
Q. I just --
THE NOTARY: I'm sorry. You guys are kind of talking over each other and when you talk over each other it cuts out on my end, so I'm losing words.
Q. Do you receive a distribution, a bonus payment, any other form of money from any entity besides Pepper Pike Staffing?
A. Personal? No.
Q. What about through a trust?
A. Again, I don't know. I mean, you're asking me a bunch of questions about -- like, when we sold our house, right, we got a payment to my wife and I. So to answer your question, yeah. When we sold the house we got -- but that's an asset.
Q. Let's talk about your business and

your business dealings.
A. I don't get money from Pepper Pike Capital, I don't get money from Pepper Pike Management, I don't get money from any of those companies, no. I get a salary from Pepper Pike Staffing.
Q. Is that your only source of wages, your only source of income?
A. I've answered this question nine -- this is literally the tenth time. My only employer is Pepper Pike Staffing.
Q. Not my question.
A. You've asked me the question 100 times. I don't know how you get a wage from something you're not an employee of. That's not -- I mean --
Q. Your only source of income -- do you understand the difference between income and wages?
A. My -- my employer is Pepper Pike Staffing.
Q. Do you receive any income from any other source besides Pepper Pike Staffing?
A. I get my -- I get my wages and -- I don't get a bonus, but whatever from Pepper



Pike Staffing.
Q. Do you receive any income from any entity other than Pepper Pike Staffing?
A. I -- I answered that question to the best of my ability. I don't understand what you're asking me.
Q. When you report on your personal -- do you file personal taxes?
A. No.
Q. You don't file a tax return?
A. I do not file a tax return.
Q. How do you report your wages from Pepper Pike Staffing to the federal government?
A. My wife and I have a joint tax return.
Q. When you file your joint tax return with your wife do you list -- for your business, your business dealings, do you list any income other than your Pepper Pike Staffing salary?
A. It's a joint tax return between my wife and I and we list -- no. We -- it's not income. We list -- like, if we sell something, we make some money and we put it on our joint tax return, but it's a joint return between



Jody and I.
Q. The only money you make from business is from Pepper Pike Staffing; is that correct?
A. Again, my only employer is Pepper Pike Staffing. I get a salary from Pepper Pike Staffing and that's my salary. I make interest on savings accounts, I make that type of money, but my employee is Pepper Pike Staffing and that's where my salary comes from.
Q. And that's your only source of income?
A. I just flipping said I have interest accounts and things like that. I can't answer the same question nine times.
Q. All right. Let's -- here's what I'm getting at.
A. I can't -- ask me what you're getting at because you're asking me these stupid questions ten times and I'm --
Q. Are you angry about being deposed today?
A. No. I'm angry about your stupid questions. You've asked me who my employer is 10 times. I've answered it 10 times. I'm not



-- the same flipping question 10 times. I was perfectly fine this morning. I woke up, I went to McDonald's, I got a bagel, I was happy, life was good and then you started asking the same question 10 times and it's irritating.
Q. I'm not asking about your salary from Pepper Pike Staffing. I'm asking --
A. I've answered your question. I make interest, I make -- I -- yes. I've had, you know -- you asked me do I have a personal return. I say no. Then you say -- of course I don't have a personal return. I'm married. I have a joint return.
Q. Have you finished your answer?
A. Yes.
Q. I'm asking, do you make money in your business dealings outside of what you earn from Pepper Pike Staffing? As a businessperson, are there other sources of money that you receive? That's what I'm asking. Outside of Pepper Pike Staffing. If the answer is no, just tell me no.
A. In the course of Pepper Pike Capital, no.
Q. Right. You keep adding a

qualification to it. I'm asking, anything besides Pepper Pike Staffing --
A. You're asking me, personally, if I make money? Okay. I have a checking account. The checking account makes $2 of interest a year.
Q. Mr. Kiebler, please listen to my question. As a businessperson, do you make any money outside of what you make from Pepper Pike Staffing?
A. As a businessperson, no.
Q. What does Pepper Pike Capital Partners do?
A. It owns Pepper Pike Staffing, Pepper Pike Management and Pepper Pike Acquisitions and Pepper Pike Construction.
Q. What is the nature of the business?
A. Real estate. You already asked me this earlier and I answered that question. That's the second time.
Q. I haven't, but thank you for the clarification.
A. It's in the transcript earlier when you said, where do you work, I said, Pepper Pike Capital Partners, you said, what does it



do and I said, real estate. That's the second time you've asked me that question.
Q. Is Pepper Pike Capital Partners a private equity firm? Does it seek investors?
A. Pepper Pike Capital Partners? No.
Q. Do any of the subsidiaries you mentioned seek investors?
A. There's no investors in any of those companies.
Q. And as the founder, you don't know who owns Pepper Pike Capital Partners?
A. First of all, I'm not sure how to -- first of all, I don't know if I'm the founder and, second of all, no. We've already answered that. You've asked that question -- this is probably the fourth or fifth time you've asked that same question.
Q. You're not sure if you're the founder of Pepper Pike Capital Partners?
A. We've already answered that question. This will be the fourth time I've answered that question. I don't know.
Q. Between Pepper Pike Capital Partners and the four subsidiaries you mentioned, how many employees are there?



A. I don't know.
Q. Is it more than 100?
A. I don't know.
Q. Who would know how many employees there are?
A. I don't know.
Q. Is there anyone at Pepper Pike Capital Partners who would know how many employees it has?
A. Yes.
Q. Who is that person?
A. I don't know. Someone there, I'm sure, does.
Q. Does Pepper Pike Capital Partners and the subsidiaries, do they have an internal Human Resources department?
A. We have an HR person.
Q. Who is the HR person?
A. Christa.
Q. I'm sorry?
A. Christa.
Q. And do you use an outside payroll company or is payroll on the inside?
A. I don't know.
Q. Who are the executives of Pepper



Pike Capital Partners?
A. Just me.
Q. Do you know who Kristie Arnst is?
A. I do.
Q. Who is that?
A. She was our former employ -- Pepper Pike Staffing employee.
Q. She was only an employee of Pepper Pike Staffing?
A. All the employees are employees of Pepper Pike Staffing.
Q. So Pepper Pike Capital Partners and the other subsidiaries don't formally employ the employees, they're all run through Staffing?
A. Pepper Pike Capital Partners, as I said earlier, has no employees. Pepper Pike Staffing has employees.
Q. And the Pepper Pike Staffing employees, they perform the various job functions for the other subsidiaries and for Capital Partners?
A. I don't know how to answer that question. Pepper Pike Staffing has employees. Pepper Pike Capital Partners really doesn't do

33

much other than own other companies. So with the -- what the job of that is, I don't know.

Q. Was Kristie Arnst president of Pepper Pike Staffing?

A. I don't know. I don't believe so, no.

Q. Was she president of Pepper Pike Capital Partners?

A. She was not.

Q. What was her job title?

A. She worked -- or I believe she was president of Pepper Pike Management.

Q. And did she recently leave the company?

A. She did.

Q. Why?

A. You would have to ask her.

Q. Did she leave voluntarily or involuntarily?

A. Voluntarily.

Q. Do you know who Sharon Zinser is?

A. I do.

Q. Was she an employee or executive of Pepper Pike Capital Partners or any of the subsidiaries?



34

A. She worked for Pepper Pike Staffing.

Q. What was her job for Pepper Pike Staffing?

A. She was CFO.

MR. BESSER: Alex, if you could -- or Jon, if you haven't yet, if someone could transmit Exhibits 1 and 2 to the witness.

MR. HYMAN: I e-mailed them to Paul, so he should have them in his inbox.

Q. Mr. Kiebler, you should have two files there. One is -- the file name would be EX 1 for Exhibit 1 and one will be EX 2. Do you have those with you?

A. Yeah. I've got EX 1.

Q. If you could open that up and tell me if that's from Pepper Pike Capital Partners' website.

A. I've actually never been on our website, so I don't know.

Q. Do you see in the middle of the first page there's a short paragraph that starts Pepper Pike Capital Partners?

A. Yep.

Q. Does that accurately describe the



35

business, that paragraph?

A. Not as of today, no.

Q. In what respect is it not accurate?

A. Pepper Pike Capital Partners owns the other four companies that we discussed. It doesn't have a portfolio. We don't manage or own 5,000 apartments. That's about it.

Q. Does it manage or own any apartments? Are you saying the number is wrong or the own and management is wrong?

A. I've already asked and answered that question. This will be the fourth time I've -- Pepper Pike Capital Partners owns four companies. It doesn't own any real estate.

Q. Is the number approximately 5,000 units accurate in terms of the subsidiaries?

A. Pepper Pike Capital Partners does not own any apartments.

Q. Right. Do the subsidiaries own any apartments?

A. Subsidiaries of Pepper Pike Capital Partners?

Q. Correct.

A. I've answered that. No. Pepper Pike Capital Partners has no ownership in any



36

apartments.

Q. And -- right. I need -- I'm trying to understand, do the subsidiaries --

MR. HYMAN: Objection.

A. But I've said that. The subsidiaries do not own any apartments. You asked me the same questions 10 times. I don't know if you're trying to piss me off, frustrate me, or whatever. It's obviously working because you asked the same thing.

Q. Listen --

A. I only work for Pepper Pike Staffing.

Q. I don't want you to be ticked off. Would you like to take a break to calm down?

A. No. I would like you to answer me -- answer a question that you haven't asked me five times prior.

Q. I'm asking a different question, so just -- I'll ask you to listen carefully. If you don't understand my question, just tell me.

A. Can I answer before you ask? I work for Pepper Pike Staffing.

Q. You have an excellent attorney.

He's more than capable of objecting to questions.
A. I'm more than capable of understanding how many times you ask me the same question.
Q. Does Pepper Pike Capital Partners or the subsidiaries, do they manage approximately 5,000 units? Apartment units?
MR. HYMAN: Objection. Asked and answered.
Go ahead.
Q. I'm not asking own. I'm asking manage.
A. Right now we do not manage 5,000 apartments.
Q. Does it manage any apartments?
A. Pepper Pike Capital Partners? No.
Q. Or the subsidiaries?
A. Pepper Pike Management manages apartments, yes.
Q. Okay. Approximately how many does it manage?
A. I don't know. I mean, somewhere between 0 and 5,000.
Q. In any other respect, is this



paragraph on the first page of Exhibit 1 inaccurate?
A. Dude, I already answered that question. I read off four reasons it was inaccurate. You can ask the court reporter to repeat my answer, but I'm not going to answer the same question 10 times for you. It's not --
Q. Well, I haven't --
A. It's not right. I've already answered that question, dude.
Q. I'm asking you different questions, so --
A. You're not asking me. You asked me earlier what was wrong with that paragraph. I read it and I said, these three things are inaccurate. You started asking me about Pepper Pike Capital and where I worked and I said Pepper Pike Staffing and then you asked me what is wrong and I've already answered the question.
MR. BESSER: Ashanti, could you please read back his answer about the things that are wrong with that paragraph?
THE WITNESS: That would be great.



Thank you.
THE NOTARY: One second. I have to find it.
(Record read.)
Q. Do you have anything else to add to your answer about how Paragraph 1 -- how that paragraph on Exhibit 1 is incorrect? Or have you completed your answer?
A. Again, Pepper Pike Capital Partners does not invest, Pepper Pike Capital Partners does not manage, Pepper Pike Capital Partners does not redevelopment, Pepper Pike Capital Partners doesn't have a portfolio and it has no investors.
Q. Other than that --
A. That paragraph is relatively accurate.
Q. All right. Who is responsible for the content on the website?
A. Dude, I already said I've never been on our website. I can tell -- hand on the Bible, put me through a lie detector, I've never --
Q. I'm not asking you that. I'm asking --



A. I've never been on our website --
THE NOTARY: Hold on a second. Hold on. Can I stop you for one second? I'm losing a lot of testimony because you guys are going back and forth and you're argumentative. I want the record to be accurate. If you could please wait, one at a time, it will help me out a lot.
THE WITNESS: Can you put on that record that I'm not being argumentative, he is?
THE NOTARY: I mean, you guys are going back and forth and it's making it very hard for me to take the testimony down.
THE WITNESS: I have a friend who does that and you guys type like 220 words a minute. That's amazing.
Q. Have you finished your answer, Mr. Kiebler?
A. Yeah. I can repeat it if you'd like.
Q. You should have a file -- you should have a file in front of you, EX 2. Do you have 2?
A. Exhibit 2. All right.
Q. I'll represent to you that this is

off the Pepper Pike Capital Partners website.
A. I'll represent to you I've never been on the website.
Q. I didn't ask you that.
A. You were going to.
Q. Are you sure you wouldn't like to take a break? You seem extremely upset.
A. I'm upset because you keep on asking me the same answers. No. I don't want to take a break. Ask me your question.
Q. Are you Paul E. Kiebler IV?
A. That would be me.
Q. Do you see there's a box under your name on the first page of Exhibit 2 that starts, since founding?
A. I see that box.
Q. Is it accurate to say that you founded Pepper Pike Capital Partners and its predecessor APM Management in 2004?
A. That is inaccurate. And you've already asked me that question before. But it's inaccurate.
Q. What is inaccurate about it?
A. Pepper Pike Capital Partners I don't believe was even in existence in 2004.





In fact, I know it wasn't. And -- and that's not what it says. It says that APM was established in 2004. I think you're reading a statement and trying to make it say something it doesn't.
Q. No. I'm just asking -- I -- I read it to you verbatim. I'm asking what about the words on it is inaccurate.
A. I've answered earlier that I don't know who founded Pepper Pike Capital Partners. I can tell you that Pepper Pike Capital Partners was not founded in -- in fact, I don't think either of them were founded in 2004.
Q. At the end of that paragraph there's a sentence that starts, Mr. Kiebler directs. Do you see that?
A. I see it.
Q. Is it accurate to say Mr. Kiebler directs all facets of the organization and its 5,500-plus apartments? Set aside the number.
A. It is inaccurate. No.
Q. You do not direct all facets of the organization?
A. I do not.
Q. Is Frank Gory CEO and president of





Pepper Pike Capital Partners?
A. I don't know.
Q. Is he currently employed by the company or any of its subsidiaries?
A. He is an employee of Pepper Pike Staffing, yes.
Q. You don't know what his title is or his role for Pepper Pike Capital Partners?
A. I don't know his role for Pepper Pike Capital Partners.
Q. Is Steve Pogozelski the director of accounting for Pepper Pike Capital Partners?
A. He is not.
Q. What is his role with the entity, the company or any of its subsidiaries?
A. He is an employee of Pepper Pike Staffing.
Q. What is his -- what is his job?
A. He handles the accounting for the management company.
Q. Is Christa Lenko the director of Human Resources for Pepper Pike Capital Partners or its subsidiaries?
A. She is the director of HR resources for Pepper Pike Staffing.





Q. Is Keith Booth the CFO of construction for Pepper Pike Staffing?
A. He works for Pepper Pike Staffing and he does the accounting work for the construction.
Q. Is that his only title, as far as you know?
A. I don't know if CFO/construction is a title or not. I don't know who wrote this and I don't really know what it means, but he works for the construction company and he's an employee of Pepper Pike Staffing.
Q. As an employee of Pepper Pike Staffing he performs services for Pepper Pike Construction, is that what you said?
A. I said he does accounting for the construction and he's an employee of Pepper Pike Staffing.
Q. Is John Ritzic the director of field operations for Pepper Pike staffing?
A. He's an employee of Pepper Pike Staffing and his title is director of field operations.
Q. Does he have any role for the other subsidiaries?

A. He does construction work.
Q. And, finally, who is Stephanie Sturzinger?
A. An employee of Pepper Pike Staffing.
Q. Is she director of revenue?
A. She is.
Q. Does she have any role for Pepper Pike Capital Partners or the other subsidiaries?
A. She directs the revenue at the properties.
Q. The properties that the subsidiaries manage, the apartment properties?
A. The properties that the management company manages.
Q. So Pepper Pike Staffing employs the employees, correct?
A. That has to be the fifth time you've asked me that exact same question. If we've got to go back to the court reporter, I will. But -- I've never been in a deposition in my entire life where the attorney asks me the exact same question 10 times.
Q. Does Pepper Pike Staffing do



anything other than employ the employees?
A. Yeah. They have employees, they manage employees, they handle probably the payroll, they -- they're a company.
Q. Does Pepper Pike -- Pepper Pike Property Management do anything other than manage the rental properties?
A. It's a company. I mean, companies do -- my guess is that some of the -- Pepper Pike Management will host a party. I mean, I don't know. It's a company that manages apartments.
Q. What does Pepper Pike Construction do?
A. Construction.
Q. Does it build properties that Pepper Pike property Management then manages?
A. It does not build anything.
Q. What construction does it do then?
A. It does construction work.
Q. What does it construct?
A. It doesn't build anything. Asked and answered.
Q. When you say it does construction, I'm asking you to explain what that means



because I don't understand what it's -- what is constructing.
A. You don't know what construction is?
Q. It's building. And you're saying it doesn't build. So I'm asking what it does.
A. In your knowledge, the only construction is building from the ground up? Like, if you had a hot water furnace -- hot water tank go out in your house and you had to call the construction guy to come in and fix it, that's construction.
Q. Okay. So Pepper Pike Construction does maintenance -- maintenance or repair work of the properties?
A. It does renovation work, that type of thing.
Q. So it does renovation of properties that Pepper Pike Property Management then manages?
A. Some, yes. Different contract.
Q. Different what?
A. Different contract, but, I mean, they're a customer.
Q. What does -- which is a customer of



which?
A. I have no idea what that question means.
Q. Okay. You said, they're a customer. I'm just trying to understand who's the customer.
A. Both Pepper Pike Management and Pepper Pike Construction work for different companies and -- they don't work for each other.
Q. Okay. And what is Pepper Pike Acquisitions, LLC?
A. Just a company that goes out and tries to find properties to buy.
Q. And does it buy them then?
A. No.
Q. Does it -- does it find buyers for the properties?
A. No.
Q. Who buys the properties that it finds?
A. Whoever wants to buy property.
Q. How does it find buyers?
A. Didn't have them.
Q. It has them?

49

A. It has not. When did you take this thing off the website? That's bizarre.
Q. Is it common in the real estate business to have separate corporate entities that perform different functions in the, you know, process of renting apartments?
A. As I said earlier, I'm not an attorney. I don't know how the companies are structured.
Q. Well, how long have you worked in real estate?
A. A long time.
Q. And is it common, in your experience, that there are separate corporate entities that perform different functions in the process of renting apartments?
A. Again, I've never worked for another company, my only employer is Pepper Pike Staffing, which you've asked me ten times. And in not working for another company, I wouldn't know how they're structured.
Q. In the companies that you've worked for, is that common, that there are multiple corporate entities?
A. That is the exact same flipping



50

question you just asked me worded differently. My only employer is Pepper Pike Staffing, for the 11th time --
Q. But is that the only employer you've ever had?
A. I'm answering your question. If you want to interrupt me I'm going to end this. I'm going to answer your question. You've been rude. You've asked the same question. You've interrupted me this entire day. All right? Stop it. The company I work for is Pepper Pike Staffing. Pepper Pike Staffing is structured the way it's structured. I haven't worked for another company, so I don't know how other companies are structured.
Q. Is Pepper Pike Staffing the only company you've ever worked for?
A. For at least as long as it's been in existence.
Q. Which was starting in 2017, correct?
A. Probably. Yep.
Q. Who did you work for before 2017?
A. I don't know. I don't think I had a paycheck.



51

Q. Were you the owner of APM Management?
A. I'm sorry. I worked for Peek Resorts. Peek'n Peak Resorts for a while.
Q. When was that?
A. 2005.
Q. Until when?
A. 2008, maybe.
Q. Were you a part owner of APM Management?
A. I don't remember.
Q. Did all the subsidiaries, Management, Staffing, Acquisitions and Construction, start in or around 2017?
A. I don't remember.
Q. Were you involved in their creation?
A. Vaguely.
Q. Vaguely how? In what respect?
A. I don't remember.
Q. Did you decide to create them?
A. No.
Q. Do you know who decided to create them?
A. I don't remember.



52

Q. What is Pepper Pike Acquisition Associates?
A. That's a company I started back in, I don't know, 2012, or something like that.
Q. What does it do?
A. It's a company that I own that holds some of my investments as well as some of my personal assets.
Q. Are you the sole owner?
A. No.
Q. Who are the other owners?
A. I don't know.
Q. Does it have investors?
A. No.
Q. Do any of your family members own any part of Pepper Pike Acquisition Associates?
A. I don't know.
Q. Does any trust that you control or benefit from own any part of Pepper Pike Acquisition Associates?
A. As I said earlier, I don't know who owns it. So if I don't know who owns it, I wouldn't know that answer. So I don't know.
Q. But you do own at least part of it, correct?

A. Excuse my immense frustration by having to answer the same question for the fifth time, but I don't know. And, yes, we can have the court reporter read back the first four times you asked me that same question if you'd like.
Q. Does Pepper Pike Acquisition Associates have any employees?
A. It does not.
Q. Does it do anything other than hold some of your investments and personal assets?
A. It does not.
Q. It is correct that you are a manager and executive officer of Pepper Pike Acquisition Associates, correct?
A. Repeat the question.
Q. Is it correct that you are a manager and executive officer of Pepper Pike Acquisition Associates?
A. I don't know.
MR. BESSER: Alex, if you could send all the sub 2 exhibits.
MR. COOK: Okay.
MR. BESSER: That would be, I think, B through L, maybe.



MR. COOK: I have A through M.
MR. BESSER: A through M? Okay. Fine.
MR. COOK: Okay.
MR. BESSER: If you can send those to Jon. And maybe now is a good time for a break while we do that. We'll give the witness a chance to look at them.
MR. HYMAN: Yeah. I was going to suggest this would be a good time for a break, so let's go off the record.
(Thereupon, a short break was taken.)
BY MR. BESSER:
Q. Mr. Kiebler, you should have a file in front of you labeled Exhibit 2B, as in boy. Do you have that?
A. Yes.
Q. Have you seen this document before?
A. No.
Q. On the second to last page at the bottom there's an electronic signature. If you could flip -- scroll to that.
A. Yes.
Q. Do you dispute that that is your electronic signature dated May 9th, 2018?



A. I don't know what an electronic signature is. I'm not an attorney.
Q. There's a box there. It says issuer and the next box over says signature?
A. It does.
Q. And what is under that box that says signature?
A. It says slash -- S/Paul E. Kiebler.
Q. Did you cause that to be filed? Cause that to be signed?
A. Did I cause it to be filed or signed? I don't remember. I don't know what causing something to be signed means.
Q. Did you type that in there?
A. Did I type this? No. I didn't type this form.
Q. Did you have someone type it on your behalf?
A. I don't remember.
Q. You're not -- you're not disputing that that could have happened? You're not saying this is a fraudulent document, correct?
A. I'm saying you put a document in front of me. I don't know exactly what the document is and you're asking if it's a



fraudulent document. I've never seen the document before, so, obviously, I could take -- if you want to put this deposition on hold for a couple days I could try and research what it is and figure out what it is, if that's what you'd like.
Q. Well, why don't you take a minute to look at it and let me know when you're ready to answer questions about it.
A. I've looked at it. I told you I've never seen it before. What would you like me to answer?
Q. Do you know what a Notice of Exempt Offering of Securities is?
A. I know it's a Notice of Exempt Offering of Securities.
Q. Are you familiar with that -- this form in general?
A. I have not seen this -- I don't remember seeing this form in the past.
Q. Do you know what Fall Creek Investors, LLC is?
A. I do.
Q. What is that?
A. It's a company.

Q. That does what?
A. Owns an interest in another company.
Q. What is the company it owns an interest in?
A. I don't remember.
Q. Directly or indirectly, does Fall Creek Investors have any interest in any real property?
A. Again, Fall Creek Investors owns an interest in a company.
Q. Right. So indirectly does it own any interest in real property?
A. I'm answering your question. It owns interest in another company.
Q. Does that company own -- I -- I'm asking either directly or indirectly, and it sounds like the answer is no to directly. But, indirectly, does Fall Creek own an interest in any real property?
A. I'm answering your question. Fall Creek owns an interest in another company.
Q. Does that company own any real property?
A. That company owns an interest in a



company.
Q. Does that second company own any real property?
A. The company Fall Creek owns an interest in? No. It does not own property.
Q. If we follow the chain to the end of however many companies there are, is there any real property at the end of that?
A. Yes.
Q. If you look at page 2 of Exhibit 2B, do you see that it identifies you as an executive officer of Fall Creek Investors?
A. Page 2?
Q. Yes. Under heading of three related -- having three related --
A. I don't see where it says anywhere where I'm an executive of -- relationship, executive officer.
Q. Having three related persons?
A. Having three related persons? Oh. Item 3. It says Paul -- Kiebler, Paul E., relationship, executive officer.
Q. Is it accurate to say that you are an executive officer of Fall Creek Investors?
A. It's accurate that's what this



document says.
Q. And is it -- is it true?
A. I don't know.
Q. Then, under that there's an entry for clarification of response. Do you see where it says, Manager, Pepper Pike Acquisition Associates, LLC, the manager of the issuer?
A. I see that.
Q. Is it true that you are a manager of Pepper Pike Acquisition Associates?
A. I'm going to say that you already asked and answered that question. I said I don't know.
Q. Is it true that Pepper Pike Acquisition Associates is the manager of Fall Creek Investors, LLC?
A. I don't know.
Q. Is it true that Fall Creek Investors has the same business address as the former business address of Pepper Pike Capital Partners?
A. This form says 25825 Science Park, Suite 150.
Q. Is that now or was that ever a Pepper Pike Capital Partners address?



A. In 2017? Yes.
Q. So if you go -- if you would scroll back down to the signature page, second to last page. Are you there?
A. Yes.
Q. Do you know who actually submitted this document on behalf of Fall Creek?
A. I do not.
Q. Are you denying that you submitted it or saying you don't remember if you submitted it?
A. I don't -- I don't remember.
Q. You should have a document that's -- a file that's labeled 2C. Do you have that?
A. Yes.
Q. Have you ever seen this document before?
A. Not that I remember.
Q. Do you know what Riverbend Investments 11235, LLC is?
A. No.
Q. Could you scroll down to the third page of the document, which is actually paginated number 2?
A. Yep.

Q. At the bottom do you see a heading Intermediary Entities?
A. Yes.
Q. And it says, the fund's sole asset is a membership interest (the "LP Interest") in Pepper Riverbend Investors, LLC, an Ohio limited liability company (the "LP"). Do you know what Pepper Riverbend Investors, LLC is?
A. Yes.
Q. What is that?
A. It's an entity that owns an interest in an entity.
Q. What entity does Pepper Riverbend Investors own an interest in?
A. An entity. I don't know the name of it.
Q. The paragraph goes on, the other members of the LP are affiliates of Pepper Pike Capital Partners. Is that a true statement?
A. I don't know.
Q. It goes on, the LP is managed by Pepper Pike Acquisition Associates, LLC, an Ohio limited liability company and affiliate of Pepper Pike Capital Partners. Is that a true statement?



A. I don't know.
Q. You're not denying that Pepper Pike Acquisition Associates, LLC, manages Pepper Riverbend Investors, LLC?
A. Again, I don't know. I'm not denying it or confirming it. I'm telling you I don't know.
Q. You're not denying that Pepper Pike Acquisition Associates is an affiliate of Pepper Pike Capital Partners?
A. Not being an attorney, I don't know the definition of affiliate, but they are -- the companies really have nothing to do with one another, so, you know, I don't know.
Q. Directly or through intermediary entities, does Pepper Pike Capital Partners own any interest or stake in Riverbend Apartments in Indianapolis?
A. I would go back to my earlier comment when I said Pepper Pike Capital Partners owns no real estate. So saying that, I would assume that Riverbend is real estate and I would assume that the answer is no. But we've talked about that a couple times.
Q. If you could flip to the very last



-- scroll to the very last page of the document labeled Exhibit A. Do you see that?
A. I do. There's your answer to your question. You could have looked.
Q. So if you look at this organizational chart it shows that affiliates of Pepper Pike Capital Partners own a partial interest in Riverbend Apartments, correct?
A. You've got to repeat that. What is it? Which entity?
Q. This organizational chart shows that affiliates of Pepper Pike Capital Partners own a partial interest in Riverbend Apartments, correct?
A. Where is Riverbend Pepper -- where is -- what entity are you talking about?
Q. Let's start at the top. At the very top is Riverbend Apartments, the property itself. Do you see that?
A. I see that.
Q. Then, there are two intermediate entities directly below it.
A. I do.
Q. And then it branches off in two directions. One direction is a 41 percent



stake from Riverbend JV, LLC. Do you see that?
A. I see that.
Q. And then in turn Riverbend JV branches off into two ownership stakes. One is 80 percent by Pepper Riverbend Investors, LLC. Do you see that?
A. Pepper Riverbend Investors, LLC, yep.
Q. Then, in turn, Pepper Riverbend Investors branches off into two stakes and one is 64 percent by other members of the LL -- of the LP including affiliates of Pepper Pike Capital Partners?
A. Yep.
Q. You dispute this ownership organization?
A. I'm telling you right now, Pepper Pike Capital Partners has no ownership in any real estate and you read the document, so the document, you know, says what it says.
Q. It says affiliates of Pepper Pike Capital Partners.
A. Again, we've gone over this. I'm not an attorney. I don't know what an affiliate is, I don't know what it is not and,

you know, is that just written in there to cover a bunch of bases by some attorney that was doing -- you know, that was filling out a form. I mean, I didn't create this form, so you can't ask me to get in the head of the person that did.
Q. You know that when offering an investment prospectus the information provided to potential investors has to be truthful, correct?
A. Yes.
Q. So I think we have established that the management function for the properties is done by Pepper Pike Management, that subsidiary, correct?
A. Pepper Pike Management manages real estate. Yes. We did establish that.
Q. What properties does it manage?
A. It manages 10 different properties.
Q. Those properties are in Ohio and Michigan? Some of them at least, correct?
A. Yes.
Q. Any other states?
A. Illinois, Indiana.
Q. Is that it? Is that it?



A. I believe so, yes.
Q. In 2017, did Pepper Pike Management manage properties as well?
THE NOTARY: I'm sorry. What was that answer?
A. Well, finish your question. I --
Q. Yeah. At the start of 2017, did Pepper Pike Management manage properties?
A. I don't know.
Q. At any point in 2017 did it manage properties?
A. I believe it did.
Q. Do you know what properties?
A. No.
Q. Are each of the four subsidiaries that you mentioned at the start, Pepper Pike Construction, Pepper Pike Acquisition, Pepper Pike Staffing, Pepper Pike Management, all wholly owned by Pepper Pike Capital Partners?
A. I don't know.
Q. As you sit here, you're not aware of any other -- any other person or entity that holds an ownership stake?
A. Again, I -- I don't know.
Q. Do you or Pepper Pike Capital



Management or APM Management have any ownership or equity directly or through intermediary entities in the property known as the Crossings at Canton?
A. You'll have to repeat that question.
Q. Do you or Pepper Pike Capital Partners or APM Management own any ownership or equity, either directly or through intermediaries, in the property known as Crossings at Canton?
A. Yes.
Q. Is that a yes for you or for the corporations?
A. Pepper Pike Capital Partners has no ownership in any real estate. Pepper Pike Capital Partners owns Pepper Pike Staffing, Pepper Pike Management, Pepper Pike Construction and Pepper Pike Acquisitions and, therefore, they have no ownership in any of the properties. Through some form of ownership, I don't know, I have a very, very small interest in Crossings at Canton.
Q. Do you know what the entity Crossings Owner, LLC is?



A. It's a company that owns some either direct or indirect interest in Crossings at Canton.
Q. Are you aware that earlier this year one of the Pepper Pike Capital Partners subsidiaries was sued in Michigan federal court for alleged housing discrimination?
A. It was alleged.
Q. You are aware of the allegation, I mean? The lawsuit?
A. Briefly. I haven't dealt with it personally.
Q. If you could look at the file labeled Exhibit 2A. Do you have it in front of you?
A. I do.
Q. Have you ever seen this before?
A. No.
Q. No?
A. No.
Q. This is an article from Crain's Detroit Business dated June 8th, 2020. Do you see that?
A. Yes.
Q. And this article refers to the

69

allegation made against Pepper Pike Capital Partners, correct?
A. I don't -- I haven't read the article.
Q. Go to the second page. The fifth paragraph begins with a quote, the Crossings at Canton. Do you see that?
A. The second -- the second page, the fifth paragraph. Quote begins with -- one, two, three, four, five. Plaintiffs in the lawsuit? Is that what you're saying?
Q. Yeah. The Crossings at Canton unequivocally denies the allegations and will vigorous -- are you there?
A. Yeah. That's on the first page. You'd said the second page.
Q. Okay. The Crossings at Canton unequivocally denies the allegations and will vigorously defend the lawsuit, said Kristie Arnst, president of complex owner Pepper Pike Capital Partners in an e-mail. So my first question is, have you ever seen the e-mail it refers to?
A. No.
Q. Is it true that Kristie Arnst was

70

president of Pepper Pike Capital Partners?
A. Do you realize you've already asked me that question and I already answered it and I said no and I'll say --
Q. And now -- and that -- right. So you're saying --
A. I don't give a rat's behind what the Detroit press put in some news article I've never seen before. It's not truthful.
Q. All right.
A. I've already answered the question. You're asking me the same flipping question ten different times and I've given you the same answer. How many times are you going to ask me the same thing? It's just annoying, it's frustrating, it's very unprofessional. Ask me -- to answer your next question, no, Kristie was never president of Pepper Pike Capital Partners. And when you ask it 10 minutes from now, the answer is no.
Q. The paragraph goes on, quote, after purchasing the property in 2017, the leases with LIGHT House were renewed annually in 2017 and 2018. My question is, did I read that correctly?

71

A. You are a very good reader. Yes, you did.
Q. And that is a quote from Kristie Arnst, correct?
A. That's what's on this piece of paper. How would I possibly know if that's a quote from Kristie Arnst? Wow. Wow.
Q. If you could go to the next page --
A. Do you want me to go in her mind? If we could take a five minute recess I'll get a scalpel, go in her mind and see what she was thinking and saying.
Q. Would you like to take -- would you like to take a re --
A. If it's her quote or not.
Q. Would you like to --
A. And if you're going to talk over me, I'm not going to talk anymore.
THE NOTARY: I'm sorry. I didn't getting much of that because you guys kind of were going over each other.
THE WITNESS: Because I was answering his question and he was rudely interrupting me the way he did all morning. So, I mean, whatever.

72

Q. If you'd like to take a break and go look for the e-mail, that's fine with me.
A. How am I going to find an e-mail? I don't have her e-mail. I'm not Kristie Arnst. Again, we went over this. Asked and answered. My name is Paul Kiebler. My name is not Kristie Arnst. I don't have her e-mail and I don't have access to her brain waves. But you're going to ask me that question again.
Q. Nobody at the company has access to Kristie Arnst's old company e-mail?
A. I have no flipping idea what people at this company have access to and what they don't have. I am testifying as Paul Kiebler, which we established earlier that I do not have access to her e-mails. You can ask me the same question a fourth time and I'll give you the same answer. Yes. I'm frustrated because it's like you've never done this. You're asking me the same damn question 10 times. I'll answer it the exact same way. I'm not -- I'm not going to -- oh, yeah, yeah, wait a minute. I can get in Kristie's head. Let me. Hold on. I'll get a scalpel. I'll open up her ear hole and I'll read what she's thinking, what she

said. I wasn't there. I said I've never seen this document. It's a third-party document that was in a newspaper and you're sitting there quoting shit off of it and saying, can you verify it. No, I can't. Silly. You're trying to make stuff up and it's just not truthful.

Q. Are you finished?

A. I'm finished.

Q. If you could scroll to the next page. The second full paragraph starts with, the property.

A. Yep.

Q. Second sentence of that paragraph says, according to Costar Group, Inc., a Washington, D.C.-based real estate information service, an affiliate of the company paid 52.325 million for the 744-unit complex in May 2017.

A. Please don't ask me to verify whether that's accurate because -- how -- how am I possibly going to know what Costar Group, Inc., a Washington, D.C.-based real estate information service, is -- what's your question? This is stupid.





Q. My question is, did an affiliate of Pepper Pike Capital Partners purchase the Crossings of Canton?

A. An affiliate of Pepper Pike Capital Partners did not. I've answered the question -- this will be the 11th time. I'm going to start keeping track on a piece of paper. This is the 11th time. Pepper Pike Capital Partners and the four subsidiaries do not own any real estate interest. Pepper Pike Capital Partners has four subsidiaries. You can ask me the question, you can try and make stuff up, you can go and find some company -- some ice cream stand in Iowa that says that, you know, Pepper Pike owns the ice cream stand under the place that serves a soft cone. It still doesn't own anything. We've asked and answered the same flipping question 12 times.

Q. Do you know what company paid in May of 2017 to purchase the Crossings of Canton?

A. I guarantee you have some kind of an org chart that will show me. But no, I don't. It was not Pepper Pike Capital Partners. We can have articles from every





newspaper in the country. It's simple -- you're not going to change the fact that Pepper Pike Capital Partners doesn't own real estate. I don't even know why you want it to, unless there's some reason which I don't know about. But it's absurd. That's the 13th time we've testified to that. I'm keeping track.

Q. Did Pepper Pike Acquisition Associates take a mortgage on a property in Wayne County, Michigan in August of 2019?

A. What? Does Pepper Pike have a mortgage?

Q. Did Pepper Pike Acquisition Associates, LLC, take a mortgage on a property in Wayne County, Michigan in August of 2019?

A. Like, did it lend money to some property? No.

Q. Did it take out a mortgage from a bank?

A. What company did --

Q. Pepper Pike Acquisition Associates, LLC.

A. It might have been a guarantor on a mortgage. That's my personal company that I started in 2012. That's me.





Q. Who would it be guaranteeing a mortgage for?

A. I don't know. You have the document. Why don't you tell us?

Q. But you just said it's you, so --

A. I don't know what you're looking at. If you share the document, I'd be more than happy to justify it.

Q. File 2M.

A. Why didn't we just start this way? Why do we have to play these games? Jesus. 2M.

Q. Okay.

A. I've got 2M open.

Q. The second page, do you see there's a listing for an assignment of -- assignment of either a mortgage or a lien on August 19th, 2019 from Pepper Pike Acquisition Associates to Home Savings Bank?

A. And you're saying that's a lien?

Q. I'm asking you what it is.

A. I've never seen this document in my life. This is your document. Not mine.

Q. It's not my document. It's from the Wayne County Register of Deeds.

A. Well, you're the one that's giving it to me. I have never seen it before. So I figured that if you would use it you would at least know what it is, but, obviously, not. I don't know what this document is. I've never seen it before and Pepper Pike Capital Partners owns no real estate and my employer is Pepper Pike Staffing.

Q. Would you be more comfortable if we did this deposition in the courthouse? You think you would feel more comfortable?

A. I would feel more comfortable if you would not ask me the same question 10 times. I've answered. I don't know what this document is. I've never seen it before.

Q. Did I ask you what the document was?

A. Yes. You just did. You said, what is this document. I said, I don't know, it's your document --

Q. I would like you to listen carefully to my questions. I think this will be easier on both of us.

A. That would be great. Thank you.

Q. On August 19th, 2019, did Pepper



Pike Acquisition Associates, LLC, grant a lien or a mortgage to Home Savings Bank of some property in Wayne County, Michigan?

A. I don't know.

Q. On August 19th, 2019, did Pepper Pike Acquisition Associates grant a lien to Pepper Pike Construction, LLC, in Wayne County, Michigan?

A. I don't know.

Q. If you could scroll back to the first page, the bottom entry dated February 2nd, 2018. Do you see Crossings Owner, LLC granting something -- some lien to APM Management, LLC? Do you see that?

A. I don't see it granting a lien, no.

Q. Is it granting something to APM Management, LLC?

A. I don't see that either.

Q. Do you see where it says Notice of Commencement at the bottom of page 1?

A. I see Notice of Commencement. I don't see granting anything.

Q. Okay. Do you see where it says Grantor, Crossing Owner, LLC?

A. I do.



Q. Do you see where it says Grantee, APM Management, LLC?

A. I do.

Q. Can we agree, based on this government document, that Crossing Owner, LLC granted something to APM Management relating to property in Wayne County, Michigan?

A. We can agree there was a Notice of Commencement. I don't know if we can agree that there was a granting of anything.

Q. So you don't know what this represents? That's going to be your testimony?

A. I will answer for the third time. I've never seen this document before.

Q. What is Wayne Harbor JV, LLC?

A. Wayne Harbor? I don't know.

Q. Oh. I'm sorry. Warren Harbor JV, LLC?

A. That's an entity.

Q. Directly or indirectly, does it own an interest in real property?

A. It owns an interest in a company.

Q. And if we follow through the intermediate entities, does that end in ownership of real property?



A. Yes.

Q. Warren Harbor JV, LLC has the same business address as Pepper Pike Capital Partners, correct?

A. There's probably 100 companies that share that same address.

Q. Are you involved in any way in all of those companies?

A. Some.

Q. Do any of them have employees that work out of that address?

A. All the employees are employees of Pepper Pike Staffing. Let me write that down.

Q. So all of the hundreds of companies that share the same address as Pepper Pike Capital Partners have no employees because they're all -- all the employees are Pepper Pike Staffing, correct?

A. No. I have to correct that. One company does have its own employees.

Q. Which ones?

A. They're 1099s. I don't know if a 1099 employee is an employee.

Q. Which one has 1099 employees?

A. It's named -- it's the Cleveland

Lumberjacks hockey organization. Pepper Pike Acquisition Associates, my company, owns a hockey organization where we support youth hockey players and that organization has coaches and referees.
Q. If you could open up Exhibit 2D, David. The second to last page, do you see an electronic signature Paul E. Kiebler IV?
A. Yep.
Q. January 15th, 2020 is the date. Do you have any recollection of submitting this document to the government?
A. I don't remember it, no.
Q. Do you deny that you did it or you don't remember?
A. You asked me if I remembered, I answered I don't remember. I don't -- I don't understand how I can ask a question and then you ask me the exact same question after I just answered it.
MR. HYMAN: Hey, Matt, can we take like a five-minute break?
MR. BESSER: Yeah.
MR. HYMAN: Thank you.
MR. BESSER: Okay. We're off.





(Thereupon, a short break was taken.)
BY MR. BESSER:
Q. We were looking at Exhibit 2D. I asked you to scroll through item 3, Related Persons.
A. Yes.
Q. Do you see where it says -- it identifies you as the CEO of the managing member of the issuer, Warren Harbor?
A. That's what it says, yes.
Q. Who is the managing member of Warren Harbor?
A. Of Warren Harbor?
Q. Yeah.
A. I don't know.
Q. Whatever it is, you're the CEO of it?
A. I've never seen that before, but maybe.
Q. Okay. Exhibit 2E.
A. Exhibit 2E. Let me get there. I'm there.
Q. Farmington Lender II, LLC. Am I correct that -- that through a series of intermediary corporations it owns some





apartment buildings?
A. It does not.
Q. What does Farmington Lender II, LLC do?
A. It is a lender.
Q. Does it lend to other entities to purchase property?
A. Does not.
Q. What does it lend -- I mean, it lends money obviously. To whom does it lend? What type of person or entity?
A. To -- to other entities.
Q. For the purpose of managing apartment complexes?
A. Not for managing, no.
Q. Building?
A. Again, we don't build anything.
Q. Right. I'm saying, does it -- does it lend to others to build?
A. No.
Q. Do you know what purposes it lends money for?
A. For real estate-related business.
Q. You are the manager of Farmington Lender II, LLC?





A. If that's what this paper says.
Q. True?
A. I don't know, but the paper does say that.
Q. Do you have any role in Farmington Lender, LLC?
A. Day-to-day, no.
Q. Do you have decision-making authority for the loans it makes?
A. No.
Q. Are you involved in any way in deciding what it will lend?
A. Best of my knowledge, it only made one loan.
Q. Who -- was that loan for -- related to an apartment complex in Farmington Hills, Michigan?
A. Yes.
Q. Am I correct that Farmington Lender II, LLC has no employees?
A. Correct. The employees are Pepper Pike Staffing.
Q. Exhibit 2F.
A. I've got to write this down. Exhibit 2F. 2F, 2F. There you go. The date

of this --
Q. Let me just back up for a second. You said the employees are of Pepper Pike Staffing. Do Pepper Pike Staffing employees manage the operations of the Farmington Hills apartment complex?
A. Pepper Pike Management manages Farmington Hills apartment complex.
Q. And then are Pepper Pike Staffing employees the ones who do the day-to-day onsite there at Farmington Hills?
A. Again, Pepper Pike Management manages it and the employees are through Pepper Pike Staffing.
Q. So Exhibit 2F is another SEC form for BWIP Core JV I, LLC. That entity -- do you know what that entity is?
A. No.
Q. You don't?
A. I've seen it before. I don't know what it is.
Q. Are you an executive officer or director of it?
A. I don't know.
Q. The second page, Related Persons,



mentions three -- has three entries. One is Kenneth Lapine, the second is you and then one is BWIP II, LLC. Let me focus on the you one. It identifies you on this form as an executive officer and director and promoter of Core JV I, correct?
A. That's what the form says.
Q. And at the back page this bears your electronic signature, correct?
A. That is what the form says.
Q. And as with the others, am I correct that you aren't denying that you either submitted or hadn't submitted, you just don't remember?
A. I don't remember the form.
Q. Do you know what BWIP II, LLC is?
A. What is the company?
Q. BWIP II, LLC. It's the third related person listed.
A. I believe it owned an interest in an entity.
Q. And who is Kenneth Lapine? I don't know if I'm pronouncing that right.
A. He's an attorney.
Q. Is he a business associate of



yours?
A. Yeah. I mean, he does legal work for us. Sure.
Q. Okay. Do you have a business relationship with him other than as lawyer-client?
A. Yeah. We play golf and do stuff together.
Q. Any other business relationship though as opposed to social?
A. Personally?
Q. Yeah. You and Mr. Lapine.
A. We did.
Q. But not currently?
A. Personally, I don't think so. I don't know.
Q. What is located at 30195 Chagrin Boulevard, Suite 320?
A. A building.
Q. I would assume so. Is that the former business address of APM Management?
A. I believe so.
Q. Exhibit 2G. Can you tell me what MPG JV, LLC is?
A. What was it again?



Q. The issuer on this form, MPG JV, LLC.
A. 2J, right?
Q. 2G. G, as in globe.
A. G, as in globe. G, G, G. Looks like it's an entity that owns an interest in another entity.
Q. Directly or indirectly, does it own real property?
A. At one point one of the entities owns real estate.
Q. Do you know what property it was? What real estate it was?
A. An apartment community.
Q. In what state?
A. Illinois.
Q. What was your relationship to MPG JV, LLC?
A. I believe I was personally a manager.
Q. And the last page, does that bear your electronic signature?
A. As I learned today, that's what that means.
Q. What law firm did you use for

89

offerings of securities?
A. I don't remember.
Q. Could you point me in the direction of who it might have been who submitted these forms if it wasn't you?
A. Again, I gave you a list of our law firms that we use. It would have been one of those.
Q. All right. Exhibit 2H. Does Spicetree Owner, LLC own the apartment complex known as Spice Tree Apartments?
A. Does it own that?
Q. Does or did it at the time of this filing?
A. It owned an interest in an entity.
Q. And indirectly did that lead to Spice Tree Apartments?
A. Yes.
Q. Turn to the second page under related persons. The first entry is BWIP 9 [sic], LLC. Do you see that?
A. I do.
Q. And that entity is identified as the managing member of Spicetree Owner. Do you see that?



90

A. Yep.
Q. Is that correct, to the best of your knowledge?
A. I believe so.
Q. And then, in turn, you are the sole member of BWP 9 [sic], LLC?
A. That's what this says.
Q. Is that accurate, to the best of your knowledge?
A. That's what this form says.
Q. Do you have any reason to dispute it?
A. I've never seen this form before, so --
Q. So the answer is no, you have no reason to dispute what it says?
A. If that's your answer, yes.
Q. Exhibit 2I should be for Georgetown Apartments.
A. Yes.
Q. What does Georgetown Apartments Investors, LLC do?
A. Nothing.
Q. Nothing?
A. I don't think it exists.



91

Q. It doesn't exist anymore?
A. I don't believe so.
Q. Do you know when it went out of existence?
A. No.
Q. Did it, directly or indirectly, own the Georgetown apartment complex?
A. It owned a company and directly up the chain some place one of the entities owned Georgetown Apartments.
Q. And Georgetown Apartment Investors operated out of the -- at the time it existed it operated out of the then APM Management address, business address, correct?
A. Georgetown Apartment Investors didn't operate. It was just an entity.
Q. Okay.
A. Appears to be that.
Q. All right. Exhibit 2J.
A. Yep.
Q. Let me back up. Georgetown Apartments. Did you at the time it existed, directly or indirectly, own any ownership stake? You, personally?
A. I do not believe so.



92

Q. What about through a trust?
A. I don't -- personally, no, I don't believe so.
Q. All right. Exhibit 2J is an Annual Corporate Filing Statement with the State of Michigan. Do you see that?
A. It says filed by corporation division administrator. I've never seen this form before. I don't know what it is.
Q. You see under item one, limited liability company name, Farmington Owner, LLC?
A. I do.
Q. Is that the property that owns the Farmington Hills apartment complex?
A. No.
Q. What does Farmington Owner, LLC do?
A. That's the entity that owns the apartment complex.
Q. Okay. That's what I -- that's what I asked. Okay.
A. That is not what you asked. You can go back to the court reporter. You asked if that's the property that owns it. It's not a property. It's an entity.
Q. Okay.

A. We can argue all day long.
Q. Do you know what I mean?
A. I do not know what you mean. I can't get inside of your head and I can't get inside of Kristie Arnst's head, which you asked me earlier to do. So -- I don't have that ability. I wish I did.
Q. Farmington Owner, LLC has no employees, correct?
A. Correct.
Q. Do you, directly or indirectly, personally or through a trust, have any ownership stake in Farmington Owner, LLC?
A. Maybe a dotted line through a trust some place, but not directly.
Q. And did it operate -- or it exist at the same business address as Pepper Pike Capital Partners?
A. It has the same mailing address, yes.
Q. Does it do anything other than own the property?
A. No.
Q. Exhibit 2L. Have you ever seen this before?



A. No.
Q. This is a claim of lien on a property called The Retreat At Farmington Hills. Is that the property owned by Farmington Owner, LLC?
A. Indirectly, yes.
Q. The third full paragraph states that the owner of such property is Pepper Pike Capital Partners. You say that that is incorrect?
A. That is 100 percent inaccurate. It is not correct.
Q. It says the general contractor is Pepper Pike Construction, LLC. Is that correct?
A. It's the contractor. I don't know if it's the general contractor or not, but it is the contractor.
Q. Are you familiar with the business that filed this lien?
A. Yes.
Q. Was the lien satisfied?
A. No.
Q. Is a lien subject to a lawsuit?
A. I mean, I'm not an attorney.



There's no ongoing litigation with it.
Q. Is it -- is it -- was there a legal dispute over the validity of the lien?
A. Yes.
Q. And was it resolved by judgment, by settlement or by some other means?
A. It's not resolved. It's ongoing.
Q. Okay. But as far as you know, there was no lawsuit filed?
A. Well, I mean, I'm not an attorney. I know there's not litigation. I know they filed the lien. If filing a lien is a law -- or litigation, then there is. But not being an attorney, I don't know the definition of that.
Q. Does Pepper Pike Capital Partners have legal counsel with respect to this lien?
A. No.
Q. Does Pepper Pike Construction have legal counsel for --
A. Yes.
Q. Who is that counsel?
A. A guy up in Michigan. I've never met him.
Q. The firm?
A. I don't know the name. I don't



know his name. I think his first name is Jeff.
Q. Am I correct that's not one of the instances you've been deposed with respect to that lien?
A. There was no litigation. I don't know what I would have been deposed in. Unless they can randomly take depositions.
Q. Actually, yes. So that's -- am I correct you haven't been deposed with respect to this lien?
A. I haven't been deposed with respect to this lien. We're trying to negotiate with the contractor. We offered to let him go for -- if he pays us 200 grand and we're trying to negotiate. He's paying us.
Q. He -- Northern Home Improvement is paying you?
A. He should. Yep.
Q. Okay. Paying which entity?
A. Construction.
Q. Was there -- what is he paying you for? Is there damage on the property? Is it for wages on a subcontractor?
A. The contract wasn't performed.
Q. Okay. By Northern Home

97

Improvement, you're saying?
A. Right.
Q. Do you know what entity or entities or people owned the apartment complex called Spring Hollow in Toledo?
A. We discussed --
Q. Could it have been LC Spring Hollow, LLC?
A. Could have been.
Q. Do you, directly or indirectly, personally or through a trust, have any ownership or equity stake in LC Spring Hollow, LLC?
A. No.
Q. You cut out.
A. What's that?
Q. Cut out.
A. Cut out?
Q. Yeah. I didn't hear your answer.
A. I said no. I have no ownership.
Q. Do you know who -- what person or entities own the property known as Woodlands in Toledo?
A. Again, I would just guess.
Q. Do you, indirectly or directly,

98

personally or through a trust, own any equity or stake in LC Woodlands, LLC?
A. I may indirectly, through a company, own a very, very small percentage, but I don't believe so.
Q. The Toledo-area property known as Hawthorne Hills, did you, directly or indirectly, personally or through a trust, own any ownership interest in it at any time?
A. I may have owned a very small percentage indirectly.
Q. Same question for Hawthorne Hills Toledo, LLC. Any ownership interest?
A. That's the one you just asked about, wasn't it?
Q. Well, I was asking the property. Now I'm asking about an entity known as Hawthorne Hills Toledo, LLC.
A. I don't know.
Q. What about the property known as Country Club in Toledo? Did you ever, directly or indirectly, have any ownership stake in it?
A. That company was sold years ago. I don't remember.
Q. Do you, directly or indirectly,

99

have any ownership stake in either LC Country Club, LLC or LC Country Club B, LLC?
A. Country Club B, as in boy?
Q. Yes.
A. I've never even heard of that. I don't know.
Q. Country Club B was the entity that the deed was signed over to. That's why I'm asking about it. Does that refresh your memory?
A. No. I don't know.
Q. Okay. Am I correct that Pepper Pike Management managed the properties Spring Hollow, Woodlands, Hawthorne Hills and Country Club at some point in 2017?
A. You're incorrect.
Q. Okay. Did it manage any of them?
A. No.
Q. Did APM Management manage any of them?
A. Yes.
Q. Did APM Management employ the employees who ran the day-to-day at any of those properties?
A. I don't remember.

100

Q. Did APM Management have subsidiaries in 2017?
A. I don't remember.
Q. Do you, directly or indirectly, have any ownership or equity in 1075 Weybridge Associates, LLC?
A. Do I?
Q. Yeah.
A. No.
Q. And your testimony would be then neither do any of the defendants -- the corporate defendants, directly or indirectly?
A. You're asking me about Pepper Pike Capital Partners?
Q. Or any of its subsidiaries.
A. And this would be the 16th time that they don't own any real estate.
Q. I'll ask you about the Country Club and then maybe it will be a good spot for a lunch.
A. Well, no. I just want to go through. I --
Q. We are going to take a break for lunch.
A. Well --

Q. The court reporter is entitled to a break.
A. You've asked me the same question 16 times. I've written it on my piece of paper. I mean, let's get this over with.
Q. Okay. Country Club property was sold in July of 2017, correct?
A. I don't remember.
MR. BESSER: Alex, if you could send Exhibit 16.
MR. COOK: One minute.
(Off the record.)
BY MR. BESSER:
Q. Have you seen Exhibit 16 before?
A. I've seen pages of it.
Q. This is the deed transferring the Country Club apartment complex in 2017, correct?
A. The first page I haven't seen, but let me read it. Yes. It appears that way.
Q. Did -- what was your role with LC Country Club, LLC?
A. I was the authorized signatory.
Q. Did you have any other role?
A. Not that I remember.





Q. Were you an owner or member?
A. I might have been a member. I was not an owner.
Q. As a member, did you have some equity in it?
A. I just said I didn't have any ownership in it. Equity is ownership.
Q. Okay. You said that a member of an LLC is just another word for owner.
A. What?
Q. Your testimony is you were a member of LLC, but had no ownership? Is that --
A. I was a manager of the LLC and I had no ownership in the LLC.
Q. Who made you the authorized signatory for it?
A. This is -- I don't. This is almost four years ago. I don't remember.
Q. Page 2. Is that your notarized signature?
A. I don't know.
Q. Is that your notarized signature?
A. Yes.
Q. Having seen your notarized signature, does that refresh your memory about





whether you saw the first page before you signed the deed?
A. It does not recollect my memory. My testimony will stand as previously testified.
Q. Can you tell me who any of the owners of Country Club, LLC -- LC Country Club, LLC were in 2017?
A. In 2017, no.
Q. Who did you report to for LC Country Club, LLC as the authorized signatory?
A. I don't remember.
Q. Who did you report to as a member of it?
A. I don't remember.
Q. Who were the other members of it?
A. I don't remember.
Q. Were there other members?
A. What's that?
Q. Were there other members?
A. I don't remember.
Q. You might have been the only one?
A. I don't remember.
Q. Having seen the deed, can you tell me who LC Country Club B, LLC is? What it is?





A. Not by looking at the page I'm looking at.
Q. Do you have any memory of who it was that owned that company that purchased the Country Club?
A. It appears to be LC Country Club, LLC.
Q. All right. Do you have any memory of who the owners of that purchaser were?
A. I would just be speculating. I'm sorry to interrupt. Do you see Country Club B on this form you gave me?
Q. Yes. It's on the fifth line down on the first page.
A. Never seen that entity before. Wonder if it was a typo.
Q. If not LC Country Club B, LLC, who would have purchased the Country Club property?
A. Oh. Is that the purchaser?
Q. Yes.
A. Oh. I have no idea. Some dude out of New York. That's why I've never seen the entity. Of course I would have never seen it. They bought it. I had nothing to do with that. The mystery is solved.

105

Q. Well, you at least signed over the deed, right?
A. For LLC Country Club. Not for LC Country Club B. I don't know who that is.
Q. Were you involved in the sale negotiations?
A. No. There was a broker.
Q. Were you involved through the broker in setting the price, negotiating the price?
A. Typically the broker set the price and negotiated.
Q. And that was the process that was followed for this deed?
A. I don't remember, but --
Q. Is it correct that you were an 80 percent owner of APM Management?
A. What's that?
Q. Is it correct that you were an 80 percent owner of APM Management?
A. When was that?
Q. In 2017.
A. I don't remember.
Q. If the tax returns show that you were an 80 percent owner of APM Management in



106

2017, would you dispute that?
A. I would assume the tax return is correct.
Q. In 2017, APM Management became Pepper Pike Capital Partners, correct?
A. No.
Q. Pepper Pike Capital Partners is a successor to APM Management, correct?
A. I don't believe -- APM Management is still here. It's a company. It's operating.
Q. Are you aware that Pepper Pike -- that the defendants in this case have admitted already that Pepper Pike Capital Partners was a successor to APM Management?
A. I don't know if they did or didn't.
Q. Okay. You're saying it is not --
A. I don't know what the legal definition of a successor is. I can tell you that, you know, APM, I believe, is still here. But --
Q. Does APM Management do anything?
A. I believe it manages The Woodlands. I'm not 100 percent sure though.
Q. APM Management does not have any



107

employees currently, correct?
A. Again, I don't know.
Q. Why did you form Pepper Pike Capital Partners, LLC?
A. On the advice of my attorney.
Q. Does the Paul Kiebler Revocable Trust own 100 percent of it?
A. What is it?
Q. Pepper Pike Capital Partners, LLC.
A. I don't know. You asked me that earlier in the deposition and I said I didn't know and I don't know now.
Q. Do you know who Jason Wasserman is?
A. Wasserman? No.
Q. Is it Wasserman or Wasserstein?
A. I don't know either of those people.
Q. Okay. Was there a Jason who was a part owner of APM Management?
A. Yes.
Q. What was his last name?
A. Wasserbar.
Q. Wasserbar. Okay. Does he own any portion of Pepper Pike Capital Partners?
A. No.



108

Q. Was his interest in APM Management bought out by you or anyone else?
A. I don't know.
Q. Steven Pogozelski, he was a part owner of APM Management, correct?
A. I don't know.
Q. He does not own any portion of Pepper Pike Capital Partners, LLC, correct?
A. I don't believe so.
Q. Was Steven's interest in APM Management bought out by you or anyone else?
A. Again, I don't know.
Q. All right.
MR. BESSER: Well, this is a good spot for a break.
Jon, how long would you like?
MR. HYMAN: Take a half hour. How long do you plan on going today?
MR. BESSER: You know, that will be up to agreement by us. To the end of the day. If you want to stop earlier, we can stop earlier.
MR. HYMAN: All right. Well, let's reconvene at 1 and we'll figure out what time we want to go to.

MR. BESSER: Okay. Thank you.
MR. HYMAN: All right.
(Thereupon, a lunch break was taken.)



AFTERNOON SESSION
CONTINUED EXAMINATION OF PAUL E. KIEBLER IV
BY MR. BESSER:
Q. Have you ever had any training on employment law?
A. On what?
Q. On employment law.
A. I have.
Q. How recently?
A. The most recent, maybe two weeks ago.
Q. And who gave that training?
A. We had a consultant come in.
Q. Was that training given to all the employees?
A. Yes.
Q. What employment law topics did it cover?
A. Just general employment stuff. Yeah. It covered a lot of stuff. It was a couple hours.
Q. Before that, when was the most recent time that you had had employment law training?
A. We use a system online. It's an



educational system. We require new employees to take classes on that. We take classes -- I don't know. I don't know when is the last time I did it. Maybe a few months ago. Less than a year ago.
Q. In 2017, is that the same process you used for employment law training?
A. I don't remember the specifics of 2017.
Q. By 2017 had you had employment law training before?
A. Again, I don't remember the specifics of 2017.
Q. Understood. I'm asking if, at that point, you had ever had employment law training?
A. Prior to -- I don't remember.
Q. The employment law training you've had, has it covered employee leave law? Laws covering employee leaves?
A. I assume it covered all aspects of employee law. I don't remember the specifics of it.
Q. You understand that companies have to comply with the employment laws, even if



it's inconvenient, correct?
A. Yes.
Q. And it is your -- it is Pepper Pike Capital Partners' policy to make sure it finds out what employment laws apply to it in the jurisdiction where it works, correct?
A. Again, Pepper Pike Capital Partners does not have any employees, so employment law probably isn't as important to Pepper Pike Capital Partners which --
Q. Well, what about Pepper Pike Staffing?
A. Pepper Pike -- so is your question about Pepper Pike Staffing?
Q. Yeah. Is it the policy to make sure it knows what employment laws apply to it in the jurisdictions where it employs people?
A. I don't -- I don't know.
Q. What do you know about the Family Medical Leave Act?
A. Not a ton.
Q. Do you know anything about it?
A. I know that there's rights that employees have if they or their families are sick.

113

Q. What kind of rights do you understand those to be?
A. It's a -- I don't know, I mean, the specifics of it. We have someone here that, you know, handles that, our attorneys help and, you know, that's how it's managed.
MR. BESSER: Jon, have you gotten Exhibit 3?
MR. HYMAN: I did.
Q. All right. Do you have file Exhibit 3 in front of you?
A. I do.
Q. And the cover of that says Pepper Pike Capital Partners, LLC Employee Handbook, December 2016. Do you see that?
A. I do.
Q. Did Pepper Pike Capital Partners, LLC have employees in December 2016?
A. Again, Pepper Pike Staffing had the employees, Pepper Pike Capital does not have any direct employees.
Q. This is the handbook that applied to the subsidiaries?
A. I don't know.
Q. Are you aware of any other handbook



114

that would have applied to the employees?
A. I wasn't aware of this handbook, so no.
Q. You've never seen this before?
A. I have not.
Q. Is there a different handbook that you're familiar with? Or you haven't seen a handbook, period, for the company?
A. Yeah. I don't remember seeing a handbook.
Q. If you can turn to page 28 of the document, which has a little stamp in the right-hand bottom corner, APM 157.
A. Yep.
Q. And I realize you say you've never seen the handbook before, but could you just read under the heading where it says Family Medical Leave Act and tell me if that's consistent with the company's FMLA policy?
A. Again, this appears to be the FMLA policy of Pepper Pike Capital Partners.
Q. Why would it need an FMLA policy if it had no employees?
A. Maybe it was thinking about hiring employees. I don't know.



115

Q. Was it thinking about hiring employees?
A. I don't know. This was in 2016.
Q. Did you run Pepper Pike Capital Partners back then?
A. Did I run it? I didn't run --
Q. Who was in charge? Who was in charge?
A. Pepper Pike Capital Partners didn't really do much. It owned four -- four little companies. I mean, there wasn't much going on at Pepper Pike Capital Partners.
Q. Who's in charge of it today?
A. Again, it does virtually nothing. It basically owns four entities and the entities do things.
Q. Who's in charge of the entities?
A. The entities?
Q. Subsidiaries, yeah.
A. So, you know, Frank is, obviously, running the management company. We already went over that. Construction company, I'm involved in. Staffing company, myself and HR involved in. And Acquisitions -- well, it's not doing much. I guess you would say I'm



116

involved in it.
Q. Well, the employees and managers ultimately report up to you?
A. No. They report through Pepper Pike Staffing, where they're employed.
Q. And the person who runs Pepper Pike Staffing, does that person report to you?
A. There's not much reporting. I mean, it just has employees. What would it need to be reporting?
Q. Do you report to anyone?
A. My wife.
Q. In work? With respect to business, do you report to anyone in Pepper Pike Capital Partners?
A. Pepper Pike Capital Partners? Pepper Pike Capital Partners reports to no one.
Q. Do you -- in your role with Pepper Pike Capital or any of the subsidiaries, do you report to anyone?
A. There's different people that run different entities that Pepper Pike Capital Partners owns, so maybe I report to them in some twisted way.
Q. Does anyone have the authority to

117

fire you?
A. Me.
Q. You're the only one who has the authority to fire you?
A. I mean, obviously, entities can fire the company, not fire me direct.
Q. Any person at Pepper Pike Capital or the subsidiaries have the authority to fire you?
A. No.
Q. Do you have the authority to fire anyone?
A. I could, but most people don't report to me, so I wouldn't fire them. There's sort of a chain of command.
Q. Could you turn on Exhibit 3 to page APM 136?
A. Why is APM on this document? This is a --
Q. That's a Bates stamp -- yeah. That's a Bates stamp put on there by your counsel for purposes of identification during the litigation.
A. What page did you want me to go to?
Q. Exhibit 136. It's page 7 of the



118

document.
A. 136. Yep.
Q. Do you see at the top there's a heading Americans With Disabilities Act?
A. Yes.
Q. Are you familiar with that law?
A. ADA?
Q. Yes.
A. Yep.
Q. What's your understanding of what it requires of a company with respect to its employees?
A. To make reasonable accommodations for employee -- or that -- for anyone that has a disability. We at our apartment communities, you know, put in ramps and things like that.
Q. So are you referring to tenants and visitors or employees or both?
A. I'm referring to anyone that has a disability.
Q. Are you aware that reasonable accommodation under certain circumstances could include job-protected medical leave?
A. That's a legal point. I'm not an attorney.



119

Q. Still, are you aware whether it could or not?
A. Again, I'm not an attorney. I don't know the definition of all this.
Q. You know what. You just used the term reasonable accommodation.
A. That's because I read it off this page. It says, can -- reasonably accommodated for a job without undue hardship.
Q. Okay. Do you know what a reasonable accommodation is?
A. Yeah. You are able to install an elevator in a building and -- you know, there's only stairs and you can install it and accommodate someone in a wheelchair, you should do it, and we did.
Q. Do you have -- do you have any understanding of whether one type of reasonable accommodation could be protected medical leave?
A. Again, I don't know the legal definition of those words. We have attorneys that we work with and we follow their request.
Q. So when a medical issue, a potential disability issue comes up with an employee you go to the attorneys?



120

A. Again, I -- we do work with our attorneys. We try and do the best thing we can for everybody and, you know, we -- and that's what we do. I can't think of another way to answer the question.
Q. Under either the FMLA or the ADA, do you know whether employees returning from leave have a right to reinstatement in their old job or an equivalent job?
A. Again, I haven't read the law. I don't know the entire statute of the law.
Q. You don't know one way or the other?
A. I answered the question. I said, I haven't read the entire law. I don't know what the -- I don't know the specific wording of the law.
Q. Understood. I'm asking about this one thing. Do you know whether there's a right to reinstatement or not? If your answer is I don't know, fine.
A. What's that?
Q. If your answer is I don't know, fine. I'm just trying to understand your answer to that specific question.

121

A. My answer to that specific question is, I haven't read the law. I know what the policy is and, you know, we abide by it.
Q. Setting aside the allegations at Crossings of Canton, which, as I understand, did not involve employees, are you aware of any employee allegations of either disability discrimination or an FMLA violation made against either Pepper Pike Capital Partners or any of the subsidiaries in the past five years?
A. Again, the only subsidiary that has employees is -- APM has employees and Pepper Pike Staffing has employees and not -- I don't remember.
Q. Not that you're aware of?
A. I just don't remember.
Q. Okay. Are you including APM Management in your answer? You don't remember any allegations against APM Management?
A. Not that I remember.
Q. In the event of a reduction in force, is the policy of Pepper Pike Capital and its subsidiaries to consider an employee's length of service? Is that correct?
A. Well, again, Pepper Pike Capital



122

Partners doesn't have employees, so it probably doesn't have a policy for that.
Q. What about Staffing?
A. Yeah. I don't know how Staffing does that.
Q. Could you flip to page 17 of the document, which is stamped APM 146?
A. Okay.
Q. Do you see toward the top there's a heading reduction in staff?
A. Yep.
Q. Are you familiar with this policy?
A. Again, this is a policy of Pepper Pike Capital Partners, which doesn't have any staff, so I wouldn't be familiar with it, but I can certainly read it for you and see what Pepper Pike Capital Partners's policy was.
Q. Go ahead and read it. Are you familiar with it?
A. I just read it. I mean, I understand what the words say.
Q. Does that policy apply to Pepper Pike Staffing?
A. I don't know. I don't know their handbook.



123

Q. Know what about their handbook?
A. I said I don't know their handbook. Do you have a copy of it we can look at real quick?
Q. Well, do you know, is there one?
A. I don't know. I'm asking you. I don't know --
Q. Sir, they're not my documents. They're not my documents.
A. This isn't my document. I've never seen it before.
Q. Well, do I -- do I work for Pepper Pike Capital Partners?
A. I don't know. Do you? No one does. We already -- that's the 20-something time.
Q. Exactly. Exactly.
A. There's no employees at Pepper Pike Capital Partners. We both agree to that. You're talking about a handbook for a company that has no employees.
Q. Well, does it make sense to you, sir, that a company that has no employees would spend all this time and, presumably, money creating a handbook for no employees?



124

A. Yes, it does.
Q. How does that make sense to you, to create a handbook if you have no employees?
A. Because maybe they were talking about hiring employees and expanding into something else and, you know, they went ahead and did it. I don't know. I mean, I can't get in other people's minds. As we talked about earlier, I can't crawl in somebody's ears and see what they're thinking. I didn't write this -- this handbook, I'm not familiar with this handbook. I've -- this handbook is not here in the office. This is the first time I've seen the handbook. But if you want to ask me about Pepper Pike Capital Partners's employees I will tell you, for the umpteenth time, Pepper Pike Capital Partners has no employees.
MR. COOK: Hey, Matt. Can we take just a quick five-minute break?
MR. BESSER: Sure.
MR. COOK: Thanks.
(Thereupon, a short break was taken.)
BY MR. BESSER:
Q. If Exhibit 3, this handbook, doesn't apply to the Pepper Pike Staffing

125

employees, who would know what policies do apply to that -- to their employment?
A. I don't know. Let me find the exhibit, Exhibit 3. This is Pepper Pike Capital Partners. Pepper Pike Capital Partners, this would be their employee handbook.
Q. Capital Partners, you said?
A. Correct. Yeah. That's what the document says that was provided.
Q. Again, this was produced by your attorney, so you know. Am I correct that you are unsure whether Pepper Pike Staffing has a separate handbook?
A. Yeah. I don't know. I don't -- I don't know if it has a handbook or not.
Q. In the first half of 2017 were the employees employed by Pepper Pike Staffing or by APM Management?
A. Depends on what company they worked for. If they worked for APM, they were employed by APM. If they were working for Pepper Pike Staffing, they were employed by Staffing. That's like asking me if an employee of McDonald's worked for Burger King. If they



126

worked for McDonald's, they were employed by McDonald's.
Q. In the first half of 2017 both corporations had employees?
A. I believe Staffing had employees and I believe APM has employees.
Q. The regional property managers in 2017, first half of 2017 --
A. You're asking about specific employees in 2017? I don't know.
Q. How did -- whichever company it was that employed property managers and regional property managers, how did the company go about recruiting new hires?
A. I don't -- I don't know.
Q. Who was responsible for hiring property managers and regional property managers in 2017?
A. I don't know.
Q. Could it have been Stephanie Sturzinger?
A. Might have been, might not have been. I don't know.
Q. Do you know who was responsible for maintaining records about job vacancies and



127

applicants for jobs in 2017?
A. No.
Q. Do you know if the company used online hiring portals to post vacancies and receive applications in 2017?
A. In 2017, I don't know.
Q. Who was in charge of HR in the first half of 2017?
A. I don't remember.
Q. In 2016, so a year prior, is it true that oversight of the various properties was flexible with respect to which regional property manager had responsibility? Let me rephrase that question. In 2016, did regional property managers vary which properties they would oversee from time to time?
A. I don't remember. Properties were assigned to regional property managers.
Q. In 2016, about how many properties would each regional property manager be responsible for?
A. I don't remember.
Q. Let me switch gears. What, if anything, did you personally do to look for documents or e-mails in response to discovery



128

in this case?
A. We've turned over what was available.
Q. Understood. I'm asking about you, personally. Did you, personally, do any of that searching?
A. No.
Q. Do you know who did?
A. No.
Q. Were you involved in responding to discovery in any way, providing information? Documents or information?
A. Just from a very high level.
Q. High level in what respect?
A. I just knew it was happening.
Q. Did you provide information to respond to discovery?
A. I would not have had any.
Q. That's a no, you did not provide any information to respond to discovery?
A. I don't remember.
Q. Did you see the discovery requests?
A. I don't remember.
Q. Do you know what they sought? What categories of information they sought?

A. If I don't remember seeing the discovery requests, I pretty much don't remember what would be on the page.
Q. How then do you know that you would not have had any responsive information?
A. Because we had a meeting about it and I wasn't assigned to duty on it.
Q. Who was at the meeting?
A. I don't remember. It was a room full of people.
Q. What people?
A. I said I don't remember.
Q. Was your counsel there?
A. I don't remember.
Q. Was Steven Pogozelski there?
A. Again, I don't remember who was in that room.
Q. Did you provide any information to counsel to respond to discovery?
A. Again you've asked me that question and I said I did not.
Q. When was this meeting to discuss discovery?
A. I don't remember.
Q. Was it this year?



A. I don't remember.
Q. Was it at your offices?
A. Yes.
Q. Do you know whether it was close in time to when the complaint was filed?
A. I don't remember.
Q. Do you know what the company did, the defendants did to ensure they were meeting their obligations to answer discovery truthfully and fully?
A. I don't know.
MR. BESSER: Alex, if you could send 4, 4A, 4B, 4C and D.
MR. COOK: Yeah. Let me pull it up. 4 and then 4A thru C?
MR. BESSER: And D. I'm sorry. And 5.
MR. COOK: Okay. Got it. Okay. All right. That just went out.
MR. BESSER: Do you have Exhibit 4?
MR. HYMAN: Not yet. I do now.
Q. Let me know when you have that, sir.
MR. HYMAN: I just forwarded it to Paul.



Q. Do you have Exhibit 4, Mr. Kiebler?
A. No. Oh, there it is. Yep. I got it.
Q. You can open it up. Defendant 4 is Defendants' Answers, Responses and Objections to Plaintiff's First Set of Discovery in this case. Have you seen this document before?
A. I don't remember.
Q. You might have, you just don't remember?
A. I don't remember. I mean, I've seen a lot of legal documents. They all look the same to me. I'm a real estate guy.
Q. So you can't tell us whether you read these, whether they were -- before they were served, correct?
A. I just don't remember.
THE WITNESS: Can you guys hold on a sec? Hold on a sec. I've got a 2:30 doctor's appointment to go to. We're taking off. I've got to cancel.
MR. HYMAN: Well, Paul. Hey, Paul.
THE WITNESS: Yes.
MR. HYMAN: We're going to end at 3 anyway. So make your 2:30 doctor's appointment



and we'll come back another day.
THE WITNESS: All right. It's -- I've got a wart on this little pinky right here. So I was going to have them burn it off. But that's at 2:30. So you guys decide what to do.
MR. BESSER: What time would you have to leave?
THE WITNESS: It's 10 minutes away. So 2:20.
MR. BESSER: We'll see where we're at at 2:15.
Q. Could you turn to the second page of Exhibit 4 where it says Interrogatory No. 3?
A. Yeah.
Q. Read that to yourself.
A. Yep.
Q. The interrogatory asks each person providing information for the answers to these interrogatories. Do you see that?
A. Yep.
Q. It says, prepared by counsel with input and information from Paul Kiebler, President and CEO of Pepper Pike Capital Partners.

133

A. Yep.
Q. Are you saying that that answer to number 3 is incorrect?
A. No. I would say that corresponds with my previous testimony, that from a high level I was involved in it. The staff did all the work and I basically was sort of in the meeting.
Q. Okay. A couple minutes ago you said, no, you didn't provide information in response.
A. No. I didn't --
MR. HYMAN: Objection. Asked and answered.
Q. Go ahead.
THE WITNESS: I'm sorry.
A. I said specifically I didn't go and dig and find information, but I did say that I was involved at a high level, set in the meeting and, you know, the staff basically did that.
Q. Okay.
A. So that's 100 percent consistent.
Q. Okay. So the answer to Interrogatory No. 3 is true?



134

A. Yeah. That information came from us.
Q. I'm asking you, about you, Paul Kiebler. When it says, input and information from Paul Kiebler, you're saying that's true?
A. Yeah. Because I was there, I was the top person in that meeting and they put it together and got it over to the attorney. I believe my answer is 100 percent true.
Q. Why then did you not sign the sworn verification to these discovery responses?
A. Because I'm not an attorney and I didn't -- wasn't asked to.
Q. Is Steven Pogozelski an attorney?
A. No.
Q. Okay. If you look to the back page you'll see that Steven Pogozelski signed a sworn verification attesting these answers are true. Do you see that?
A. I do.
Q. I don't see Steven Pogozelski as listed as -- being listed as having provided information on Interrogatory 3. Did he?
A. I assume that everyone in the company pulled together as much information as



135

we could to respond with the requests.
Q. So there are people who provided input and information in response to these interrogatories other than Paul Kiebler?
A. At my direction, yes. I mean, it's not feasible that I would be able -- have the time, energy or effort to do 100 percent of this.
Q. Why are they not all listed in the answer to Interrogatory No. 3?
A. I don't know.
Q. You know that in litigation a party has an obligation to provide truthful information, right?
A. Yes.
Q. The next page --
A. I still believe that's a truthful answer, but we can go on.
Q. But it's not complete, correct, because it omits people who provided information?
A. No. It's truthful in that the statement is an accurate, truthful statement.
Q. But it's incomplete --
A. It's accurate and truthful.



136

Q. But it's incomplete because other people provided information, correct?
A. Would we list the guy who made the paper in the woods because of the paper -- the information was on paper? I mean, understand what the sentence means. Or we can twist and spin it however you want, but I think it's a 100 percent accurate statement. Just because some guy made a sheet of paper doesn't mean we should list him in --
Q. Well, did Steven Pogozelski make a sheet of paper or did he provide substantive information?
MR. HYMAN: Objection. Asked and answered.
A. I don't remember what Steven did, but I was making a point based on your previous point that anyone that had anything to do with it needed to be listed out and, you know, it's at my direction.
Q. You understood and you understand that answers in discovery have to be fully truthful and correct, correct? Right?
A. My opinion -- yes, I do. And, in my opinion, that is truthful.

Q. The next page has Interrogatory No. 6. Do you see that?
A. Yep.
Q. Do you want to read that to yourself and let me know when you're ready?
A. Yep.
Q. This interrogatory asks for people with knowledge relevant to the case, right?
A. That's what it asks for.
Q. And the only two people the company identifies are Sharon Zinser and yourself?
A. That's what the answer is.
Q. But that's not fully complete, is it?
A. I think those are the people that were at the top of the food chain, that you mentioned earlier.
Q. Did Stephanie Sturzinger know anything about the subject of this case?
A. Again, you'd -- I don't know. I mean --
Q. Do you know Stephanie Sturzinger submitted an affidavit about the merits, the facts of this case?
A. I've not seen her affidavit, no.



Q. You don't know that she submitted an affidavit, a sworn statement?
A. I've heard that she did it, but I have not seen one.
Q. And you know that her statement was about the substance of the reorganization, the company's defense?
A. I don't know what her statement was. I can't tell you that -- well, I don't know what her affidavit was.
Q. Does Stephanie Sturzinger know about the substance of the company's defense?
A. Again, you would have to ask her about it.
Q. I'm going to. I'm asking, do you know if she has knowledge about the reorganization?
A. About the reorganization of what?
Q. The companies.
A. About how the companies are formed? No. She wouldn't know about how the companies were formed. What is the reorganization you refer to?
Q. Well, tell me -- tell me what the defense is in this case, as you understand it.



A. I'm not an attorney. I'm not going to give a legal argument.
Q. I'm not asking for a legal argument. I'm asking you to tell me why the company denies liability.
A. That's a legal argument.
Q. You can't give me any factual reason why the company thinks it's not liable?
A. That's a legal argument. I mean, I'm not going to give --
Q. I don't hear an objection from your counsel, so you can go ahead and answer.
MR. HYMAN: Objection. I mean, I think he answered. He's telling you that he thinks you're asking for a legal argument.
Q. Okay. So when we go -- when we go to trial and you're on the stand and I ask you why does the company think it's not liable your answer is going to be, I don't know, I'm not a lawyer?
A. No. I'm -- my assumption is we'll sit down, we'll prepare for trial like most people will prepare for trial and, you know, if that's a question you ask, I'll answer it to the best of my ability. Right here in this



deposition I'm answering it, I'm telling you that you're asking for a legal opinion from me and I'm not comfortable giving you one.
Q. Okay. Is the company liable?
A. That's a legal question.
Q. But you're not denying the company is liable? You don't know?
A. I'm not --
MR. HYMAN: Objection.
A. You're asking me for a legal opinion, which I think is completely inappropriate. I'm not an attorney, I'm not a judge and I'm not a jury. In my opinion, no.
Q. In your opinion, no, the company is not liable?
A. I can't answer the question. I mean, you're asking me for questions -- I mean, ask me if Pepper Pike Capital Partners owns real estate. The answer is no.
Q. Why did --
A. It didn't have --
Q. Why did -- are you done, sir?
A. I am.
Q. Why did defendants fire Michelle Brady?

141

A. I don't know.
Q. Did you ever know?
A. I -- I don't know.
Q. Who would know?
A. I don't know.
Q. Who made the decision to fire Michelle Brady?
A. I don't know. I tell you at the time -- I don't know.
Q. Did you ever know who made the decision to fire Michelle Brady?
A. If I knew then, I don't remember, so I don't know. I mean, I've answered that question.
Q. Did you make the decision to fire Michelle Brady?
A. I've made the decision to fire three people in my entire life.
Q. Is one of them Michelle Brady?
A. No.
Q. Were you involved in the decision to fire Michelle Brady?
A. I don't remember.
Q. In 2017, the company made changes to the way it manages properties; is that



142

correct?
A. In that time frame, yes.
Q. Was Stephanie Sturzinger involved in that process?
A. Describe that process.
Q. The process of changing the way it managed its properties.
A. Well, we hired third-party management. I don't think she was involved in the third-party management.
Q. Would you be aware of the process of hiring third-party management?
A. From a high level, yes.
Q. If you could turn to page 8 of the document, Interrogatory No. 14.
A. Yep.
Q. This interrogatory asks, state the name, residence and business address, residence and business phone number of any person who assumed any of plaintiff's job duties after her employment with defendants was terminated and the answer is, none, the position was outsourced. Did I read that right?
A. You read that correctly.
Q. Michelle Brady's position was not



143

outsourced, correct?
A. We were in the process of turning all the management over to a third-party management company and we were consulting with them and they were helping, you know, make decisions on the property level.
MR. BESSER: Ashanti, could you read back my question, please?
(Record read.)
Q. Could you answer my question, please?
A. I don't know. I mean, I just don't know.
Q. Who would know?
A. I have no idea.
Q. Would Steven Pogozelski know?
A. I can't get in his head, but I would assume not.
Q. You would assume not?
A. Not.
Q. Would Stephanie Sturzinger know?
A. Again, I can't get inside of her head.
Q. How is it that it was represented to the plaintiff that Michelle Brady's position



144

was outsourced?
A. I don't understand that question.
Q. Did the company communicate to its counsel the position was outsourced?
A. I wouldn't know. I don't know.
Q. Who would know?
A. I don't know.
Q. Who else provided information to counsel for these interrogatories besides you?
A. Again, there was a room full of people that I directed that ultimately gave information to the attorneys.
Q. Did you communicate to counsel that Michelle's position was outsourced?
MR. HYMAN: Objection. Objection. Objection. Calls for attorney-client privilege.
MR. BESSER: Well, unfortunately, because of the crime-fraud exception, you can't assert that privilege anymore. The court has already found that this answer was fraudulent, so I'm entitled to know how it came to pass that it was fraudulently represented to us.
MR. HYMAN: Well, I'm still asserting the objection and I'm not going to

145

let him answer that question.

MR. BESSER: Okay. Let's call the court.

MR. HYMAN: Okay.

MR. BESSER: Let's take a break.

(Thereupon, a short break was taken.)

MR. BESSER: We're back on the record. The parties had previously agreed to suspend the deposition today at 3 and resume another day. We now have a discovery dispute that requires the court's intervention. The court has asked us to call to address it in two minutes. So since we were going to finish at 3 today anyway, we're just going to suspend the deposition for today, call the court and then resume another day.

Anything else, Jon?

MR. HYMAN: No.

MR. BESSER: All right. We are off the record for today.

(The deposition concluded at 2:18 p.m.)



146

Whereupon, counsel was requested to give instruction regarding the witness's review of the transcript pursuant to the Civil Rules.

SIGNATURE:

Transcript review was requested pursuant to the applicable Rules of Civil Procedure.

TRANSCRIPT DELIVERY:

Counsel was requested to give instruction regarding delivery date of transcript.

Mr. Besser: Original.

Mr. Hyman: Copy.



147

REPORTER'S CERTIFICATE

The State of Ohio, )
SS:
County of Cuyahoga. )

I, Ashanti Edwards, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, PAUL E. KIEBLER IV, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.



148

I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this ________ day of __________________, 2020.

________________________________
Ashanti Edwards, Notary Public
within and for the State of Ohio

My commission expires October 14, 2022.

149

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

RE: MICHELLE BRADY VS. APM MANAGEMENT, LLC, ET AL.
DEPONENT: PAUL E. KIEBLER IV
COURT REPORTER: Ashanti Edwards, RPR

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

Date Witness

Sworn to and subscribed before me, a Notary Public in and for said State and County, the referenced witness did personally appear acknowledge that:

1. They have read the transcript;
2. They signed the foregoing sworn statement; and
3. Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this day of , 20 .

Notary Public

My Commission Expires:

150

DEPOSITION REVIEW
ERRATA & CERTIFICATION OF WITNESS

RE: MICHELLE BRADY VS. APM MANAGEMENT, LLC, ET AL.
DEPONENT: PAUL E. KIEBLER IV
COURT REPORTER: Ashanti Edwards, RPR

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

Date Witness

Sworn to and subscribed before me, a Notary Public in and for said State and County, the referenced witness did personally appear and acknowledge that:

1. They have read the transcript;
2. They have listed all of their corrections in the appended Errata Sheet;
3. They signed the foregoing sworn statement; and
4. Their Errata and execution of this Statement is of their free act and deed.

I have affixed my name and official seal this day of , 20 .

Notary Public

My Commission Expires: