# Continued Deposition of Paul Kiebler

Michelle Brady vs. APM Management, LLC, et al.

November 17, 2020

CADY
REPORTING SERVICES, INC.

Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHELLE BRADY, )
Plaintiff, )
vs. ) Case No. 1:19-CV-01303
APM MANAGEMENT, LLC, ET AL., )
Defendants. )

- - - - -
CONTINUED VIDEOTAPE DEPOSITION
OF PAUL E. KIEBLER, IV
TUESDAY, NOVEMBER 17, 2020
- - - - -

The continued deposition of PAUL E. KIEBLER, IV, called by the Plaintiff for examination pursuant to the Federal Rules of Civil Procedure, taken before me, the undersigned, Aimee N. Szinte, Notary Public in and for the State of Ohio, taken remotely via Zoom, commencing at 9:30 a.m., the day and date above set forth.





APPEARANCES:

On behalf of the Plaintiff:

Matthew Besser, Esq.
Bolek, Besser, Glesius, LLC
Monarch Center, Suite 302
5885 Landerbrook
Cleveland, Ohio 44124
216.464.3004
mbesser@bolekbesser.com

On behalf of the Defendants:

Jonathan T. Hyman, Esq.
Meyers, Roman, Friedberg & Lewis
Eton Tower
28601 Chagrin Boulevard
Suite 600
Beachwood, Ohio 44122
216.831.0042
jhyman@meyersroman.com

ALSO PRESENT:

Alex Cook, Videographer and Zoom technician

- - - - -





PAUL E. KIEBLER, IV DEPOSITION INDEX

EXAMINATION BY: PAGE NO.
MR. BESSER ...................

Exhibits Previously marked and referred to

Exhibit 4
Exhibit 4-A
Exhibit 4-B
Exhibit 5
Exhibit 6
Exhibit 7
Exhibit 8
Exhibit 9
Exhibit 10
Exhibit 11
Exhibit 12
Exhibit 12-A
Exhibit 12-B
Exhibit 14
Exhibit 15
Exhibit 18
Exhibit 19
Exhibit 20
Exhibit 20-A

- - - - -





PAUL E. KIEBLER, IV, of lawful age, called by the Plaintiff for examination pursuant to the Federal Rules of Civil Procedure, having been first duly sworn, as hereinafter certified, was examined and testified as follows:

MR. BESSER: Jon, can we agree to the same stipulations as the fist part of the deposition?

MR. HYMAN: Correct.

MR. BESSER: Okay. Thanks.

MR. HYMAN: I will say, Matt, you're still a tad scratchy, but we'll see how it goes.

Alex, are you hearing that too?

THE VIDEOGRAPHER: Yeah, I am.

MR. BESSER: Should I just dial in my phone?

(Recess taken.)

MR. BESSER: We're good with the same stipulations, Jon?

MR. HYMAN: We are.

CONTINUED EXAMINATION OF PAUL E. KIEBLER, IV

BY-MR.BESSER:

Q Mr. Kiebler, are you located in your office?

A I am.

Q Is anyone in the room with you?
A Nope.
Q You understand that you're under oath this morning, correct?
A I do.
Q And are you aware that this deposition is being recorded for potential use at trial, video recorded for potential use at trial?
A I'm aware it's being recorded.
Q Okay. Did you review any documents or e-mails in order to refresh your memory for testifying this morning?
A No.
Q We talked about Pepper Pike Acquisition Associates last week. Do I remember correctly that you said it, and I'm not saying there's anything improper about this, but it exists to hold your assets and investments, is that right?
MR. HYMAN: If you remember.
Q Did you understand my question?
A Your question was do you remember and my answer is I don't know what you remember.
Q Does Pepper Pike Acquisition Associates exist for the purposes of holding your assets?





A One of the reasons.
Q Are there other reasons? I'm sorry.
A Yeah. There's many reasons.
Q What are the other reasons?
A It's an operating company.
Q Does it have any employees?
A No.
Q What does it operate?
A It owns a hockey organization. It owns a piece of land. It manages other businesses that I have interest in.
Q Is that it?
A One of many things. I don't recall everything it does sitting here.
Q Does it perform any services or provide any goods to Pepper Pike Capital Partners or its subsidiaries?
A Perform any services as in what kind of services?
Q Any business services. Does it do anything for Pepper Pike Capital Partners?
A I don't know what it would do.
Q As you sit here, you can't think of anything it does for them?
A Well, again, I don't know.





Q Does Pepper Pike Acquisition Associates have a CEO?
A I don't know.
Q Are you an officer of Pepper Pike Acquisition Associates?
A I believe so.
Q Are you aware of any other officers?
A I don't know.
Q So as an officer of Pepper Pike Acquisition Associates, as you sit here today, you are not aware of anything that it does for Capital Partners or the subsidiaries?
A Again, I answered that question. I don't know.
MR. BESSER: Alex, if you could resend Exhibits 4, 4-A and 5.
THE VIDEOGRAPHER: Give me one moment.
Q Mr. Kiebler, Exhibit 4 --
MR. HYMAN: He doesn't have them yet because I don't have it.
MR. BESSER: Okay. It will be the same one as last week.
MR. HYMAN: You know what, I don't have them in my inbox, so I need to wait for them to come.





I have them now and now they are going off to Paul. Thanks, Alex.
Q Do you have them?
A Yeah. I got the e-mail from Jon.
Q Exhibit 4 are Defendant's first discovery responses. I think we looked at them last week.
Do you have that open?
A I have Exhibit 4 opened.
Q On page 8 there's an interrogatory number 14, if you could turn to that, please.
A Okay.
Q The question is, "State the name, residence and business address, residence and business phone number of any person who assumed any of Plaintiff's job duties after her employment with Defendants was terminated." And the answer is, "None. The position was outsourced."
Did I read that correctly?
A You're looking at something different than I am. My number 14 said, "Produce all job descriptions for any job held by Plaintiff for Defendants." Response, "None."
Q Okay. Sure. I believe that is maybe request

for production number 14. Interrogatory 14 is on page 8.
A Okay. I see it.
Q All right. So the answer says that the Plaintiff's position was outsourced. Do you see that?
A I do.
Q My question is, did you communicate to your counsel that Michelle Brady's job was outsourced?
A I don't recall all the conversations I had with my attorney. I speak with my attorney on a weekly basis and had a ton of conversations with him.
Q Do you remember if you ever told him whether Plaintiff, Michelle Brady's, job was outsourced?
A I don't remember.
MR. HYMAN: Objection. I think we covered this with the judge last week and I think this is, again, veering into going head first into attorney/client privilege.
MR. BESSER: Well, Jon, you consented to me asking that exact question and the judge said that I could.





MR. HYMAN: Okay. Well, he said he doesn't recall, so I think we can move on.
MR. BESSER: Okay. You agree with me that you consented to me asking the question, right?
MR. HYMAN: I think I agreed -- I don't think that was the exact question that I consented to you asking. I think I consented to you asking whether a conversation -- whether he recalled -- I don't think I ever consented to questions about the content of conversations.
Q Mr. Kiebler, you were looking a moment ago at request for production number 14 which is on page 11. Can you look back there, please?
A I'm looking.
Q And this asks for all job descriptions for any job held by Plaintiff for Defendants and the answer is, "None."
Do you see that?
A I do.
Q Did you communicate to counsel that there were no job descriptions for the Plaintiff?
A Again, I had quite a few conversations with my attorney. I don't remember all of them.





Q Do you recall telling your counsel there were no job descriptions for the Plaintiff?
MR. HYMAN: Objection. I mean I think if you want to ask him if he recalls conversations taking place. Once you get into the substance of the conversation, that is attorney/client privilege.
MR. BESSER: Well, the judge has already ruled on this and ruled in my favor.
MR. HYMAN: Well, I don't think she did.
MR. BESSER: Yeah, she did. She said that I could ask whether the witness provided the information that is incorrect to counsel.
MR. HYMAN: I think your understanding is different than my understanding.
Q Are you saying you don't recall, Mr. Kiebler, whether you told your counsel that there were no job descriptions for Michelle Brady?
A My answer was that -- I used to have my attorneys in my office once a week and had many conversations and I don't remember all of those conversations four years ago.





Q And is this one of those conversations you don't recall?
A I don't remember if the conversation took place. I mean it's four years ago.
Q Fine. I'm just asking what you remember.
If you could, you have in the -- you should have an exhibit in your inbox, 5, job description, Exhibit 5.
Do you have that?
A I do.
Q This is a job description for a regional property manager for APM Management, correct?
A It says, "Job description. Title - regional manager."
Q Have you seen this document before?
A I don't remember if I have.
Q If you don't remember seeing it before, am I correct that you did not create this document?
A I don't believe I did.
Q Do you see the signature on the second page?
A I see a signature, yes.
Q Do you recognize that as Michelle Brady's signature?
A I do not.
Q Do you see the disclaimer right above the

signature?
A I do.
Q And it says, "APM Management reserves the right to add additional responsibilities."
A Yes.
Q Does that refresh your memory about whether this is an APM document or whether you've seen it before?
A No.
Q Are you aware that the Court sanctioned the Defendants in this case for misleading the Plaintiff and the Court about the reason for the Plaintiff's termination?
A I'm aware.
Q Why did it happen, if you know, that the company said it outsourced Plaintiff's job?
A I don't understand that question.
Q Do you know why it came to be that it was represented to the Court and to the Plaintiff that Defendants outsourced Michelle Brady's job?
A I don't know.
Q You should have a file there labeled 4-A.
A Yep.
Q This is an order of the Court on the sanction.





If you could turn to page 3 and look at the very bottom paragraph. If you could just read that paragraph to yourself which goes onto the next page. Let me know when you're done, please.
A I read it.
Q The Court says that, "Defendants have consistently failed to produce documents or comply with even the most basic discovery obligations without Court intervention." And then it gives some examples.
Do you know why that happened, that Defendants had these failures?
A I do not.
Q The next paragraph on page 4, it starts, "More importantly."
Do you see that?
A I do.
Q The first sentence reads, "More importantly, however, throughout these proceedings, Defendants repeatedly falsely represented that Brady was terminated because her position was outsourced."
How do you respond to that?
A That's what the sentence says.





Q Do you agree with the Court's characterization?
MR. HYMAN: Objection. You can answer, Paul.
A I wouldn't -- I mean did the Court write this?
Q Yes.
A The Court wrote this. I mean I'm not going to argue with the Court. I don't know how to answer the question. I'm not an attorney.
Q You don't know why those repeated false representations were made, correct?
A No, I don't.
Q And then last on this document on page 6, the first paragraph that starts, "While some."
A Page 6 you said?
Q Yes, please. The first paragraph starts, "While some of Defendant's misrepresentations in this case were made through Defendant's counsel, such as the representations made at the March 19, 2020 status conference, there was no evidence that Defendant's counsel was aware of the falsity of his statements or doing anything other than working from the information provided to him by his clients."
Did I read that right?
A Yes.





Q Do you agree with that sentence of the Court?
A I wasn't there and it makes representations of things that I wouldn't know about.
Q Well, do you agree that your counsel was not aware whether he was making false statements to the Court?
A I can't believe Jonathan would lie.
Q So then anything Mr. Hyman would have told the Court would have been information that he received from the Defendants?
A Or his interpretation of it or I mean people make mistakes. I don't know. I wasn't there. I can't really comment on what happened.
MR. BESSER: Alex, if you could send Exhibits 12, 12-A, 12-B and 4-B, please.
THE VIDEOGRAPHER: All right. Those are up.
MR. HYMAN: I just got them.
Q Mr. Kiebler, do you review the APM Management income statements or balance statements?
A No. In fact, I don't think I've seen one in years.
Q In 2017 did you review them?
A I don't believe so.
Q Were you involved in their preparation?

17

A No.
Q Who prepared them in 2017, '18, '19?
A I don't know.
Q Would it be the accountants?
A I assume an accountant would have prepared it.
Q Well, I'm asking -- so would they have been prepared outside or by someone within the company?
A I don't know.
Q Do you have the exhibits in your inbox?
A I do.
Q Exhibit 12-A, if you could open that, please?
A 12-A?
Q Yes.
A 12-A. Yep.
Q Take a look and tell me if you can identify these documents?
A It says, "APM Management, LLC income statement."
Q Okay. Do you recognize this as the first page, anyway, as part of APM's 2017 income statement?
A That's what it appears to be.
Q And if it was produced by your accountants, you wouldn't dispute the authenticity of it, correct?



18

A I wouldn't know who produced this document. You just gave it to me.
Q Your accountants produced it to us. Do you dispute the authenticity of it looking at it?
A Again, it's the first time I've seen it. How -- I mean it says APM Management, LLC. You're telling me that somebody here gave it to you.
Q If you look at the first page, and I'll just tell you for the record, I mean this is income statements and balance sheets for '17, '18 and '19. That's what we'll be looking at.
On the first page for 2017 about halfway down at line 60350, do you see that?
A Yes.
Q And there's a heading, corporate management payroll -- corporate management under the heading of Payroll, and it's about $2.1 million.
Do you see that?
A I do.
Q Is that payroll for the then APM employees?
A I wouldn't know. It says, "Corporate management payroll expense."
Q Would any of that money have gone to you?
A I think I get a very small salary. I believe



19

it's $20,000 a year.
Q From APM? Let me back up just so it's clear. In 2017?
A I don't remember 2017.
Q Do you think currently you get 20,000 a year in salary from Pepper Pike would it be Staffing?
A Yes. Pepper Pike Staffing.
Q So, otherwise, you can't tell me what the corporate management heading represents?
A I assume it would represent all of the employees that work for APM that reimbursed the payroll.
Q If you could flip to, and I think it will be the fifth page of your document, the balance sheet for 2017, page 2 of the balance sheet?
A Yes.
Q Line 38100, distributions?
A 38100. Yes.
Q So APM did make a distribution to the members in 2017, correct?
A That's what it says there. I don't know what the distribution is or what it was.
Q Do you have any reason to dispute the accuracy of this entry?
A I don't know what it is, so I can't dispute it.



20

Q The next page is the income statement for 2018. If you could look again at line 60350, corporate management?
A Yes.
Q And the number is now 931,000 and change.
Does the difference between the prior year and this year help you remember what that figure represents?
A No.
Q Three pages after that, page 1 of the 2018 APM balance sheet. Could you turn there?
A Yep.
Q Line 11055, accounts/notes receivable heading. Do you see that?
A Yes.
Q It lists an amount of $294,249.99 owed to Pepper Pike Acquisition Associates.
Do you see that?
A I see a negative account receivable.
Q And right. Next to that it says, "Move to LIAB, L I A B."
A It does.
Q So do you know what APM would have owed 294,000 to Pepper Pike Acquisition Associates for in 2018?

A I do not.
Q Could it be that that was compensation for you or for your services?
A It definitely was not. My guess is Pepper Pike Acquisition had to lend the money to the company.
Q What's that guess based on?
A There was no gift.
Q No. No. I'm sorry. What was your guess based on?
A Just looking at this document, knowing that APM was under water and wasn't making a profit and needed to pay employees.
Q If it was a loan, would the loan have come in the form of a check or a wire transfer from the bank?
A I have no idea.
Q Who would have authorized the loan?
A I don't remember.
Q Would it be you?
A It could have been.
Q Does anyone else have the authority to authorize a loan from Pepper Pike Acquisition Associates?
MR. HYMAN: Objection. Are you





talking about that particular loan or are you talking about loans in general and at what point in time?
Q In general, does anyone else have the authority to make loans from Acquisition Associates?
MR. HYMAN: And again, objection. Are you talking about ever? Are you talking about at the time of this loan? Are you talking about now?
Q Ever.
A Yes.
Q Who else had authority to make loans from Acquisition Associates?
A Back when Acquisition Associates was started, Andy Kuhar, myself, various CFO's we've had over the years. I don't know.
First of all, I testified I believe that's a loan. It may not even be a loan. We don't know.
Q In 2017 did anyone else have the authority to make loans from Acquisition Associates?
A I don't remember specifically for 2017. I just answered over the course of the company.
Q Did Acquisition Associates have a CFO in 2017?
A I don't remember if they had -- it never had a





formal CFO. It had a kitchen table CFO over the years. I don't remember who was in '17 or not.
Q I don't understand what you mean by kitchen table CFO?
A It's a kitchen table CFO. Somebody that was, you know, helping but offering guidance, that type of thing.
Q Would it be the same person who was then CFO of APM Management?
A In 2017, I don't remember.
Q Did Acquisition Associates ever share a CFO with APM management or Pepper Pike Capital Partners?
A I don't believe so.
Q You should have a file, Exhibit 12. Do you have that?
A I do.
Q If you could open that up and look through it, tell me if you've seen these before.
A Hello?
Q No?
A Can you hear me?
Q Now I can. I couldn't hear anything for a while.





Have you ever seen Exhibit 12 before?
A I have not.
Q This is -- these are balance sheets for Defendants that were produced to us by your counsel.
It is true that Pepper Pike Capital keeps a combined balance sheet with the subsidiaries, is that true?
A I don't know how the accounting is presented.
Q You don't know how the accounting is presented?
A Is that what you asked me, how the balance sheet is presented?
Q Well, yeah. Is it one combined balance sheet for Capital Partners and the subsidiaries?
A I don't know. You know, again, I testified Pepper Pike Capital Partners owns Pepper Pike Construction, if that's what you're asking me.
Q If you could look to page -- the third page of the document. The top will say, "Balance sheet 2018", as of 2018?
A Yep.
Q Line 11055 has an entry of Pepper Pike Acquisition Associates.
Do you see that?
A Accounts receivable, yep.

Q And then there are a couple different columns.
Do you see that?
A I do.
Q The first column is PPA. That's for Pepper Pike Acquisitions?
A Okay.
Q I'm asking, is that right?
A I thought that was a statement. Probably.
Q Okay. And next, PP Cap, would be Capital Partners, the corporate parent?
A Okay.
Q I'm asking if you know?
A Probably.
Q Next is PP PM. Would that be Pepper Pike Property Management?
A Yeah. It's just PPM, but probably.
Q And then last, PPS. That would be Staffing?
A I would guess.
Q So in this accounts receivable line item there are negative amounts listed here. So do you know why Pepper Pike Acquisitions would have owed Acquisition Associates $78,500 in 2018?
A Pepper Pike Acquisition Associates would have owed -- I do not. It may have borrowed money.
Q I'm sorry?





A I don't know.
Q Is the same true for the other two amounts, 17,500 and change from Capital Partners and 347,000 and change from Management?
A Those are negative accounts receivables, so Pepper Pike Acquisitions doesn't -- those companies -- those companies -- Pepper Pike Acquisitions, right?
Q That's how I'm reading it. Is that your understanding?
A I'm sort of repeating what you said earlier. I mean they're negative note receivables, so if that's what was a negative receivable, those companies owe Pepper Pike Acquisitions money.
Q Do you know what for?
A I do not.
Q All right. Exhibit 12-B, file 12-B, these are income and balance statements provided to us by your accountant?
A What accountant?
Q Cohen and -- I think Cohen & Rosenthal.
A Cohen & Cohen?
Q I believe that's right. Yeah.
A I don't think we use Cohen, but.
Q All right. Well, we issued a subpoena to the





entity that was identified on the tax returns that were produced to us and in response to that subpoena, they provided these.
A I was just curious who the accountant was.
Q I could tell you. Hold on. Bill Joseph.
A Joseph, okay.
Q So in the second to last page of 12-B, again, a notes receivable negative number on line 11055. 330,863 owed from Capital Partners to Acquisition Associates.
Can you tell me what that is for?
A I assume it was money that it borrowed.
Q What is your -- and this is in 2019, I should say.
What is that assumption based on?
A It's a negative note receivable.
Q In 2019 who had authority to make loans from Pepper Pike Acquisition Associates?
A I don't remember specifically.
Q Did you?
A I did, yes.
Q Do you remember if anyone else did?
A During the course of the year, I do not.
Q Did you know that Plaintiff filed a motion to compel production of financial information in





this case, Defendant's financial information?
A I don't know what that means.
Q Did you know that the Plaintiff had to go to the Court to get an order for Defendants to produce their tax returns and balance sheets?
A Isn't that the way all discovery is done?
Q No.
A I knew there was discovery.
Q You did not know that we had to file a motion with the Court to get those documents?
A I didn't know what your day-to-day business is.
Q Did you know that the Court ordered Defendants to produce their tax returns and financial documents?
A Yeah. It feels like a debtor's exam. I figured we would have a trial before we had a debtor's exam.
Q So that's a yes?
A That's my answer.
Q And the first word of your answer was yes, right?
A No. I said this feels like a debtor's exam and normally you have a trial before a debtor's exam.
Q Did you know that the Court ordered production

of the tax returns?
A I know that we produced it. You know, in what order -- you keep on asking me legal questions and I keep on answering I'm not an attorney. I know that we produced tax returns.
Q Right. But you know when a Court orders something, you know what that means. You don't need to be a lawyer to know what that means, right?
A I thought all discovery was ordered by a court. You just can't randomly go up to people and say, "Hey, give me some information." I think all discovery is ordered by a court, isn't it?
Q Did you know that there was a motion filed and the Court made a ruling that required Defendants to produce financial information?
A Yes. And, as I testified earlier, my understanding is that all information that's produced in a lawsuit is ordered by the Court, so yes.
Q So your understanding is incorrect. I'm telling you that we had to go to the Court and file a motion because Defendants refused initially to produce that financial information.





Were you aware of that?
A I was aware we provided financial information.
Q Were you aware that we had to go to the Court because Defendants initially refused to produce it?
A Same answer I just gave. Yes, I was aware, and I believe that all information is produced in a lawsuit under court requirement.
Q Is it your belief that we had to go to the Court to get an order to get any documents and that the Defendants refused to produce everything?
MR. HYMAN: Objection. Asked and answered.
A It's my belief that documents are produced in lawsuits under the guidance of the court.
Q Were you aware that Defendants initially refused to produce financial documents?
A Again, I've asked and answered that question. The Court oversees the production of documents. We produced documents and --
Q Not my question request, sir. Not my question, sir.
Were you aware Defendants initially refused to produce financial information?





A I believe we produced the information that we thought was appropriate and we did.
Q Were you aware that Defendants initially refused to produce financial information?
MR. HYMAN: Objection.
A I'm aware --
MR. HYMAN: Asked and answered.
A I'm aware that we originally produced documents that we thought was appropriate and in accordance with what the Court requested.
Q And that did not include tax returns? Well, let's back up.
Did you know that we asked for tax returns with the initial discovery requests?
A I don't remember when the original discovery request was and I don't remember the specific conversations I had with my attorneys at the time.
Q So your testimony is that you are not aware that Defendants initially refused to provide tax returns? Is that your testimony?
A No. I'm actually trying really hard not to get frustrated today, but you can't put answers in my mouth, is your testimony this and then you go on with a statement that you want me to say





and it's not true. You can't shove lies into my mouth.
Q Mr. Kiebler, you've previously been accused in Federal Court of giving evasive testimony, haven't you?
MR. HYMAN: Objection.
A I don't remember that.
Q You were deposed in a case called Martec Brothers versus Kiebler Slippery Rock, LLC in Pennsylvania Federal Court, weren't you?
A In Federal Court? I don't remember that.
Q And there were multiple motions to compel filed against you and your company, isn't that right, in that case?
A What was my company?
Q Kiebler Slippery Rock, LLC.
A That was ten years ago and I don't remember.
Q One of the motions to compel filed against you accused you of giving evasive answers in deposition testimony, isn't that right?
A I wouldn't remember ten years ago.
Q So my question is a simple one. Were you aware that in discovery we initially asked for the Defendants in this case to provide tax returns? Yes or no, were you aware?

A Can I answer the question?
Q If you would answer forthrightly.
A I'm answering forthrightly.
MR. HYMAN: Matt, he's trying to answer your question, so let him speak.
A I'm aware that you guys asked for a bunch of information. I'm aware that we sat down. We compiled what we believed was appropriate. We sent it in.
Q And were you aware that initially Defendants refused to provide tax returns? Yes or no?
MR. HYMAN: Objection.
A I don't remember.
Q You don't remember?
A No. Because everyone is interrupting me when I talk. Again, I don't remember specifically what was requested, what was not requested. I remember that we put together the information that we thought answered the subpoena and we sent it in. If we were wrong, we were wrong.
Q Were you aware, yes or no, that the Plaintiff filed a motion to get the tax returns because Defendants refused to provide them?
A Again, I've answered the question to the best of my ability.





MR. HYMAN: Objection.
A I'm aware that we provided information under the guidance of the Court.
Q Did you communicate to your counsel that Pepper Pike Acquisition Associates has no current ongoing relationship with the Defendants in this case?
MR. HYMAN: Objection.
A I don't remember all of the conversations I had with my attorney.
Q Did you communicate to your attorney that Pepper Pike Acquisition Associates was unrelated to the Defendants in this case?
MR. HYMAN: Objection. Again, we're veering hard into attorney/client privilege.
A Again, over the last four years I've had many conversations with my attorneys and what we talked about, I don't remember all of the specifics of it.
Q You are the sole member of Pepper Pike Capital Partners, correct?
A Again, we talked about that in the previous deposition and I don't remember and I don't believe I am.





Q A Paul Kiebler trust is the sole owner of Pepper Pike Capital Partners, correct?
A This may be the fourth time we've asked the same question. I don't know.
Q You don't know. Okay.
What is the net worth of Pepper Pike Capital Partners including the subsidiaries?
A My guess is negative.
Q What is that guess based on?
A The fact that none of them make money.
Q When is the last time any of them made money?
A I don't know.
Q Is it losing money or just not making money? Is it breaking even?
A I don't know the specifics of the day-to-day accounting.
Q How does it stay in business if it's not making money?
A Accounts receivable. I mean loans.
Q Have you had any offers to purchase Pepper Pike Capital and the subsidiaries in the past five years?
A No.
Q Have you solicited any offers to sell it?
A No.





Q Has Pepper Pike Acquisition Associates received any income or compensation from any of the Defendants or their subsidiaries since 2017?
A Not that I remember.
Q How much in compensation in any form, deferred or otherwise, have you received from APM or Pepper Pike Capital or any of their subsidiaries since 2017?
A I don't remember. I would be guessing if I gave you that answer.
Q You said that Staffing paid you I think it was 20,000 a year?
A No. I said I think that someplace in the neighborhood.
Q Other than the neighborhood of 20,000 a year, have you received any form of compensation from Pepper Pike Acquisition Associates or Pepper Pike Capital or any of their subsidiaries since 2017?
A I don't remember.
Q What about any trust that you benefit from or control, have they received any form of income or compensation, deferred or otherwise, from APM or Pepper Pike Capital or any of their subsidiaries since 2017?

A I don't believe so.
Q Have you received any distributions from APM or Pepper Pike Capital or their subsidiaries since 2017, ownership distribution?
A I don't remember. I don't believe so, but I don't remember.
Q Have any of the Defendants or their subsidiaries given any form of compensation, any monies to any member of your family since 2017?
A Yes.
Q Which members of your family?
A My mother gets a small salary and my wife gets a small salary.
Q Are they employed by any of the entities?
A My mother gets her distribution from buying the company from my father years and years ago and my wife does some marketing and things like that. It's not very much.
Q Okay. How much do they get?
A I think my mom may get 20,000 bucks a year and my wife probably gets something similar.
Q Any other members of your family receive any other -- any monies other than that from any of the entities or their subsidiaries since 2017?





A No.
Q You earn more than $20,000 a year, correct?
A From Pepper Pike Capital Partners, no.
Q Do you earn more than $20,000 a year, period?
A Me personally?
Q Yeah.
A Maybe. Depends on the year.
Q In 2017 did you earn more than $20,000?
A I don't remember what my 2017 earnings were personally.
Q What about in 2018, more than 20,000?
A Again, I'm not going to remember income personally in any specific year.
Q Does your wife have a different job other than the marketing for the companies?
A She does not.
Q In May of 2018 you bought a house, correct?
A I did.
Q For $3.3 million and change?
A Okay.
Q My question is -- and I'm sure you worked hard for it. My question is where did you earn the money from to buy that house?
A My wife and I have several trusts that produce money and mainly through the trusts.





Q Do the trusts produce money related to the business of Pepper Pike Capital or APM?
A No.
Q Do they make money from real estate? What do they make money from?
A Different businesses that they own.
Q Are any of those businesses businesses that Defendants manage? That's my question.
A Do the Defendants manage the businesses that the trust owns, no.
Q Defendants don't manage any of the -- do the trusts own any of the apartment complexes that Defendant manages, operates?
A The trusts have very small interest in apartments and some of those apartment communities are managed by Pepper Pike Management.
Q What types of businesses do the trusts own that operate -- that earn the income?
A They own businesses that own other businesses. They own a hockey organization. They own operating businesses. They own a bunch of different stuff.
Q What industry besides hockey and you said the small interest in the apartments?





A Some automotive stuff.
Q Automotive like car dealerships or manufacturing?
A No. Car companies.
Q Oh, like producers of automobiles?
A No. It owned a racing team at one point. They went defunct. It's owned, you know, that type of thing.
Q What other industries?
A That's all.
Q So does the hockey team produce significant revenue?
A I mean there's 120 kids. Each kid pays roughly 3 to $5,000, so I mean there's some revenue there.
Q The bulk of the income from the trust, does it come from apartment rentals?
A Well, again, the trust doesn't own any apartments directly. It owns interest in different companies and, you know, they own -- some of those companies own companies that own apartments. It's a complicated trust. I mean it's something my mother set up a long time ago and, you know.
Q All right. The industry that produces the bulk

of the revenue from the trust, is it the apartment rental industry?
A Again, the trust owns companies. It doesn't own any -- I take it back. It owns one piece of vacant land, 3 acres in Brunswick, Ohio. But other than that, I don't believe it owns any real estate directly.
Q Okay. The industry that produces the bulk of the revenue for the trust, is that the rental industry, the apartment rental industry?
A Again, the trust owns companies that, you know, ultimately, you know, those companies down the road own some real estate. They own some other stuff. You know, we've answered the same question a bunch of times.
Q I'm not saying there's anything wrong with that.
A It's my mom's trust, so. And my wife's a beneficiary of it.
Q Okay. Are you the beneficiary of any of these trusts other than the Paul Kiebler Revocable Trust?
A There's several trusts. I'm beneficiaries of some and I'm not beneficiaries of others.
Q All right.





MR. BESSER: Alex, can you send -- and then maybe we'll take a short break. Alex, can you send Exhibit 6 through 11 and then we'll just take five minutes while you do that.
(Recess taken.)
Q Mr. Kiebler, do you have the file Exhibit 6 in front of you?
A Yes, I do.
Q These are W-2's produced to us by your counsel. Have you seen these before?
A The ADP report, no.
Q Do you know what entities these are for, APM versus Staffing, et cetera?
A I'm looking for a name. I don't see a name on them. If there's a name on them, it probably would be that.
Q The top right corner of the first page there's an entry for total employees.
Do you see that?
A Yeah.
Q And it says 22 total employees for 2017.
Does that help you figure out which entity this page refers to?
A It does not.





Q The second page in the top right corner lists 195 total employees for 2017.
Do you see that?
A Wow. Yeah.
Q Did APM have 195 employees in 2017?
A I don't know. I don't remember. I do not remember. I just don't know.
Q Does that sound about right? I mean does that number seem wildly off to you?
A Yeah.
Q Do you think it would have been more or less?
A I'm surprised it's that high.
Q Do you know if APM and Pepper Pike combined had more than 100 employees in 2017?
A I don't know how many employees they had. I would be guessing if I answered.
Q You should have a file labeled Exhibit 7 in front of you or with you?
A Yep.
Q This is the 2017 APM tax return produced to us by your counsel. Do you see halfway down the first page there is a signature line, it says, "Paul E. Kiebler."
A Yeah.
Q Did you typically sign the tax returns?





A I don't believe I did.
Q Who would it have been in 2017 for APM?
A This one has my signature, but there's no signature on it, so I don't know.
Q The seventh page, the heading should say, "Information on partners owning 50 percent or more."
A Yep.
Q This page reflects that in 2017 you owned 80 percent of APM?
A Is this the APM return?
Q I'm sorry?
A I was just wondering what this return was. That's what this says. That's the maximum ownership.
Q Do you dispute that or you're not sure?
A Again, we testified earlier, I don't remember who owned APM or what percentages were.
Q The next page in the upper left corner is labeled K-1.
Do you see that?
A I do.
Q And then halfway down it says, "Information about the partner." It says, "Paul E. Kiebler, IV."

A Yep.
Q And then below that the box lists profit loss capital percentage.
Do you see that?
A I do.
Q And it has you at 80 percent.
Do you see that?
A Yep.
Q And the next page is also a K-1 for Jason Wasserbauer.
Do you see that?
A I do.
Q And it lists his profit loss capital at 15 percent. Is that right?
A Yep.
Q And then the next page is Steve Pogozelski's K-1?
A Yep.
Q It shows him at 5 percent?
A Yep.
Q So is this accurate that the three of you were the owners of APM in 2017?
A That's what this form says.
Q Two pages after that there's a page that's got a heading, Federal Statements?





A Yep.
Q Do you see that statement 1 is the first box?
A Yep.
Q The entries, payroll reimbursement, 228,000, and allocated payroll reimbursement, 2.3 million and change, can you tell me what those are for?
A It says, "Payroll reimbursement", so it must have been reimbursement of payroll.
Q What employees was APM being reimbursed for paying payroll to? Whose employees?
A What were the employees' names?
Q Yeah. Was APM paying -- was APM in 2017 paying payroll and then being reimbursed?
A By this form, it appears that way.
Q Do you know who was doing the reimbursing?
A I assume whoever the employees worked for.
Q Do you know who that was?
A I assume many different companies.
Q Three pages after that there's another page headed Federal Statements and then four boxes, statements 4 through 7. I believe it's page 14 of the document.
A Yes.
Q The bottom box, statement 7, Schedule L,





line 17, other current liabilities.
Are you there? Can you see that?
A Yes.
Q There is an entry there for Accounts Payable Pepper Pike Acquisition.
Do you see that?
A I see AP Pepper Pike Acquisition.
Q And the beginning of the year balance was 190,000. The end of the year was 1.3 million.
A Yes.
Q Do you know what APM would have -- what new liability of around 1.1 million APM would have incurred to Pepper Pike Acquisition Associates that year?
A I just know in 2017 APM was losing significant money and had to cover its expenses, so it may have been that. It may have been just an accounting adjustment for past years. I don't know specifically.
Q The top entry on that in that box is accounts AP Apollo Property Management, 319,325 at the start of the year and then nothing at the end.
Do you see that?
A I do.
Q What was that for?





A I don't know.
Q You were an owner of Apollo Property Management, correct?
A I was one of a few.
Q In 2017?
A I don't know if Apollo Property Management was still in existence in 2017.
Q You agree with me the tax returns show it paying off a $319,000 -- APM paying off a $319,000 liability to it, correct?
A It doesn't say that. It could have just written it off and said it's an uncollectible debt.
Q As an owner of Apollo Property Management, are you aware whether that company wrote off a debt from APM Management?
A I believe it did. I'm not 100 percent sure, but I think so.
Q Can you tell me any of the other owners of Apollo Property Management in 2017?
A No. Again, I'm not -- I don't remember when Apollo Property Management went under.
Q Three entries down from that is AP Lander Circle Associates, 206,000.
Do you see that?

Continued Deposition of Paul Kiebler



A I do.
Q Were you an owner, whole or part, of Lander Circle Associates?
A I had a company that sounded similar to that. I don't know if that's the company or not, but probably.
Q Do you know what this liability was for?
A The same thing. I mean over time the company never made money, borrowed money from different entities and then the entities wrote it off to take the tax loss because they knew they were never going to get paid.
Q In 2017 other than I think the distribution we saw reflected on an earlier document and maybe about 20,000 in salary to you, did APM give any money to owners or investors that year?
A I don't remember in 2017.
Q Exhibit 9, please. Do you have that open?
A Yes.
Q This is the 2017 Pepper Pike Capital Partners federal tax return, correct?
A Yes.
Q If you go to I think the eighth page, there's a K-1.
A There's the answer to the question you asked me





a bunch of times.
Q What question?
A Sorry to interrupt. Go ahead.
Q So the Paul Kiebler Revocable Trust owns 100 percent of Pepper Pike Capital Partners, correct?
A That's what this document said in 2017.
Q Is that accurate, to the best of your knowledge?
A In 2017 this appears correct.
Q Do you believe that that ownership percentage has changed since then?
A I don't believe so, but I'm not 100 percent certain.
Q Seven pages after that, so I guess that would be page 14, 15, something like that, there's a page with a heading Federal Statements and it's statements 1, 2 and 3?
A Yep.
Q Statement 2 has an entry for single member payroll, 129,490, correct?
A Yes.
Q And that was money that went to you in 2017 from Pepper Pike Capital Partners, correct?
A I don't believe so, no.





Q Who was the single member in 2017?
A It says, "Single member payroll." The single member is Pepper Pike Capital Partners and the payroll is the payroll the company had. So it doesn't say that that single member got the payroll. It's the single member was the entity that had a payroll.
Q I don't mean to quibble with you. I don't think that's what a single member LLC is. A single member LLC is an LLC with one member, one owner.
A Didn't we determine earlier that there's one owner of -- I don't know what that means. My answer is -- obviously you're correcting me. I don't know what it means. I tried to help you and guess, but I don't know.
Q All right. And I don't want you to guess. I'm sure your lawyer doesn't either.
Is it possible that this 129,000 and change was paid to the trust, the owner of the LLC?
A In reimbursement -- reimbursed expenses?
Q No. In payroll.
A I don't know. The same thing as bank fees there. So I didn't get bank fees, so I don't





think that's what it means, but I'm not an accountant.
You're saying that they paid me a bank fee of 24 bucks. That makes no sense.
Q No. No. That's not what I'm saying.
A Well, then I'm not sure.
Q If you could flip to Exhibit 8, please. Are you there?
A I am.
Q The first page of this document, this is the 2018 federal tax return for APM that was provided to us by your counsel. On the first page there's a signature line and it's typed, "Paul Kiebler Revocable Trust."
Do you see that?
A I do.
Q And it identifies it as the LLC member.
Do you see that?
A I see, "LLC member; Paul E. Kiebler, IV, Revocable Trust."
Q So this is different than 2017 when the K-1 showed you and Jason Wasserbauer and Steven Pogozelski as the members.
Do you know why the ownership transferred to the trust?

A I don't believe it did. That was probably a mistake.
Q Okay.
A I mean the first one was a mistake.
Q The 2017 is a mistake, you think?
A I believe APM was always owned by the trust.
Q You don't think Jason Wasserbauer and Steven Pogozelski were part owners in 2017 of APM?
A No. I think they owned 15 percent and 5 percent, the way the tax return says. I just don't recall the other 80 percent.
Q I got you. You're saying the other 80 percent might have been owned by the trust instead of you individually?
A Correct.
Q Page 19 of this document or the file. Are you there?
A Yes.
Q This shows a 294,000 end of year liability to Pepper Pike Acquisition Associates.
Do you see that?
A I do.
Q Can you tell me what that is for?
A APM wasn't making money. It may have borrowed money. It may be an accounting entry. It may





be depreciation. I don't know specifically what it was for.
Q Could it have been compensation?
A What do you mean by that?
Q Income.
A Absolutely not.
Q In 2018 would anybody besides you have had authority to make a loan from Acquisition Associates?
A Again, APM was not making money, so it borrowed money to make payroll, but I don't remember specifically who was authorized to make those loans. Most likely it was me.
Q Exhibit 10. Do you have Exhibit 10, file 10? This is the 2018 Pepper Pike Capital tax return produced to us by your counsel.
A All right.
Q Page 12. Do you see that? Are you there?
A I do.
Q The first entry is income of 6.3 million and change for allocated payroll reimbursement?
A I do.
Q Can you tell me what that represents?
A Payroll reimbursed from the various companies that paid.





Q Would this be payroll of Pepper Pike Staffing employees?
A Well, Pepper Pike Capital Partners owns Pepper Pike Staffing and it rolls up into it, so maybe.
Q And below that there's an entry for 376,000 owed by Pepper Pike Construction to Capital Partners.
Do you know what that is for?
A It's not owed. That's income.
Q Income. I'm sorry. Paid. Paid.
A Probably just services, a portion of rent, whatever.
Q And below that is 451,000 paid to Pepper Pike Property Management.
Do you know what that is for?
A I don't. The management company had a loss, I'm sure.
Q And then 214,000 paid from Pepper Pike Staffing.
What's that for?
A Again, probably services.
Q And then last is 161,000 paid to Pepper Pike Acquisitions, LLC.
Do you know what that's for?





A That's not paid to. That's the loss that Acquisitions had for the year. It says, "Other income and loss." This is income and loss.
Q All right. Exhibit 11, the last in this series, I think it's the 17th page. It's a letter from Joseph and Rosenbaum dated September 11, 2019?
A Yes.
Q This is the Pepper Pike Construction 2018 tax return provided to us.
Have you seen this before?
A I have not.
Q Six pages in there's a form in the upper left corner. It's labeled Form 1125-A.
A Page 6?
Q Six pages from that -- six pages from the first page of the return.
A What page is it on the thing I got?
Q It's probably about eight pages from that letter.
A Eight pages from the beginning of the form or eight pages from the letter?
Q I'll tell you. It should be eight pages from the letter. It will say, "Cost of goods sold" at the top.

A Do you know what page the letter was on?
Q I don't. I'm sorry.
A You said it says, "Cost of goods sold"?
Q Yes.
A Cost of goods sold. I found it.
Q All right. Thank you.
This says that Pepper Pike Construction made a little over 12 million in purchases in 2017. I'm sorry. 2018. What did it buy?
A Cabinets, countertops, appliances, flooring, that kind of stuff.
Q For refurbishing a complex, an apartment complex?
A Yeah. Different customers had hired it to do some work and they had to buy pieces and parts to do that work.
Q None of that was purchasing the properties themselves?
A Hell, no. Absolutely not.
Q All right. I'm going to change topics. Before I do, do you need a break or are you okay to go on?
A No. Let's go. I'll run over to my refrigerator to get a drink.
MR. HYMAN: I'm going to do the





same, Matt.
MR. BESSER: All right.
A I'm back.
MR. BESSER: Alex, I'm not going to it just yet, but if you could send over Exhibits 20 and 20-A.
THE VIDEOGRAPHER: Okay. I'll pull those up right now. 20 and 20-A you said?
MR. BESSER: Uh-huh. Please.
THE VIDEOGRAPHER: You said go ahead and send them now?
MR. BESSER: Please.
THE VIDEOGRAPHER: Okay.
MR. HYMAN: All right. I'm good.
Q Did you read the Complaint or the Amended Complaint in this case before the Defendants submitted their response?
A Parts of it.
Q Did you provide information in order to respond to the Complaint or the Amended Complaint?
A We did provide information. We provided information.
Q The company or you provided facts?
A Again, as we discussed in my last deposition, we had a meeting with our attorneys and we sat





down and we provided information as a group.
Q And I'll show it to you if you need. If the Defendant's Answer admits an allegation, you don't dispute the admission, correct?
A I would have to see the allegation to go ahead and tell you that answer.
Q Did you review the Answer or the Amended Answer before it went out, before it was served?
A Again, I would have to understand which document -- there's been hundreds of documents in this case. So did I review every single document, no. So if there's a document you want me to review, I would be more than happy to do it.
Q Do you know what the Answer to a Complaint is?
A Again, I didn't review every single document. I mean there's been --
Q Understood.
A No. I don't know what the Answer to the Complaint is, so if you have a copy of it, I would love to see it.
Q I just mean generally, do you know, are you familiar with that term, an Answer to a Complaint?
A An Answer to the Complaint is the answer to the





Complaint.
Q Is that a legal term you've heard before?
A I've heard it before.
Q Were you aware that in April of 2017, Michelle Brady expressed the desire to take leave for a medical issue?
A Personally, no.
MR. BESSER: Jon, do you have 20 and 20-A?
MR. HYMAN: Yeah. I sent them off to Paul.
Q Do you have those files, 20 and 20-A, in front of you?
A I have the e-mail, yes.
Q So Exhibit 20-A is the Third Amended Complaint.
Do you see that?
A Yeah. It says, "Defendant's Answers" -- it says, Defendant's Answers to Plaintiff's Third Amended Complaint."
Q So I think that's 20. The accompanying exhibit is 20-A.
A Third Amended Complaint.
Q Okay. And then 20 is the Answer.
On 20-A, if you could look at paragraph 20, 19 and 20.

So 19 and 20 say, "Allege in April of 2017 Brady was hospitalized with a severe asthma attack."
20, "Brady asked APM for a brief period of medical leave to recuperate."
And then if we look at the Answer, paragraphs 19 and 20. Are you there?
A I see the 19 in 2019 and I see the 20, "Brady asked." Is that what you're talking about?
Q Right. And then the answer to those allegations on Exhibit 20.
A That's the other one?
Q Yes.
A I'm there.
Q The answer is, "Upon information and belief, Defendants admit the allegation set forth in paragraph 19 of Plaintiff's Amended Complaint."
And then 20, "Defendants admit the allegation set forth in paragraph 20 of Plaintiff's Amended Complaint."
Do you have any reason, basis or facts to dispute the admission in paragraph 19 and 20 of the Answer?
A Sitting here, no.
Q Do you have any reason or basis to dispute that





Defendants knew Michelle Brady made -- let me back up.
Were you involved in any way with Michelle Brady's request for medical leave?
A No.
Q Were you aware of it at the time?
A I don't remember. That was 2016, '17, something like that.
Q Would you typically be aware if a management employee was taking medical leave?
A It depends on who the employee was and what -- you know, what my daily interaction with them was.
Q What if it was a management employee who was not stationed on a day-to-day basis in the headquarters?
A I mean, sure. I talk to employees all the time that aren't stationed here at the headquarters.
Q All right. So you might know. You might not know. It sort of depends on the person?
A Correct.
Q Do you have any reason to dispute that Michelle requested leave through June 15 with a return to work June 16, 2017?
A What were the dates again?





Q Leave through June 15 with a return to work June 16.
A When would she have asked for that?
Q In April.
A So from April to June?
Q Yeah.
A I don't remember that.
Q Do you have any reason to dispute that Michelle informed the company that she intended to return to work from her leave?
A I don't know that.
Q Do you have any reason to dispute that the company told Michelle that it was eliminating her position the day before she was set to return?
A I don't know the conversation with her.
Q No facts to dispute that that you're aware of?
A I don't know the conversation with her.
Q When did the company decide to terminate Michelle Brady?
A I don't think we did terminate her.
Q When did the company decide to end Michelle Brady's employment?
A We had switched from in-house management to third-party management because the company was





losing money and when we did that, there wasn't the need for the employees. So that time frame. I don't remember the specific day.
Q What was the time frame when that decision was made?
A Sometime during 2016 and '17.
Q So the company decided to get rid of all of the regional manager positions in that time frame?
A It wasn't -- I mean we got pressure from equity investors and lenders, but yeah, we had turned over management to a third-party or were in the process of.
Q APM had equity investors in 2016, '17?
A No. The companies that -- the properties that APM managed had investors in those properties and those investors weren't happy with the overall performance of the property and the management.
Q Can you tell me whether the decision to get rid of the regional property manager position was made in '16 or in '17?
A Yes.
Q Would you please tell me?
A Oh. I thought you asked if it was made during -- it was made sometime between '16 and '17.

I don't remember the specific date.
Q But do you know which year it was between those two?
A Yeah. I answered the question this will be the fourth time. It was sometime '16, '17. I mean there was -- you know, it was a long process of unwinding a company that was unprofitable and wasn't performing. And, you know, the decision was made, you know, to go with an outside source.
Q Who made that decision to go with an outside source?
A Again, I answered that already. It was a decision that was a group decision with investors of the real estate, you know, with lenders, and there was a lot of pressure from a lot of different places to make that change.
Q Who were the people at APM who were involved in making that decision?
A We talked, again, you know, I used to meet with my attorneys every Friday, you know, people internally here in the company. It wasn't something we wanted to do. It was something that was in the best interest of the real estate that, you know, the investors owned.





Q Was Stephanie Sturzinger involved in the discussions to eliminate the regional position?
A Again, there wasn't a discussion to eliminate regional positions. The discussion was that we were switching to a third-party management company and, in doing that, we didn't need the employees anymore. Was Stephanie involved in the low level of that discussion, sure. I mean everybody was.
Remember, we were unwinding a company with, you know, employees that worked with us for a very long time, friends and family. So it wasn't like, you know, it was something that we wanted to do. It was a change in business plan. It was a pretty traumatic, disappointing thing. Nobody was happy about it.
Q Were these discussions reflected in e-mails or memos?
A I don't remember how they were made or discussed. You know, we were a very small, tight family, including Michelle, that, you know, talked and worked together.
I mean Michelle had goats. I used to talk to her about her goats on at least a weekly basis. My wife is an animal lover and





loved goats and Michelle had goats and we used to talk about that all of the time.
It was not a fun period of time within APM during that time frame. Probably things people would rather not remember or not think about again.
Q Was Sharon Zinser involved in the process of deciding that the company no longer needed those employees?
A I mean sure, Sharon was involved, not at a massive, high level. Again, a lot of the investors, the property owners were the ones that were driving that decision.
Q Did Sharon Zinser have decision-making authority to eliminate the regional property manager position?
A Again, we didn't eliminate positions. What we did is we changed -- we were forced to change the business model to go to third-party management. Like we were out picking and choosing of who we wanted to fire and who we didn't want to fire.
We were changing the entire business model that we had operated under for a very long period of time. It was very expensive.





It was very traumatic. It was not something anyone wanted to do. It was miserable.
Sitting here testifying about all of this shit just brings up all of those terrible, miserable memories. I mean family and colleagues I worked with for ten years that I had to let go. It was not an enjoyable process.
And you see the frustration in my voice. The frustration is not because I'm mad at you. It's because I hated having to do that and I hate it to this day.
Q As a result of that process, the company determined it no longer needed regional property managers, right?
A I've answered that question three times.
Q I'm not understanding your answer. I'm sorry.
A I'm telling you, my answer is that we were forced to make a decision to go to third-party management. In the process of going to third-party management, the employees that we had worked with for a very long time that were very close to us, you know, weren't needed.
A lot of them interviewed with the new company which would set up interviews with

almost every single employee and the new company decided who they wanted to keep and who they did not want to keep. And that was the process. And we can spin it however you want, but that's the truth.
Q As a result of that process, the company no longer employed regional property managers, is that right?
A I don't remember specifically who was employed, who was not employed, but I don't remember any regional property managers working for us at that time. We were shuttering our entire management company. If you don't have the management company, you don't need the employees.
As the tax return shows, we were losing money on an annual basis. The investors did not want to renew our contracts.
Q So was the decision to no longer have any property management employees, to outsource everything to an outside manager for all of the properties?
A As the lenders allowed it we were outsourcing all of the properties to an outside company and we were going to maintain an asset management





staff to watch over the third-party.
Q As a company was APM, did it keep for itself the management of any of the properties, any of the previous properties or was it all third-party?
A The plan was to turn them all over. There were a few properties that we had to get lender approval on and some of the lenders took -- you know, government agencies, some of those lenders take a very, very, very long time to approve things like that. And so they all didn't go at once. It was a process.
Q Did all of the properties eventually get turned over to outside management or did some not make it?
A Some didn't make it. You have to remember that running a management company to manage three properties is -- financially is a complete and total disaster, so we would have never said, let's manage two properties. I mean you have to buy Yardi. Yardi is a $100,000 program. Yardi by itself would eat up 100 percent of the management fee.
Q So it would have to be like a critical mass of a number of properties for it to make financial





sense?
A I assume it's like a law firm where if you have one attorney, you have to buy insurance and you have to buy the books and the computers and all of that other stuff. You know, it's hard to do it based on that. But if you have ten attorneys all sharing the cost of that insurance and the books and things like that, then it makes more financial sense. But you never open a law firm with one guy because you couldn't make it. Same thing with property management.
Q How many properties would you need for it to be feasible?
A It all depends on how the properties are structured, how large the companies are and what the management fee is. I mean there's a million variables in that question.
Q All right. So going back to Sharon Zinser, you said she was involved I think you said it was at a low level?
A I said she was involved -- I think I said she was involved in various levels.
Sharon did not want to turn over property management. She was -- you know, she didn't





like the idea at all and neither of us -- none of us did.
Again, I testified to this and I'll say it 20 times. You're talking about a family of people that worked together for a very long time that were all friends and colleagues and we were forced to dismantle it and it was not a pleasant time in any of our careers.
Q Was Sharon one of the people who decided to make the decision to end Michelle Brady's employment?
A I don't remember who decided what, when. Again, it was not a shining part of my career and it's nothing that I relive on a daily basis. You know, a lot of this stuff is the first time I've seen it and I've tried to sort of put it out of my memory the best I can.
Imagine you don't have the money to make payroll, right, and you have to let people find jobs for people that you've worked with for ten years. Your own law firm, I'm sure there's people in that law firm you love and are members of your community and you suddenly have to say, hey, look, this just isn't going to work out. We haven't been successful. We're

being forced to shutter the business. And you can't afford to pay anything and so I don't revel in that memory. I apologize.
Q That's all right.
You said this was a long process that took place over '16 and '17?
A It felt like it was a long process because the bad times always feel a lot longer than the good times.
Q Yeah.
When did it become apparent that you were going to have to make this change in business model? Was it in '16?
A I don't remember the specific date.
Q When did you determine that you were going to have to let go of employees? Was that in '16?
A When we were forced to start handing over management. I mean, again, if you're not managing properties, there's no reason to have employees.
The entire business model was changing. We were going to have third-party management manage all of the real estate. Pepper Pike Capital Partners was going to oversee or asset manage that third-party. So was the





negotiation between the investors and Pepper Pike Capital Partners.
Q So if the third-party management contracts were entered in February, March time frame, would that be about the same time that the company determined that it no longer needed regional property managers?
A Again, I've answered the question. You know, as properties were turned over to third-party management, you know, the employees weren't needed anymore. They couldn't be afforded. They couldn't be paid for.
And, you know, you can't -- it's like running a McDonalds with zero customers. You can't staff the front desk or the checkout line. If you don't have customers to pay the bills, then you can't have a staff to work the business.
Q You said that not all of the properties made it to third-party management because there were some delays in approvals, right?
A Correct.
Q But the plan was to do third-party for everything?
A That was my plan, yes.





Q And that was the plan at the time that you actually signed the contracts for the properties that were outsourced, correct?
A Yeah. In fact, the third-party management company that we signed with actually started helping with the properties that they were going to take over in the future, so they were -- you know, while they didn't have a contract for it, they were still helping manage, helping direct, do that type of work.
Q Do you know -- at the end of 2016, do you know how many properties the company had under management?
A I don't remember. I'm sure there's a document you have that tells you that.
Q I wish there was.
A I don't remember.
Q Okay. Do you know how many regional property managers the company had as employees at the end of 2016?
A Less than five.
Q Was Sabrina Draplin one of them?
A Sabrina worked here at one point, yes.
Q Was she a regional property manager?
A I don't remember. She was either a regional





property manager or property manager.
Q Do you know when she was let go?
A I don't.
Q Do you know if she was let go as a result of this change in business model?
A I don't remember.
Q At the time the company signed the third-party management contracts, once those were signed, how many regional property managers were there?
A Again, it was a process, so it wasn't like we went from X to Y. It was a process.
So the third-party management company took over the majority of the portfolio in various stages and as they took over properties, we didn't need or we could not afford to maintain the properties, going back to my McDonalds example.
Q So if the contracts were signed end of February, start of March, the contracts were signed then, in March how many property managers were left after those contracts were signed?
A I don't remember either of those. My guess is -- I would just be guessing.
At that point, again, a third-party

management company was doing the majority of the day-to-day oversight of the properties and were taking the fee, which the companies were already losing money. And with them taking the vast majority of that fee, there wasn't money to maintain.
Q If the documents showed that the company fired Michelle on June 15, 2017, can you tell me how many regional property managers there would have been at that time besides her?
A I don't think Michelle was fired, first of all, so I would --
Q Well, let's call it termination then. Can we call it termination? Let go? How do you want to call it?
A When she left.
Q Okay.
A So what was the question?
Q So at the time she left, if she left on June 15, 2017, how many regional property managers were there besides her?
A My guess is she was the last one.
Q Do you know who the second to last one was?
A No.
Q Do you know when the second to last one would





have been let go?
A If I'm guessing, you had mentioned the dates that those contracts were signed. And when those contracts were signed, we no longer needed regional managers and they were let go at that time frame.
Q Do you believe all of the other regionals were let go at or within a few days of the date of signature of the contract?
A I don't remember, but it would make business sense.
Q Camelot East and Georgetown, were those properties that the company managed after the third-party management company's contracts were signed?
A I believe Georgetown was managed by some company out of West Virginia. I don't remember the name of it. Yeah. Georgetown was managed by -- the investor picked that management company. It was a group that did a bunch of mobile homes. But no, we didn't manage Georgetown then.
And then Camelot East was an agency loan. And agency, you know, the government agencies were taking forever to approve that kind of





stuff, so I don't know when Camelot was turned over.
Q Do you know the last time that Camelot East or Georgetown had an APM regional property manager?
A I do not.
Q Did the company consider moving Michelle to a different position before letting her go?
A Again, we didn't let her go. But I assume that HR would have had that conversation.
Q Should they have?
A Again, we had -- I think the form you showed me, we had -- APM had 220 employees and we went down to 22, if I remember those forms correctly. So there weren't a lot of openings at that time.
Q Do you know if she had asked whether she could be placed in a different position?
A I don't know. But I also don't believe so.
Q Did you write or approve the letter the company gave Michelle informing her that her employment with APM was over?
A No.
Q Have you seen it before?
A I may have. I don't remember. You need to





remember, this was not a fun place to work in 2017.
Q Are you familiar with a property that was known as Kenwood Gardens?
A Yes.
Q Was that also known as the Flats at Douglas?
A Yes.
Q I'm going to list a couple of properties. Tell me if it sounds right that these were properties that the company hired a third-party to manage.
A Well, the Flats of Douglas and Spice Street both were sold in 2017, but yes, they had third-party management.
Q Okay. So did the company retain, hire a third-party management company to manage these properties, Spice Tree Apartments?
A I believe that they did, but again, it was sold.
Q Okay. Fox and Hound?
A Fox and Hound definitely had third-party management.
Q Mount Prospect Green?
A I believe so, but I'm not 100 percent certain. Yeah. I'm almost 100 percent certain.

Q Crossings at Canton?
A Yes.
Q And I think we already said Flats at Douglas?
A Yeah.
Q How did the company find the third-party manager?
A The investors of the properties found them.
Q Were you involved in the negotiation?
A Negotiation of what?
Q Negotiating the contracts with the third-party manager.
A To a degree. I mean that's not -- I don't think those things are formally negotiated. They're more of a contract that gets shoved down your throat.
Q When was APM's first contact with a third-party manager? How long was the process before the contract was signed I mean?
A Again, I mean that was not a great period in my life. It feels like it was ten years, but it was definitely shorter than that, but I don't remember specifically.
Q The relationship with the third-party manager did not last very long, is that right? A couple months?





A I think it was longer than that. It was less than a year.
Q Did the company decide -- did APM or Pepper Pike Capital decide to stop using the third-party manager or vice-versa?
A Again, APM and Pepper Pike Capital wouldn't have the right to hire or fire anybody. It's never owned real estate. We've gone over that 20 times.
Q That's not what I'm saying.
A Well, how would -- how would APM or Pepper Pike Capital Partners have the ability to fire a management company if it has no ownership in the property?
Q They signed -- APM signed a sub-management agreement with the third-party manager, right? That's how it worked?
A I don't remember that. I just remember that there's a third-party management contract and they took over management.
Q Okay. So was it APM who decided or was it the third-party manager who decided that that -- that the contracting relationship should stop?
A Again, APM had no ownership in the real estate, so it wouldn't get the right to hire or fire





anybody. It's like me walking into McDonalds and firing the guy behind the counter.
Q I think we're talking past each other. Let's do this.
MR. BESSER: Alex, could you send Exhibits 14 and 15?
THE VIDEOGRAPHER: Yes. Give me one second.
MR. HYMAN: Matt, while they're being sent, let's take a two-minute bathroom break.
MR. BESSER: Yep. Yep.
(Recess taken.)
Q I think you have two exhibits there. One is 14. One is 15.
Have you seen Exhibit 14 before?
A If I have, I don't remember it.
Q Was the company managing a property called North Point in 2017?
A It was.
Q And then do you recall that it terminated its management in 2017?
A I do.
Q And does that March 13 date on the top of the first page sound about right to you?





A I don't remember the specific date, but that's the date of this document.
Q Exhibit 15 is a series of sub-management agreements produced by your counsel to us. Are these familiar to you? And if you need, you can look to page 28, the signature page.
MR. HYMAN: That's Bates 28. It's not page 28 of the pdf. It's actually page -- the number at the bottom. It's page 26 of the actual document.
A Yep. I see it.
Q Do you remember signing this document?
A I don't remember signing it, but that appears to be my signature.
Q If you look at Bates 3, the first page of the first agreement.
A Yep.
Q These are the contracts by which the company retained a third-party manager, is that correct?
A This one looks like it's for Whitebridge Associates.
Q Do you see the paragraph before that it lists APM Management, LLC as the manager?
A Yes.

Q Okay. So the sub-management agreement is made 21 February by and between Oakland Management Corp and APM Management?
A Correct.
Q So I just want to establish, is this -- are these the contracts by which APM retained the third-party manager that you discussed?
A Again, APM didn't own it, so we just assigned the management.
Q Understood.
A It appears we --
Q Understood. But you hired or you retained a third-party manager through a sub-management agreement, correct?
A Certainly not by our choice, but yes.
Q Okay. And do you see halfway down in section 1.2 --
A Yes.
Q -- this is a contract for Fox and Hound Apartments, correct?
A Yes.
Q And then if you go to Bates 34, also dated February 21, '17 --
A Yep.
Q -- and then section 1.2 identifies the premises





as Kenwood Gardens.
Do you see that?
A Yes.
Q So this is the sub-management agreement for hiring the third-party to take over Kenwood?
A Yes.
Q And then Bates 65, March 1, 2017?
A All right. I see it.
Q Section 1.2 identifies this as being for Mount Prospect Gardens, is that right?
A Yeah. It's actually Mount Prospect Greens, I believe, but.
Q And then I think last is page 96, March 1, 2017?
A These are all different dates, right?
Q Well, I think we saw two February 17 and two March 1. You're welcome to look.
A All right. I'm there.
Q And 1.2 reflects that this is the management agreement for Spice Tree Apartments?
A Yes.
Q So having looked at these contracts, is that -- can we agree that these are the dates on these contracts when the third-party manager was sent to take over?





A It's the date of the contract. They had taken over in various phases. You know, it wasn't like a light switch that you sign the contract that day and the property is taken over. It was a process that happened between 2016 and '17.
Q Had the third-party manager taken over -- was it actually running, managing the properties in 2016 before these contracts were signed?
A That's the definition of managing. I mean they were definitely on-site. They were definitely, as I testified earlier, directing and, you know, managing.
And, you know, we were the manager. APM was the manager of record. But it was a process of, you know, imagine turning over five, six properties all in a couple month period and say here, go at it, and like a light switch.
It's not -- it's like the President, right. You can't be the President on January 20 and not be the president on January 21. You have to have a transition period. You know, there was definitely transition periods.





Q All right. So if I understand right, the transition period began at some point in '16?
A The discussions began in '16. We started touring properties. I don't remember the specific dates, but, you know, it definitely happened in '16 and '17. I can't remember the specific date.
Q Do you know, was the management contract with the third-party manager signed for Crossings of Canton in 2017?
A I don't remember. I don't think we -- I'm not -- I'm trying to think of when they bought it. I think they bought it in '17. So, yeah. I don't even know when they bought it, to be honest with you.
Q All right. At some point I think we established the relationship identified in these contracts, Exhibit 15, ended?
A It did.
Q Which side made the decision that it should end? Was it APM? Was it the investors? Was it the third-party manager?
A I think it was a combination of everyone.
Q Was there a breakdown of the relationship?
A I think the investors thought that the new

management company would have better success in leasing. I think the new management company thought that the investors were going to invest more money into the property than they were going to. And APM was sort of stuck in the middle.
Q Does it sound right that the relationship ended around the fall of '17 or would it have been earlier or do you know?
A Like I said, it was definitely less than a year. I think I testified to that earlier.
Q At some point APM or Pepper Pike Capital determined that it needed to hire new property managers and regional property managers, correct?
A Pepper Pike Staffing I believe hired regionals.
Q And that would have been in 2017?
A '17 or '18. I don't remember.
Q Why did Pepper Pike Staffing start looking for new property managers or regional property managers?
A The investors asked us to start looking and we did that.
Q About when was that?
A Sometime in '17 or '18.





Q If documents showed a regional property manager being hired by Defendants in September or October, would that refresh your memory?
A Maybe. But I can -- I would doubt anyone was hired in that time frame.
Q After the signing of these contracts on Exhibit 15, and separate from those properties, did Defendants stop managing any other properties through July when it sold or when Country Club was sold? Do you understand my question?
A No.
Q In between when the contracts that are Exhibit 15 were signed and July of 2017, did Defendants stop managing any other properties?
A I think you brought up Georgetown and I don't know when that one left. They left about the same time frame.
You know, the business plan was to stop managing all of them and we were in the process of shutting down. So, you know, I'm sure that there were other management companies that other investors chose such as, you know, the company that took over Georgetown, the company that took over Wildwood. There were other





properties that had other property managers. The Oakland Group which you showed. APM was dismantled during 2016, '17.
Q Do you think Georgetown was given to a third-party manager between March and July of 2017?
A I don't remember. Again, what I testified is I don't remember exactly when Georgetown and the other properties went out, but the plan was by the end of 2017, that APM just basically wouldn't exist.
Q You mentioned Wildwood. Where was that property?
A That was before this. That one went out probably in 2015. Maybe -- yeah. '15 would be my guess. I was just thinking of properties that were taken away from APM.
Q Okay. The properties identified in Exhibit 15; Fox and Hound, Kenwood Gardens, Mount Prospect and Spice Tree, for those properties before Oakwood, Oakland came in, did they have a regional property manager, an APM regional property manager?
A I don't remember specifically who managed what.
Q Do you think they would have had a regional





property manager at that time?
A Some of them did. Some of them didn't. You know, answer directly to the corporate office.
Q Who would have been responsible for overseeing the regional property managers at the time? Who would they report to?
A The executive team. I mean, like I said earlier, I talked to Michelle Brady probably once a week.
Q Would Stephanie Sturzinger be one of the people that the regional property managers reported to at that time?
A Sure.
Q Can you name for me any regional property managers who were terminated or whose employment with APM ended in 2017?
A Sitting here, I don't remember. You had earlier read off a list of regional managers and I think I testified that by the end of '17 or by, you know, June of '17, all of the regional managers were, you know, were not here anymore. So I think we covered most of that. You had a list of them.
Q As of March 1, 2017, the date on the last two of these management contracts in Exhibit 15,

how many properties was APM still managing at that time, so let's say on March 2, 2017?
A I don't know the exact number. But, again, you know, the business plan was that they were all to go as soon as lenders approved it so it was an orderly process, you know, which that changed I don't want to say on a day by day basis, but at least on a week by week basis as we filtered through that process.
So, you know, March 2, it could have been completely different March 15. You know, that was 2017. I don't remember the specific dates each of the properties went. If you were to ask me if those four went within a 30-day period, I would have said no, but the document shows that it does.
Again, you keep on forgetting that, you know, this 12-month period of APM was not a good time. I mean we were dismantling a company of people that, you know, were family. You know, I loved a lot of these people and we had to let them go and it was just not a pleasant time for anybody, even me.
You know, we helped everybody the best we could. We got them interviews with the new





company. We did everything we could.
A lot of people, you know, your document showed -- I don't know if it's accurate or not, but your document showed, you know, going to that time frame we had 220 employees and going out of it we had 22, so roughly 198 people, you know, were gone. And it was not a pleasant, happy experience. This place was a complete and total shit show and it was no fun going to work every day.
Q What document are you referring to?
A You had that document that had the employees listed. Remember you said APM had 120 or 220 employees and then --
Q Just so you know, that's not my document. Just so you know, that's not my document. I got it from you.
A I didn't produce that document.
Q Well, I got it from you. That's funny. I got it from the Defendant, just so you know.
A Well, I'm just saying, it's a document that you gave me this morning showed that we downsized from 220 down to 22 people. And I'm testifying, and I'll testify with great vigor, that that period in my life sucked.





Q You said that the company tried to get positions for some of its former employees with the new -- with the company that took over?
A Yeah. We tried to have every employee interview with the company that took over. A lot of -- I shouldn't say a lot. Some of them just didn't want to.
I mean, you know, again, as much as it sucked for me, it sucked for them too. It just wasn't a great time. So some people, you know, just didn't want to do that. They wanted to go on their own. Some people just took some time off. They took a gap year.
You know, there was -- different people did different things. And there was 198 of them. So it wasn't like there was one set thing everybody did. It was as different as 198 people are, that's how many different paths they took.
Q Did the company try to get an interview or a job for Michelle Brady?
A I don't remember specifically, but I can tell you that the company policy was that we offered it to everyone. And I don't remember specifically, but I'll tell you that the





company policy was we offered it to everyone, so I would assume that we offered it to her. And a lot of people accepted and a lot of people just said they weren't interested.
Q Offer help getting a new job you mean?
A Offered interviews with the management companies that were taking over their properties. You know, a lot of people --
Q You said you loved a lot of these employees. Do you include Michelle in this?
A I was very good friends with Michelle. I liked Michelle.
Michelle owned a bunch of goats and my wife is a animal lover. My grandmother started the Geauga Humane Society. My wife owns a ton of animals. My wife love goats. In fact, we went to a goat farm four years ago. So I mean, yeah. I mean I don't know. You know, I understand, you know, things happen, but we had goats in common.
Q When the Oakland contracts were signed, the company still had management over Spring Holly, Woodland, Hawthorne Hill and Country Club, correct?
A Country Club sold like very --

Q In July?
A In July. So, yeah. Country Club was under contract when those things happened. Spring Hollow was being marketed. And then Hawthorne Hills and Woodland were financed with HUD and HUD needed to approve it.
And then during that period there was a massive fire at Woodland and just shut everything down with HUD. You know, there was two buildings that burned down. A couple people died. It was miserable. And HUD was dealing with that and so it was just -- it was not a good situation up there.
Q When was the fire?
A I don't remember the specific date, but it was in that time frame.
Q So after the contract, APM still managed those four properties for some period of time?
A Well, again, like I said, Country Club was under contract. Spring Hollow was going to get marketed, so Oakland kind of wound up going there and managing for two months and then basically be thrown out. We were waiting for HUD approval and then the Woodlands fire came and killed that kid, so.





Q What about Hawthorne Hills?
A Hawthorne Hills was the two that I talked about. So you had Country Club sold. Spring Hollow marketing. Hawthorne Hills and Woodlands were under a mortgage with HUD and they're half a mile away from each other, a mile apart.
Q Yes.
A And when it burned down, it just shut HUD down. HUD wanted answers about why the fire and a kid died and it was terrible. Some guy from New York drove to Toledo, woke up in the middle of the night, went to the gas station, got a bucket of gasoline, dumped it on his girlfriend and her eight-year-old son and lit them all on fire.
Q That is awful.
After the Oakland contract, did APM still manage Camelot East for some period of time?
A I don't remember. Again, they were all planned to go. That contract was with Core Properties out of Columbus who was interviewing a group out of Indianapolis. What the heck was that group. It wasn't Buckingham. It was a different group out of Indianapolis. They came





down and toured it a few times. I don't remember exactly when it was. But then Core wanted to start a management company of their own, so that investor was sort of waffling back and forth what they were going to do.
I actually believe that that would have been one of the first ones to go because of the way that the investor was acting. We literally showed them around three times.
Q If the Defendants provided an affidavit saying that the company decided to bring Camelot East and Georgetown in-house, is that not accurate?
A Again, Georgetown was in the process of being turned over to -- I don't remember what the heck the name of that company was out of West Virginia. And Camelot East was being shopped on a -- to three different management companies. So Oakland wasn't going to go down there and manage it.
So is what you read inaccurate, no. But it's 2 percent of the story.
Q Okay. You determined to bring it in-house for a short period of time in anticipation of it being managed by someone else soon thereafter?
A You can't put words in my mouth. I'm telling





you what happened during that time period.
You know, the whole business plan of APM was to go away from any type of property management. The investors were picking their management companies and that's what it was. I mean, you know, so you can --
Q When did the company start managing the Barrington property in Westlake?
A I don't know. Probably similar or a little bit after the rest of them.
Q Would it have been in June 2017 that the company started managing Barrington?
A It may have been that's the date of the contract. But, again, they were doing -- they were hiring. They were at the property. They were doing that stuff well ahead of time.
You know, Oakland was excited to grow their business, so they were out their doing their thing. The investors were excited to get rid of APM, so they were out there doing their thing.
Q I don't think I've seen a contract outsourcing Barrington. Are you saying Barrington was given to a third-party manager?
A Barrington might have sold. Barrington is

definitely managed by a different group. I mean APM does not manage Barrington today, but I'm almost certain --
Q Here is why I'm asking is because there was an affidavit submitted by the Defendants saying that the company acquired -- and I realize I'm not talking about ownership of the real estate -- saying that the company acquired Barrington on June 9, 2017.
So I guess my question is did APM or Pepper Pike start managing Barrington, managing Barrington around that time?
A I don't remember. I can tell you that, you know, different companies would hire APM to do due diligence on properties and takeovers on properties that are relatively difficult, because you have to build a Yardi system. You have to do a lease audit. It's a pain in the butt, so lease companies don't want to do it. So it's entirely possible the investor might have hired us to do it.
Q What's your relationship to Barrington, LLC?
A My personal, none.
Q You signed the mortgage for the Barrington property on behalf of Barrington, LLC. Do you





remember that?
A Yeah. Probably as an authorized signature, which was commonplace with the attorneys. They would -- because I was here in Cleveland. So what's the title under that mortgage, authorized signature.
Q So you agree you signed the mortgage?
A I don't know. I haven't seen that document in four years.
Q Do you have any ownership, do you or any of your trusts have any ownership in Barrington, LLC?
A If they did, it was through my personal trust and it was less than 1 percent. It was probably a little tiny, tiny percent.
Q The properties known as Plymouth, Heritage, Farmington Hills, Warren Harbor and Residences on 56, did APM or Pepper Pike manage those in 2017?
A What were the properties again?
Q Plymouth, Heritage, Farmington Hills, Warren Harbor and Residences on 56.
A We may have done one of them, but not the other three, and that would have been Pepper Pike Management.





Q Do you know which one it would have managed in 2017?
A I know it didn't do Plymouth and I know it didn't do Warren Harbor, so it either did one or two of the other two that you mentioned.
Q Would they have been managing them in summer or did that start later in the year?
A In '17?
Q Yes.
A I don't remember 100 percent. I believe, and I could be wrong, but I believe that Oakland managed Farmington for a while and then the cottages was -- there was a group out of Connecticut and then Pepper Pike Management took over after that. Pinnacle -- no. It started with a P. I don't remember what it was.
Q Do you have any knowledge of how APM or Pepper Pike or the subsidiaries went about hiring new regional managers or property managers in 2017?
A Yeah. It was hard because the multi-family field, I mean literally there were 20 jobs and one employee, so it was a bidding process to get employees. So, you know, they recruited. They ran ads. They were trying to get anybody





that was willing to come to work.
It's still that way today. I mean you can't hire people in the multi-family industry. It's near impossible.
Q Did you authorize APM or Pepper Pike to start recruiting for property managers, regional property managers, in 2017?
A I don't remember. But I mean, I wouldn't specifically authorize that. That wouldn't fall under my day-to-day.
Q Who would be the person in charge of that hiring process, the recruiting process; Stephanie?
A No. It would be HR.
Q Would Stephanie Sturzinger have been involved in interviewing or hiring decisions for regional property managers or property managers in '17?
A Maybe some, but not all. I mean she, again, did some of that and didn't do some of that and it was more of a team effort. You have to remember that in '17 we just dismantled the company, so we were all sort of doing things outside of our normal duty because there wasn't money to hire specific people to do specific

things. So we just -- I used to come in on Saturday and wash dishes. That wasn't in my job description, but we needed it done and we didn't have somebody to do it, so we were just doing what needed to be done.
Q If there was a document produced by Defendants that suggested the company interviewed Mara Judd for a regional property manager position on September 4, 2017, would you have any knowledge about that date one way or the other?
A Not the date, no. I mean Mara was a property manager that worked for us a long time ago. And I don't remember her ever being a regional manager, but.
Q Well, the documents produced to us by Defendants showed that the company hired her as a regional property manager in fall of 2017.
Were you aware of that?
A I don't remember that. I remember Mara lived in like Cincinnati someplace and worked for us a while ago as a property manager. She was a great lady. I mean she was younger. She was learning. She was getting her feet wet. She was -- but yeah, she lived down in like





Cincinnati.
Q But you didn't know that the company hired her as a regional property manager in fall of '17?
A I'm sure at the time I knew. I don't remember that.
Q You didn't make the decision to hire her? You didn't interview her?
A No. I mean we -- again, in that time frame it was near impossible to hire employees. You know, there were open jobs everywhere in the multi-family world. And I believe Mara worked for us in the past, so we were probably just trying to convince people that worked for us to come back and fill roles.
Q Do you know who Kelly Keeton is?
A Who?
Q Keeton, K E E T O N.
A That name doesn't sound familiar.
Q You don't recall that the company hired her as a regional property manager in October of '17?
A Kelly Keeton?
Q Yes.
A No. I don't remember that name.
Q At the end of 2017, how many regional property managers did the company have, did Defendants





have?
A I don't know. At specifically APM, my guess is none.
Q What about Pepper Pike or the subsidiaries?
A Staffing may have had one. I don't remember what Staffing had. And I wouldn't call them a subsidiary, but they were different companies.
Q Do you know whether -- you wouldn't call Pepper Pike Staffing a subsidiary of Pepper Pike Capital?
A Of Capital, yeah, but not APM. APM was a failed business that basically, you know -- I don't know.
Q Do you know whether APM or Pepper Pike or the subsidiaries posted for a property manager job in the Toledo area in June 2017?
A I wouldn't know. I can't tell you during that time frame that -- because it literally was so hard to hire employees, that Oakland and I were running ads trying to help each other.
I mean understand that there was a bidding process for employees at this point, so it wasn't like there were ten interviews for every job. The first person that walked in the door that was capable was the person that you





almost had to hire because there just weren't -- it's the same way today. I mean there's just -- you can't hire people in the multi-family world because there's just not enough out there.
Q Oakland did not take over any of the Toledo properties, correct?
A I don't remember if Oakland took over Country Club or not. Again, Country Club got sold right away. Spring Hollow was being marketed for sale and then we had to the fire at the other two. So Oakland may have taken over for the buyer of Country Club. I just don't remember.
Q You said you wouldn't know whether or not APM posted for a Toledo area property manager job in June of '17?
A That's my testimony.
Q Is there any reason why Michelle Brady would not have been qualified to do a property manager position for APM in the Toledo area in June of '17?
A No. Other than a property manager has to be on-site eight, nine hours a day, five days a week. She lived in Cleveland and the job was

in Toledo. You know, she certainly -- you know, I mean if you go back in June of '17, and I wish you could do it somehow, you would find 8,000 ads of property management jobs in Ohio. It just was that hard to hire people.
Q Is there any reason why if she lived in Cleveland why Michelle couldn't have done a property manager job for APM or Pepper Pike in the Cleveland area in May, June 2017?
A Other than we did not manage any properties in the Cleveland area.
Q Is that a no?
A We had no -- there was no job in Cleveland. I mean we would have had to hire her to manage a property that we didn't have a management contract on.
Q You're not aware that Defendants hired a property manager for a property in Westlake in late May or early June of 2017?
A I don't remember that at all.
MR. BESSER: The last two documents, Alex, are Exhibits 18 and 19.
MR. HYMAN: All right. I've got those. And, Paul, they're on their way.
Q Have you seen Exhibit 18 before?





A They haven't arrived yet.
Q Okay.
A I have not seen this printout before.
Q This is a printout for an Indeed.com job posting. Do you see it says, "Property manager. APM Management. Toledo, Ohio." And the date in the upper left corner is June 7, 2017.
A I see that.
Q Do you have any basis to dispute the authenticity of this document, any facts?
A I have no facts.
Q And then the same questions for Exhibit 19. First, have you seen it before?
A I have not seen it. It looks like the same document.
Q It's got a different date in the upper left corner.
Any facts to dispute the authenticity of that?
A No. I mean they look like they're the exact same document, just printed out on two different dates. One was printed out on June 7 and one was printed out on June 19.
Q Right. So according to these documents --





well, let's back up.
If you look on the second page of Exhibit 18 towards the bottom, right above where it says, "Apply now", it says, "One day ago."
Do you see that?
A Yeah.
Q Okay. And then on 19 in the same spot it says, "14 days ago."
A Yeah. That makes sense if you look at the dates. So it was the 7th and the 19th. That's about 14 days. Makes sense.
Q So that would -- from 18 to 19 it appears that there was a posted APM property manager position in Toledo at least between these dates, the 7th and 19th, correct?
A It appears that way.
Q And as far as you know, the company did not offer that position to Michelle Brady, correct?
A Michelle Brady, I wish she would have answered this ad. I would have hired her in a minute.
Q Well, as of June 7 she was still an employee, correct?
A I don't know. What was the date?
Q If the letter ending her employment was dated





June 15 and the Defendants Answer admits that it informed her on June 15 of the end of her employment, then can we agree that Michelle was still an employee on June 7?
A You know, I do actually remember that we talked to Michelle about this and she didn't want to drive to Toledo every day.
Q When did you talk to Michelle about this job?
A I don't remember. I remember it was a short-term deal. She didn't want to drive every day. And that -- I don't blame her. I mean would you want to commute two hours each way to work? I mean it's four hours a day in a car. You know, I don't blame her at all. But yeah. I mean it would have been a hell of a commute for a property manager job.
Q Were you involved in this conversation with Michelle?
A I don't remember. I remember hearing about it. Like I said, I talked to Michelle. And if she was on the phone right now, she would tell you I did. I talked to her about her goats and talked about that kind of stuff, but, you know, I don't remember every conversation I had with employees back in 2017.

Q Well, you said you remember that we talked to her about this position, so I was trying to --
A We as the royal we as APM.
Q Do you know who at APM it was?
A No. I don't remember that.
Q She would have reported to Stephanie Sturzinger at the time, right?
A You keep going back to this very formal chain of command where Stephanie, you know, was running around like a chicken with her head cut off trying to do all of these things. We were in the corporate office more, so my guess is it probably wasn't Stephanie. It was probably an HR person, because Stephanie was dealing with transferring 5,000 apartments over to a management company. So inferring that she would have the time, energy or effort to do all of that stuff, she would have to be super woman.
Q From whom did you learn that the company talked to Michelle about this vacant job?
A I just remember hearing about this four-hour commute and me shaking my head saying -- because I have a friend in California who has a one-hour commute and he calls me all of the





time and bitches about it. And I'm like, if he's bitching about a one-hour commute in California, nobody's doing a two-hour commute in Cleveland. And that's one way. That's four hours.
Q You're not sure who you heard that from?
A This is 2017. You can't expect me to remember that. And no, I don't remember.
Q Was it before or after the end of her employment?
A I don't remember. I mean everybody liked Michelle, so we were having conversations, but I don't remember the specific time frame. You know, that was almost four years ago.
Q So you said that you wished she had applied for the job. You wished she had applied for it, you said that?
A That was probably a flippant conversation. I wish it wasn't snowing out.
Q Me too.
Other than the distance, no reason she couldn't have had that job if she had applied for it, correct, that you're aware of?
A I don't recall. I mean, again, I'm remembering conversations from four years ago. Does she





still have her goats?
Q Am I correct that you're not aware of any e-mails reflecting discussing that job with Michelle?
A I don't think I was copied on any e-mails.
MR. BESSER: I think we're wrapped up. Let's just take a two-minute break so I can verify. Okay, Jon?
MR. HYMAN: Yeah. I'm sorry. Yeah. That's fine.
(Recess taken.)
Q After Michelle Brady's employment with the company ended, who performed the duties of regional property manager for Hawthorne Hills and Woodlands and Spring Hollow? Would that be the Director of Operations?
A I don't think there really was a regional manager. The third-party management company that was going to take over before the fire, they were, again, there. You know, there truly wasn't a regional manager. If someone, you know, was going to be defined in that role and had to be defined, it would be Stephanie, but I don't think that's a fair characterization.
Q I'm not saying labels. I'm saying the job





duties. Was it Stephanie, the Director of Operations, who performed the duties of that job after Michelle's employment ended?
A Again, Stephanie was running around like a chicken with her head cut off. She was trying to keep up. But those were supposed to be going away and the duties of a regional manager, you know, probably just weren't getting done. And if it was getting done, it would be Stephanie, but I think the majority of that duty just wasn't getting done at the time.
MR. BESSER: I don't have anything else further for you right now. I appreciate your time and your patience. And Jon will advise you of your rights from here.
MR. HYMAN: Paul, you have the right to read your transcript after it's prepared. I would advise you to avail yourself of that right.
THE WITNESS: Yes.
MR. HYMAN: We'll read.
MR. BESSER: And, Aimee, I'll order, please.
MR. HYMAN: I'll take a copy as well, Aimee.

THE STATE OF OHIO, ) SS:
COUNTY OF CUYAHOGA. )

I, Aimee N. Szinte, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that PAUL E. KIEBLER, IV, was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to stenotypy in the presence of said witness, afterwards transcribed on a computer/printer, and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified, that I am not a relative, counsel or attorney of either party, or otherwise interested in the events of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 3rd day of December, 2020.



Aimee N. Szinte, Notary Public
within and for the State of Ohio
My Commission expires July 15, 2023.





THE STATE OF OHIO ) SS:
COUNTY OF CUYAHOGA )

Before me, a Notary Public in and for said state and county, personally appeared the above-named PAUL E. KIEBLER, IV, who acknowledged that she/he did sign the foregoing transcript and that the same is a true and correct transcript of the testimony so given.

IN TESTIMONY WHEREOF, I have hereunto affixed my name and official seal at
this day of
, 2020.

Notary Public

My Commission Expires:



DEPOSITION ERRATA SHEET

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

Page No. Line No. Change to:

Reason for change:

SIGNATURE: DATE:

PAUL E. KIEBLER, IV